UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ALEXANDER CARAVALHO, ERIC CARTER,
SERGIO CASTILLO, DANIEL GREENSPAN,
AUSTIN GUEST, THOMAS HINTZE, JOSEPH
SHARKEY, EASTON SMITH, JENNIFER
WALLER,

**COMPLAINT AND DEMAND
FOR JURY TRIAL**

**Index No. 13 CV 4174 (PKC)**

Plaintiffs,

**ECF CASE**

-v-

THE CITY OF NEW YORK, NEW YORK CITY
POLICE DEPARTMENT ("NYPD") OFFICERS
FIRST NAME UNKNOWN ("FNU") LI, FNU
AHMED, FNU ABDEL-RAHIM, FNU
RODRIGUEZ, and JOHN and JANE DOE # 1 - 15
(The names being fictitious, as the true names and
shield numbers are not presently known), in their
individual and official capacities,

Defendants.

---

Plaintiffs, by their counsel, REBECCA HEINEGG, MEGHAN DUPUIS MAURUS, and

GIDEON ORION OLIVER, as and for their Complaint against Defendants, hereby allege as

follows:

## PRELIMINARY STATEMENT

1.      Plaintiffs bring this action for compensatory damages, punitive damages and

attorney's fees pursuant to 42 U.S.C. §1983 and 42 U.S.C. § 1988 for violations of their civil

rights, as secured by said statutes and the Constitution of the United States and the Constitution

and laws of the State of New York.

2.      On March 17, 2012, Plaintiffs participated in a First Amendment Assembly on the

six-month anniversary of Occupy Wall Street in Zuccotti Park, also known as Liberty Plaza.

Without lawful authority or justification, and acting pursuant to a policy, practice, and/or custom

of unlawfully limiting First Amendment assemblies and other lawful and constitutionally protected activities in Liberty Plaza, Defendants attacked the First Amendment Assembly and Plaintiffs, and arrested Plaintiffs. After over 24 hours in police custody, Plaintiffs were eventually released without charges.

## JURISDICTION AND VENUE

3.      This action is brought pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988, and the First, Fourth, and Fourteenth Amendments to the United States Constitution.

4.      This Court has subject matter jurisdiction over federal claims pursuant to 28 U.S.C. §§ 1331, 1343(a)(3-4).

5.      This Court has supplemental jurisdiction over Plaintiffs' claims against defendants under the Constitution and laws of the State of New York because they are so related to the within federal claims that they form part of the same case or controversy pursuant to 28 U.S.C. § 1367(a).

6.      Pursuant to New York State General Municipal Law § 50-e, Plaintiffs filed timely Notices of Claim with the New York City Comptroller. Plaintiffs' claims were not adjusted by the New York City Comptroller's Office within the period of time provided by statute.

7.      Venue is proper pursuant to 28 U.S.C. §1391(b) in that Plaintiffs' claims arose in the Southern District of New York.

## PARTIES

8.      Plaintiff ALEXANDER CARAVALHO is a Latino male, and at all times relevant to this action was a resident of New York State.

9.      Plaintiff ERIC CARTER is an African-American male, and at all times relevant to this action was a resident of New York State.

2

10.     Plaintiff SERGIO CASTILLO is a Latino male, and at all times relevant to this action was a resident of New York State.

11.     Plaintiff DANIEL GREENSPAN is a Caucasian male, and at all times relevant to this action was a resident of New York State.

12.     Plaintiff AUSTIN GUEST is a Caucasian male, and at all times relevant to this action was a resident of New York State.

13.     Plaintiff THOMAS HINTZE is a Caucasian male, and at all times relevant to this action was a resident of New York State.

14.     Plaintiff JOSEPH SHARKEY is a Caucasian male, and at all times relevant to this action was a resident of New York State.

15.     Plaintiff EASTON SMITH is a Caucasian male, and at all times relevant to this action was a resident of New York State.

16.     Plaintiff JENNIFER WALLER is a Caucasian female and at all times relevant to this action was a resident of New York State.

17.     Defendant THE CITY OF NEW YORK ("NYC" or "the City") is a municipal entity created and authorized under the laws of the State of New York, with general offices located at City Hall, New York, New York 10007.

18.     Defendant City is authorized by law to maintain the New York City Police Department ("NYPD"), which acts as its agent in the area of law enforcement, and defendant NYC is ultimately responsible for the NYPD and assumes the risks incidental to the maintenance of it and its employees.

19.     Defendants NYPD Officer First Name Unknown ("FNU") LI, NYPD Officer FNU AHMED, NYPD Officer FNU ABDEL-RAHIM, and NYPD Officer FNU RODRIGUEZ

were at all times herein officers, employees, and agents of the NYPD and who were personally involved in depriving plaintiffs of their rights and in implementing the unconstitutional policies, practices, customs and/or conduct complained of herein, as set forth more fully below. Defendants Li and Ahmed were personally involved in depriving at least Plaintiffs Carter, Hintze, and Waller of their rights. Defendant Abdel-Rahim was personally involved in depriving at least Plaintiff Waller of her rights. Defendant Rodriguez was personally involved in depriving at least Plaintiff Castillo of his rights. They are each being sued herein in their individual and official capacities.

20.     The individually named defendants "JOHN AND JANE DOES NOS. 1 THROUGH 15" are NYPD officers whose real names are not yet known to plaintiffs and who were personally involved in depriving plaintiffs of their rights and in implementing the unconstitutional policies, practices, customs and/or conduct complained of herein, as set forth more fully below.

21.     At all times hereinafter mentioned the defendants, either personally or through their employees, were acting under color of state law and/or in compliance with the official rules, regulations, laws, statutes, customs, usages and/or practices of the State or City of New York.

22.     Each and all of the acts of the defendants alleged herein were done by said defendants while acting within the scope of their employment by the defendant City.

23.     Each and all of the acts of the defendants alleged herein were done by said defendants while acting in furtherance of their employment by the defendant City.

24.     Defendants were each and all responsible, in whole and/or in part, for the planning for and/or creation, promulgation, implementation, and/or enforcement of the unconstitutional policies, practices and/or customs complained of herein, and/or condoned,

4

acquiesced in, adopted, and/or approved of the same, through their acts and/or failures to act, as set forth more fully below.

26.     At all times relevant herein, as set forth more fully below, defendants' actions and/or failures to act were malicious, intentional, knowing, and/or with a deliberate indifference to or a reckless regard for the natural and probable consequences of their acts and/or omissions.

26.     Each individual defendant is sued in her or his individual and official capacities.

**STATEMENT OF FACTS**

27.     At all times relevant herein in 2011 and 2012, plaintiffs were each participants in the Occupy Wall Street movement ("Occupy" or "OWS").

28.     On September 17, 2011, OWS began a 24-hour occupation of Zuccotti Park, a privately owned public space in lower Manhattan also known as Liberty Plaza.

29.     Zuccotti Park/Liberty Plaza is a Privately Owned Public Space that was created via a Special Permit issued by the New York City Planning Commission ("CPC") in 1986 pursuant to a provision of the New York City Zoning Resolution ("ZR" or "Zoning Resolution") in effect at that time.

30.     Under the Special Permit, Liberty Plaza is defined as a "permanent open park" for the "public benefit."

31.     Under the relevant provisions of the ZR, at least 50% of the sidewalk frontage of such a POPS must be free of obstruction, and circulation paths must connect to each of the street frontages. *See* ZR 37-721; 37-723; 37-726.

32.     Any proposed modifications to Liberty Plaza's design must first go through a City approval process. *See, e.g.,* ZR 37-62, et seq.; 37-38; 74-91.

33.     The CPC is precluded by statute from authorizing changes to such a POPS' physical design unless the changes will improve compliance with the applicable public accessibility standards. *See* ZR 37-625.

34.     Under the ZR, any prohibition on conduct in such a POPS must be clearly posted in writing. *See* ZR 37-73, *et seq.*

35.     By long-standing City practice, any such prohibitions must be reasonable.

36.     City law requires that "public plazas shall be accessible to the public at all times, except where the CPC has authorized a nighttime closing." *See* ZR 37-727.

37.      Between September 17, 2011 and November 15, 2011, the Occupy Wall Street movement physically occupied Liberty Plaza.

38.     On the early hours of November 15, 2011, the NYPD raided Liberty Plaza and forcefully cleared it, arresting scores of occupiers for offenses including trespassing.

39.     As a result of the NYPD's early morning raid on Liberty Plaza, there were mass arrests and property destruction. For example, the NYPD and/or other City agencies destroyed The People's Library, a collection of books and other materials belonging to OWS. Plaintiffs incorporate by reference the allegations contained in the Complaint in *Occupy Wall Street, et al. v. The City of New York, et al.*, 12-cv-04129 (GBD).

40.     Upon information and belief, no emergency situation existed in Liberty Plaza on November 15, 2011, when the NYPD conducted its early morning raid.

41.     Beginning on November 15, 2011, and for significant periods of time thereafter leading up to and including on March 17, 2012, the NYPD erected metal barricades around Liberty Plaza, and members of the public were subject to searches of their personal belongings by security personnel as a condition of entering Liberty Plaza.

42.     The NYPD also enacted and enforced arbitrary and shifting criteria determining who could enter the park, at what times they could enter, and what behavior they could engage in within Liberty Plaza.

43.     No CPC permission was sought or granted to change the physical layout of Liberty Plaza.

44.     No CPC permission was sought or granted to change the rules of conduct within Liberty Plaza.

45.     The shifting rules regarding entry and conduct enforced by Defendants to limit First Amendment and other protected activity within Liberty Plaza were not lawfully imposed.

46.     Those actions, as well as the actions taken against Plaintiffs complained of herein, violated not only the terms of the Special Permit and New York City Zoning Law, but also the United States Constitution and the constitution and laws of the State of New York.

47.     March 17, 2012 was St. Patrick's Day and the six month anniversary of Occupy Wall Street.

48.     On the evening of March 17, 2012, each plaintiff was lawfully present in Liberty Plaza.

49.     On the evening of March 17, 2012, defendant NYPD agents raided Liberty Plaza and effected mass arrests.

50.     Plaintiffs were each arrested by NYPD officers.

51.     Defendant NYPD agents then caused each Plaintiff to be transported to an NYPD precinct for mass arrest processing on a large bus.

52.     After mass arrest processing at the precinct, each Plaintiff was brought to 100 Centre Street.

53. After over 24 hours in custody, each Plaintiff was let out the back door of the courthouse building at 100 Centre Street without any charges.

## PLAINTIFF ALEXANDER CARAVALHO

54. On the evening of March 17, 2012, Mr. CARVALHO was lawfully present in Liberty Plaza with a group of others as a participant in the six month anniversary of Occupy Wall Street.

55. There, Mr. CARVALHO was approached by several NYPD officers, including several of the defendants, and violently placed under arrest.

56. Among other things, one of the defendants kicked Mr. CARVALHO in the ribs in the course of arresting him.

57. Mr. CARVALHO was taken to Bellevue Hospital, where x-rays were taken.

58. Mr. CARVALHO was eventually transported to the courthouse building at 100 Centre Street.

59. Approximately 28 hours after his arrest, Mr. CARVALHO was released out of the back door of 100 Centre Street without any paperwork.

60. Mr. CARVALHO was never charged with any offense in connection with his March 17, 2012 arrest.

61. As a result of this incident, Mr. CARVALHO suffered physical, psychological and emotional injuries, mental anguish, suffering, humiliation, embarrassment, and other damages.

## PLAINTIFF ERIC CARTER

62. On the evening of March 17, 2012, Mr. CARTER was lawfully present in Liberty Plaza as a participant in the six month anniversary of the Occupy Wall Street movement.

63.     Mr. CARTER was near the middle of the park, socializing with other demonstrators when, without warning, police stationed outside of the park entered the park.

64.     Mr. CARTER was standing in the vicinity when police entered the park. Police did not communicate a dispersal order to Mr. CARTER.

65.     Mr. CARTER witnessed police violently arrest demonstrators surrounding him. He saw police hit demonstrators with batons and kick them as they were being arrested.

66.     Four or five NYPD officer eventually approached Mr. CARTER. They did not give a dispersal order.

67.     One of the individual defendants grabbed and twisted Mr. CARTER's right arm.

68.     A second individual defendant kicked Mr. CARTER in the abdomen several times.

69.     A number of the individual defendants placed Mr. CARTER face down on the ground and handcuffed him with his hands behind his back.

70.     Mr. CARTER told the arresting police officers two or three times that his handcuffs were placed too tightly and were hurting him. He requested that the handcuffs be loosened. He received no response.

71.     Without asking Mr. CARTER to stand up or walk, a number of the individual defendants lifted Mr. CARTER entirely off the ground.  Police officers moved Mr. CARTER up the steps and dropped him on the sidewalk.

72.     Mr. CARTER was left lying on the sidewalk for approximately thirty minutes.

73.     Without asking Mr. CARTER to stand up, a number of the individual defendants again lifted Mr. CARTER entirely off the ground and moved him onto a bus. These individual defendants placed Mr. CARTER face down on the floor in the aisle of the bus.

74.     While being moved onto the bus Mr. CARTER repeatedly requested that his handcuffs be loosened. He received no response.

75.     Mr. CARTER was left lying face down in the aisle of the bus for approximately two hours. Police did not respond to Mr. CARTER's requests for assistance to be moved into an empty seat.

76.     Mr. CARTER was eventually transported to the Midtown South precinct. Mr. CARTER requested medical attention because his hands were tingling and he felt a deep pressure from the handcuffs. He received no medical attention.

77.     At the precinct, Mr. CARTER was placed in a holding cell, where his handcuffs were eventually removed. He remained in the holding cell for approximately twelve hours.

78.     Mr. CARTER was eventually transported to the courthouse building at 100 Centre Street.

79.     Approximately 28 hours after his arrest, Mr. CARTER was released out of the back door of 100 Centre Street without any paperwork.

80.     Mr. CARTER was never charged with any offense in connection with his March 17, 2012 arrest.

81.     Mr. CARTER's cell phone was lost or destroyed during the incident described above.

82.     As a result of this incident, Mr. CARTER suffered physical, psychological and emotional injuries, mental anguish, suffering, humiliation, embarrassment, and other damages.

### PLAINTIFF SERGIO CASTILLO

83.     On the evening of March 17, 2012, Mr. CASTILLO was lawfully present in Liberty Plaza as a participant in the six month anniversary of the Occupy Wall Street movement.

10

84.     Mr. CASTILLO eventually saw a large number of police officers enter the park, and saw police officers pushing demonstrators, taking their signs, and hitting demonstrators.

85.     The first contact Mr. CASTILLO had with the police was when one of the individual defendants hit him with a baton on his left shoulder.

86.     One of the individual defendants grabbed Mr. CASTILLO by the shirt/collar area and forced him to his feet. Mr. CASTILLO put his hands up and said, "I'm not resisting arrest." The police officer then threw Mr. CASTILLO onto the ground, ramming his knee into Mr. CASTILLO's lower back, and began to handcuff him.

87.     Another one of the individual defendants stepped on Mr. CASTILLO's face and pushed his head onto the concrete with his foot.

88.     As Mr. CASTILLO was thrown to the ground, his right knee was cut and bleeding.

89.     Mr. CASTILLO was screaming, "I'm not resisting arrest. Jesus Christ, I'm not resisting arrest."

90.     Mr. CASTILLO was handcuffed and taken to a penned off area with other arrestees.

91.     Mr. CASTILLO was placed on a Metropolitan Transportation Authority ("MTA") bus.

92.     The officers who placed Mr. CASTILLO on the MTA bus were overly aggressive with him.

93.     Mr. CASTILLO was transported to the NYPD's Midtown South Precinct.

94.     Mr. CASTILLO was eventually transported to 100 Centre Street.

95.     Approximately 28 hours after his arrest, at or around 3:00AM on March 19, 2012, Mr. CASTILLO was released out of the back door of 100 Centre Street without any paperwork.

96.     Mr. CASTILLO was never charged with any offense in connection with his March 17, 2012 arrest.

97.     As a result of the tight handcuffs, Mr. CASTILLO experienced numbness in his hands for over a month, had marks on his wrists for approximately three months, and was concerned about nerve damage.

98.     As a result of this incident, Mr. CASTILLO suffered physical, psychological and emotional injuries, mental anguish, suffering, humiliation, embarrassment, and other damages.

### PLAINTIFF DANIEL GREENSPAN

99.     On the evening of March 17, 2012, Mr. GREENSPAN was lawfully present in Liberty Plaza as a participant in the six month anniversary of the Occupy Wall Street movement.

100.    Mr. GREENSPAN was arrested in the park by a number of the individual defendants.

101.    Mr. GREENSPAN was placed on an MTA bus and transported to the Midtown South Precinct.

102.    Mr. GREENSPAN was eventually transported to 100 Centre Street.

103.    Approximately 28 hours after his arrest, at or around 3:00AM on March 19, 2012, Mr. GREENSPAN was released out of the back door of 100 Centre Street without any paperwork.

104.    Mr. GREENSPAN was never charged with any offense in connection with his March 17, 2012 arrest.

105.    As a result of this incident, Mr. GREENSPAN suffered physical, psychological and emotional injuries, mental anguish, suffering, humiliation, embarrassment, and other damages.

## PLAINTIFF AUSTIN GUEST

106.    On the evening of March 17, 2012, Mr. GUEST was lawfully present in Liberty Plaza as a participant in the six month anniversary of the Occupy Wall Street movement.

107.    Mr. GUEST observed several NYPD officers enter the park from the Broadway side.

108.    At least five officers approached Mr. GUEST as he was seated by the eastern end of the park.

109.    Several of the individual defendants grabbed Mr. GUEST's arm, thumb, leg, and elsewhere on his body.

110.    Mr. GUEST was put face down to the ground and placed in plastic flexi-cuffs.

111.    The handcuffs were already very tight, and then one of the individual defendants gave the cuffs a very hard yank.

112.    The handcuffs were left on Mr. GUEST for over three hours.

113.    Mr.  GUEST complained that his handcuffs were too tight, but no officer removed or loosened his cuffs.

114.    At least two of the individual defendants then carried and dragged Mr. GUEST onto an MTA bus.

115.    Mr. GUEST was dragged up the stairs and thrown head-first into the bus.

116.    The individual defendants subsequently dragged Mr. GUEST down the row of seats on the bus, banging his head on each seat. They then threw Mr. GUEST into a seat.

13

117.    After a period of time, two of the individual defendants picked Mr. GUEST up and dragged him up the stairs leading to the back of the bus, hitting Mr. GUEST's head on each stair.

118.    Mr. GUEST was transported on the MTA bus to the Midtown South Precinct.

119.    At the precinct, the police did not respond to Mr. GUEST's repeated requests for food.

120.    Mr. GUEST was eventually transported to 100 Centre Street.

121.    Approximately 28 hours after his arrest, at around 3:00AM on March 19, 2012, Mr. GUEST was released out of the back door of 100 Centre Street without any paperwork.

122.    Mr. GUEST was never charged with any offense in connection with his March 17, 2012 arrest.

123.    As a result of this incident, Mr. GUEST suffered physical, psychological and emotional injuries, mental anguish, suffering, humiliation, embarrassment, and other damages.

## PLAINTIFF THOMAS HINTZE

124.    On the evening of March 17, 2012, Mr. HINTZE was lawfully present in Liberty Plaza as a participant in the six month anniversary of the Occupy Wall Street movement.

125.    Mr. HINTZE observed NYPD officers move into Liberty Plaza and begin beating people. He observed police officers pick up and throw people out of the park.

126.    Approximately five NYPD officers approached Mr. HINTZE from behind him.

127.    Several of the individual defendants applied pressure to points in Mr. HINTZE's neck and clavicle areas, as well as putting their fingers in his ears.

128.    Several of the individual defendants pulled Mr. HINTZE down onto the ground onto his back.

129.    Mr. HINTZE was wearing a backpack weighting about 20 pounds.

130.    Several of the individual defendants flipped Mr. HINTZE over onto his face and chest and stomach.

131.    One of the individual defendants pressed his knee into Mr. HINTZE's cheek, putting his weight on Mr. HINTZE.

132.    Several of the individual defendants handcuffed, lifted him, and threw him over a large stone bench.

133.    Mr. HINTZE heard Ms. Waller screaming.

134.    Mr. HINTZE was left face-down on the bench for some time.

135.    One of the individual defendants then grabbed Mr. HINTZE's cuffed hands from behind and asked him if he was going to get up.

136.    Mr. HINTZE responded in sum and substance that he was not resisting.

137.    Several of the individual defendants grabbed Mr. HINTZE by his hands, which were cuffed behind his back, and others grabbed him by the legs.

138.    The individual defendants carried Mr. HINTZE face-down, with his heavy backpack applying pressure to his arms and shoulders.

139.    The individual defendants stopped and dropped Mr. HINTZE on his face at least two times before arriving at a holding pen near Broadway.

140.    After some time, Mr. HINTZE was stood up and pushed onto an MTA bus.

141.     Mr. HINTZE asked multiple times for his handcuffs to be removed because they were too tight and causing him pain.

142.    Eventually, defendant LI removed the plastic handcuffs and replaced them with his metal handcuffs.

143.    However, defendant LI placed the metal handcuffs on too tight, particularly around his left wrist, where the cuffs went over his watch.

144.    Mr. HINTZE was transported to the NYPD's Midtown South Precinct.

145.    Mr. HINTZE was left in handcuffs for approximately three hours before the metal cuffs were removed at the precinct.

146.    Mr. HINTZE was eventually transported to 100 Centre Street.

147.    Approximately 28 hours after his arrest, at or around 3:00AM on March 19, 2012, Mr. HINTZE was released out of the back door of 100 Centre Street without any paperwork.

148.    Mr. HINTZE was never charged with any offense in connection with his March 17, 2012 arrest.

149.    Mr. HINTZE experienced numbness on the tops of both of his hands for approximately two months following March 17, 2012.

150.    As a result of this incident, Mr. HINTZE suffered physical, psychological and emotional injuries, mental anguish, suffering, humiliation, embarrassment, and other damages.

**PLAINTIFF JOSEPH SHARKEY**

151.    On the evening of March 17, 2012, Mr. SHARKEY was present in Liberty Plaza as a participant in the six month anniversary of the Occupy Wall Street movement.

152.    Mr. Sharkey observed NYPD officers enter the park pushing people with batons, and violently arresting people. He saw groups of officers dragging people by their limbs and

16

slamming them into the ground, sitting on them, pushing knees into their heads and necks, as people said "I'm not resisting."

153.    One of the individual defendants grabbed Mr. SHARKEY.

154.    One of the individual defendants hit Mr. SHARKEY on the head and arms with a baton.

155.    Several other officers grabbed Mr. SHARKEY's arms and legs, forced him face down to the ground, twisted his arms behind his back, and handcuffed him.

156.     Mr. SHARKEY was placed on an MTA bus.

157.    As he was put on the bus, an officer tightened Mr. SHARKEY's handcuffs.

158.    A number of the arrestees on the bus with Mr. SHARKEY were injured.

159.    Mr. SHARKEY was transported to the NYPD's Midtown South Precinct.

160.    Mr. SHARKEY was eventually transported to 100 Centre Street.

161.    Approximately 28 hours after his arrest, at around 3:00AM on March 19, 2012, Mr. SHARKEY was released out of the back door of 100 Centre Street without any paperwork.

162.    Mr. SHARKEY was never charged with any offense in connection with his March 17, 2012 arrest.

163.    As a result of this incident, Mr. SHARKEY suffered physical, psychological and emotional injuries, mental anguish, suffering, humiliation, embarrassment, and other damages.

## PLAINTIFF EASTON SMITH

164.    On the evening of March 17, 2012, Mr. SMITH was lawfully present in Liberty Plaza as a participant in the six month anniversary of the Occupy Wall Street movement.

165.    One of the individual defendants grabbed Mr. SMITH by his shoulder and jacket.

166.   Multiple police officers then dragged Mr. SMITH about ten feet on the ground, placed him on the sidewalk, and handcuffed him.

167.   One of the individual defendants kneeled on Mr. SMITH's back and put his weight on Mr. SMITH's back.

168.   One of the individual defendants pushed Mr. SMITH's head into the pavement.

169.   Mr. SMITH was placed on an MTA bus and transported to the Midtown South Precinct.

170.   Mr. SMITH was eventually transported to 100 Centre Street.

171.   Approximately 28 hours after his arrest, at or around 3:00AM on March 19, 2012, Mr. SMITH was released out of the back door of 100 Centre Street without any paperwork.

172.   Mr. SMITH was never charged with any offense in connection with his March 17, 2012 arrest.

173.   As a result of this incident, Mr. SMITH suffered physical, psychological and emotional injuries, mental anguish, suffering, humiliation, embarrassment, and other damages.

**PLAINTIFF JENNIFER WALLER**

174.   On the evening of March 17, 2012, at between around 10:30PM and 11:30PM, JENNIFER WALLER was lawfully present in Liberty Plaza with a group of others.

175.   Ms. WALLER was associating with the others to celebrate OWS's six-month anniversary.

176.   Ms. WALLER observed NYPD officers entering the park and forcefully ejecting people from the park.

177.   Ms. WALLER saw some officers literally picking up and throwing people out of the park.

18

178.    One defendant approached Ms. WALLER from behind and tried to lift her off the ground into a standing position by placing one of her hands on Ms. WALLER's hair and the other on the back of her scarf, pulling on her hair and choking her.

179.    Ms. WALLER said, "Please don't hurt me, I will comply with you."

180.    Another defendant officer came up and grabbed Ms. WALLER.

181.    At approximately the same time as Ms. WALLER was being arrested, her boyfriend, plaintiff HINTZE, was also being arrested.

182.    NYPD officers shoved Mr. HINTZE onto the ground in the course of arresting him, also forcing Ms. WALLER onto the ground.

183.    Ms. WALLER saw another NYPD officer kneel on Mr. HINTZE's face.

184.    Defendants took Ms. WALLER out of the park and handcuffed her.

185.    Ms. WALLER witnessed an arrestee who appeared to be having seizures and whose head was hitting against the ground. Ms. WALLER asked that she be provided with medical attention. Ms. WALLER received no response.

186.    Over a half hour later, Ms. WALLER was loaded onto a MTA bus. Although she walked onto the bus in a compliant manner, one of the individual defendants shoved her as she was walking onto the bus so that she hit her chest.

187.    On the bus, Ms. WALLER observed other officers load arrestees, including friends of hers, in a violent manner. For example, she saw one person whose head and body was smacked into nearly every pole, chair, and step as he was carried onto the bus; she saw another rear-cuffed person who police simply dropped onto the floor.

188.    On the bus, Ms. WALLER overheard other arrestees complaining about how tight their handcuffs were, and that they were experiencing numbness. When Ms. WALLER advocated

for the other arrestees by asking NYPD officers to remove and replace those tight cuffs, she was told that the officers did not have the right tool to remove the cuffs with them on the bus.

189.    On the bus, Ms. WALLER asked to use the restroom, and was not allowed to do so.

190.    The MTA bus transported Ms. WALLER and the other arrestees to the NYPD's Midtown South Precinct.

191.    Ms. WALLER and the other arrestees on the MTA bus waited in the MTA bus for several hours outside the precinct.

192.    Inside the precinct, Ms. WALLER was eventually left alone in the cell with another woman who had multiple bruises and appeared to be in a lot of pain.

193.    At the precinct, Ms. WALLER asked what charges would be brought against her, and she received no response.

194.    Ms. WALLER eventually began to sing in the cell.

195.    An officer ran into the room with a taser and threatened to taser her or bring her to Bellevue Hospital if she did not stop singing.

196.    Ms. WALLER was eventually transported from the precinct to the courthouse building at 100 Centre Street.

197.    Approximately 28 hours after her arrest, at around 3:00AM on March 19, 2012, Ms. WALLER was released out of the back door of 100 Centre Street without any paperwork.

198.    Ms. WALLER was never charged with any offense in connection with her March 17, 2012 arrest.

199.    As a result of this incident, Ms. WALLER suffered physical, psychological and emotional injuries, mental anguish, suffering, humiliation, embarrassment, and other damages.

**FIRST CAUSE OF ACTION**
**DEPRIVATION OF RIGHTS UNDER THE UNITED STATES CONSTITUTION**
**THROUGH 42 U.S.C. § 1983**

200.    Plaintiffs incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

201.    Defendants, under color of state law, unlawfully seized and arrested plaintiffs.

202.    Defendants did not have probable cause to arrest plaintiffs, nor was it objectively reasonable for defendants to believe that they did have probable cause to arrest plaintiffs.

203.    Defendants' decision to arrest plaintiffs was based upon plaintiffs' First Amendment-protected expression, and not upon plaintiffs' violation of any provision of the penal law.

204.    Plaintiffs were unjustifiably deprived of their liberty for over 24 hours as a result of these false arrests.

205.    By the conduct described above, defendants, under color of state law, subjected plaintiff to the foregoing acts and omissions without due process of law and in violation of the First, Fourth and Fourteenth Amendments to the United States Constitution, through 42 U.S.C. § 1983, thereby depriving plaintiffs of their rights, privileges and immunities, including, without limitation, deprivation of the following constitutional rights:

a.   Freedom to engage in protected speech, expression and association;

b.   Freedom from unreasonable seizures of their persons, including but not limited to the excessive use of force;

c.   Freedom from arrest without probable cause;

d.   Freedom from false imprisonment, meaning wrongful detention without good faith, reasonable suspicion or legal justification, and of which plaintiffs were aware and did not consent;

e.   Freedom from deprivation of liberty without due process of law;

f.    The enjoyment of equal protection, privileges and immunities under the laws.

206.    As a result of the foregoing, plaintiffs were deprived of their liberty, suffered bodily injury, pain and suffering, psychological and emotional injury, costs and expenses, and were otherwise damaged and injured.

### SECOND CAUSE OF ACTION
### *MONELL* CLAIM AGAINST DEFENDANT CITY
### THROUGH 42 U.S.C. § 1983

207.    Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

208.    All of the acts and omissions by the named and unnamed individual police officer defendants described above were carried out pursuant to policies and practices of the CITY which were in existence at the time of the conduct alleged herein and were engaged in with the full knowledge, consent, and cooperation and under the supervisory authority of the defendant CITY and its agency, the NYPD.

209.    Defendant CITY and the NYPD, by their policy-making agents, servants and employees, authorized, sanctioned and/or ratified the individual police defendants' wrongful acts; and/or failed to prevent or stop those acts; and/or allowed or encouraged those acts to continue.

210.    The acts complained of were carried out by the aforementioned individual defendants in their capacities as police officers and officials pursuant to customs, policies, usages, practices, procedures and rules of the CITY and the NYPD, all under the supervision of ranking officers of the NYPD.

211.    The aforementioned customs, practices, procedures and rules of the CITY and the NYPD includes, but is not limited to, restricting First Amendment protected activities in Liberty Plaza.

212. The aforementioned customs, practices, procedures and rules of the CITY and the NYPD were enacted based on plaintiffs' First Amendment protected activity and not for any legitimate law enforcement purpose.

213. As a result of the foregoing, plaintiffs were deprived of their liberty, suffered bodily injury, pain and suffering, psychological and emotional injury, costs and expenses, and were otherwise damaged and injured.

**THIRD CAUSE OF ACTION**
**RESPONDEAT SUPERIOR LIABILITY OF THE CITY OF NEW YORK**
**FOR VIOLATIONS OF THE LAWS OF THE STATE OF NEW YORK**

214. Plaintiffs incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

215. The conduct of the individual defendants alleged herein occurred while they were on duty and in uniform, and/or in and during the course and scope of their duties and functions as NYPD officers, and/or while they were acting as agents and employees of defendant CITY, clothed with and/or invoking state power and/or authority, and, as a result, defendant CITY is liable to Plaintiffs pursuant to the state common law doctrine of respondeat superior.

216. As a result of the foregoing, plaintiffs were deprived of their liberty, suffered bodily injury, pain and suffering, psychological and emotional injury, costs and expenses, and were otherwise damaged and injured.

**FOURTH CAUSE OF ACTION**
**VIOLATIONS OF THE CONSTITUTION OF THE STATE OF NEW YORK**

217. Plaintiffs incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

218.    Defendants' conduct alleged herein breached the protections guaranteed to plaintiff by the New York State Constitution, Article I, §§ 6, 11, and 12, including the following rights:

        a.    Freedom from deprivation of liberty without due process of law;

        b.    Freedom from false imprisonment, meaning wrongful detention without good faith, reasonable suspicion or legal justification, and of which plaintiff was aware and did not consent;

        c.    The enjoyment of equal protection, privileges and immunities under the laws.

219.    Defendants' deprivation of plaintiffs' rights under the New York State Constitution resulted in the injuries and damages set forth above.

### FIFTH CAUSE OF ACTION
### ASSAULT AND BATTERY
### UNDER THE LAWS OF THE STATE OF NEW YORK

220.    Plaintiffs incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

221.    By the actions described above, defendants did inflict assault and battery upon plaintiffs. The acts and conduct of defendants were the direct and proximate cause of injury and damage to plaintiffs and violated their statutory and common law rights as guaranteed by the laws and Constitution of the State of New York.

222.    As a result of the foregoing, plaintiffs were deprived of their liberty, suffered specific and serious bodily injury, pain and suffering, psychological and emotional injury, costs and expenses, and were otherwise damaged and injured.

## SIXTH CAUSE OF ACTION
## FALSE ARREST AND FALSE IMPRISONMENT
## UNDER THE LAWS OF THE STATE OF NEW YORK

223.    Plaintiffs incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

224.    By the actions described above, defendants caused to be falsely arrested or falsely arrested plaintiffs, without reasonable or probable cause, illegally and without a warrant, and without any right or authority to do so. The acts and conduct of the defendants were the direct and proximate cause of injury and damage to plaintiffs and violated their statutory and common law rights as guaranteed by the laws and Constitution of the State of New York.

225.    As a result of the foregoing, plaintiffs were deprived of their liberty, suffered specific and serious bodily injury, pain and suffering, psychological and emotional injury, costs and expenses, and were otherwise damaged and injured.

## SEVENTH CAUSE OF ACTION
## INTENTIONAL AND NEGLIGENT INFLICTION
## OF EMOTIONAL DISTRESS
## UNDER THE LAWS OF THE STATE OF NEW YORK

226.    Plaintiffs incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

227.    By the actions described above, defendants engaged in extreme and outrageous conduct, which intentionally and/or negligently caused severe emotional distress to plaintiff. The acts and conduct of the defendants were the direct and proximate cause of injury and damage to plaintiffs and violated their statutory and common law rights as guaranteed by the laws and Constitution of the State of New York.

228.    As a result of the foregoing, plaintiffs were deprived of their liberty, suffered specific and serious bodily injury, pain and suffering, psychological and emotional injury, great humiliation, costs and expenses, and were otherwise damaged and injured.

## EIGHTH CAUSE OF ACTION
### NEGLIGENT HIRING, SCREENING, RETENTION, SUPERVISION, AND TRAINING
### UNDER THE LAWS OF THE STATE OF NEW YORK

229.    Plaintiffs incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

230.    Defendant CITY negligently hired, screened, retained, supervised, and trained defendants. The acts and conduct of the defendants were the direct and proximate cause of injury and damage to plaintiff and violated her statutory and common law rights as guaranteed by the laws and Constitution of the State of New York.

231.    As a result of the foregoing, plaintiffs were deprived of their liberty, suffered specific and serious bodily injury, pain and suffering, psychological and emotional injury, costs and expenses, and were otherwise damaged and injured.

## JURY DEMAND

232.    Plaintiffs demand a trial by jury in this action of all issues pursuant to Fed. R. Civ. P. 38(b).

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs pray for the following relief:

A.    Compensatory damages against the defendants jointly and severally; and

B.    Punitive damages against the individual defendants; and

C.    Attorney's fees and costs pursuant to 42 USC §1988; and

D.    Such other and further relief as the Court deems just and proper.

DATED:      New York, New York
            June 17, 2013

                                    Respectfully submitted,


                                    _____/s/_____
                                    Rebecca Heinegg
                                    Maurus & Heinegg
                                    *Attorneys for Plaintiffs*
                                    299 Broadway, Suite 806
                                    New York, New York 10007
                                    t: 212- 227-2303


                                    _____/s/_____
                                    Meghan Maurus
                                    Maurus & Heinegg
                                    *Attorneys for Plaintiffs*
                                    299 Broadway, Suite 806
                                    New York, New York 10007
                                    t: 212- 227-2303


                                    _____/s/_____
                                    Gideon Orion Oliver
                                    *Attorney for Plaintiffs*
                                    299 Broadway, Suite 806
                                    New York, New York 10007
                                    t: 212-766-8050