**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------

ALEXANDER **CARVALHO**, ERIC CARTER,
SERGIO CASTILLO, DANIEL GREENSPAN,
AUSTIN GUEST, THOMAS HINTZE,
JOSEPH SHARKEY, EASTON SMITH, and
JENNIFER WALLER,

                     Plaintiffs,

         -v-

THE CITY OF NEW YORK, NEW YORK CITY
POLICE DEPARTMENT ("NYPD") CHIEF OF
DEPARTMENT JOSEPH ESPOSITO, NYPD
CAPTAIN NICOLE PAPAMICHAEL, NYPD DEPUTY
INSPECTOR EDWARD WINSKI, NYPD LIEUTENANT
FRANK VIVIANO, NYPD OFFICER GRANTLEY
BOVELL, SHIELD NO. 11743, NYPD OFFICER
JABDED AHMED, SHIELD NO. 19415, NYPD
OFFICER ALEXIS RODRIGUEZ, SHIELD NO. 28722,
NYPD OFFICER CHEUNG LI, SHIELD NO.
5474, NYPD OFFICER MICHAEL GALGANO,
SHIELD NO. 2671, NYPD OFFICER FNU
ABDEL-RAHIM, and NYPD OFFICERS JOHN
and JANE DOE # 1 - 15 (The names being fictitious,
as the true names and shield numbers are not presently
known), in their individual and official capacities,

                     Defendants.

-----------------------------------------------------------------

**MEMORANDUM**
**OF LAW IN**
**OPPOSITION TO**
**DEFENDANTS' MOTION**
**FOR SUMMARY**
**JUDGMENT**

**13-cv-4174 (PKC)(SN)**

 

**MEMORANDUM OF LAW IN OPPOSITION**
**TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Gideon Orion Oliver
*Attorney for Plaintiffs*
277 Broadway, Suite 1501
New York, NY 10007
646-263-3495

## TABLE OF CONTENTS

TABLE OF CONTENTS…………………………………...………...………………i

TABLE OF AUTHORITIES……………………………………………...…………iii

STATEMENT OF FACTS…………………………………………………...………………1

**ARGUMENT**

      **APPLICABLE STANDARDS OF REVIEW UNDER FED.R.CiV.P. 56**……1

      **POINT I**

      **THE COURT SHOULD DENY DEFENDANTS SUMMARY
JUDGMENT AS TO PLAINTIFFS' FIRST AMENDMENT,
FOURTH, AND FOURTEENTH AMENDMENT-BASED
AND RELATED STATE CONSTITUTIONAL AND STATE
LAW CLAIMS**…………………………………………….………...…….17

      **POINT II**

      **THE COURT SHOULD DENY DEFENDANTS SUMMARY
JUDGMENT ON PLAINTIFFS' FALSE ARREST AND
RELATED CLAIMS**…….…………………………………….………….32

      **A.**      **A JURY COULD DETERMINE THERE
WAS NO JUSTIFICATION TO ARREST
ANY PLAINTIFF FOR TRESPASS** …………………………38

      **B.**      **A JURY COULD DETERMINE THERE WAS NO
JUSTIFICATION TO ARREST ANY PLAINTIFF
FOR DISORDERLY CONDUCT**……………………………..42

      **C.**      **A JURY COULD DETERMINE THERE WAS NO
JUSTIFICATION TO ARREST ANY PLAINTIFF
FOR RESISTING ARREST**…………………………………...46

      **D.**      **A JURY COULD DETERMINE THERE WAS
NO JUSTIFICATION TO ARREST ANY
PLAINTIFF FOR OBSTRUCTION OF
GOVERNMENTAL ADMINISTRATION
IN THE SECOND DEGREE**…………………………………..48

**POINT III**

**THE COURT SHOULD DENY DEFENDANTS SUMMARY JUDGMENT AS TO PLAINTIFFS' EXCESSIVE FORCE CLAIMS** …………………………………………..…49

**POINT IV**

**THE COURT SHOULD DENY DEFENDANTS SUMMARY JUDGMENT ON PLAINTIFFS' EXCESSIVE DETENTION-BASED CLAIMS**………..….…..…………...52

**POINT V**

**THE RECORD ADEQUATELY ESTABLISHES EACH DEFENDANT'S INVOLVEMENT IN INJURING PLAINTIFFS**………................…..….…….……….……….54

**POINT VI**

**THE COURT SHOULD DENY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON QUALIFIED IMMUNITY GROUNDS BECAUSE DEFENDANTS LACKED EVEN ARGUABLE PROBABLE CAUSE AND TO THE EXTENT THAT THEY CREATED FALSE EVIDENCE AND/OR OTHERWISE MALICIOUSLY VIOLATING PLAINTIFFS' CLEARLY ESTABLISHED RIGHTS**………………..…………………………………55

**POINT VII**

**THE COURT SHOULD NOT DISMISS PLAINTIFFS' CLAIMS BASED ON THE NEW YORK STATE CONSTITUTION AND NEW YORK COMMON LAW**………………………………………………………..57

**CONCLUSION**…………………………………………………………58

## <u>TABLE OF AUTHORITIES</u>

*Adams v. City of New York*, 993 F.Sup.2d 306 (EDNY 2014)…………………………35

*Atwater v. City of Lago Vista*, 532 U.S. 318 (2004) …………………………………………35

*Barham v. Ramsey*, 434 F.3d 565 (D.C. Cir. 2006) …………………………………35, 46

*Bellows v. Dainack*, 555 F.2d 1105 (2nd Cir. 1997) …………………………………………51

*Boos v. Barry,* 485 U.S. 312 (1988) ……………………………………………………26, 28

*Brandenburg v. Ohio*, 395 U.S. 444 (1969) …………………………………………28, 30

*Broadrick v. Oklahoma*, 413 U.S. 601 (1973)… …………………………………………..19

*Broughton v. State*, 37 N.Y.2d 451 (1975) ……………………………………………34

*Brown v. City of New York,* 2015 WL 4924395, (2nd Cir. Aug. 19, 2015)…………36, 49

*Bryant v. City of New York*, 404 F.3d 128 (2nd Cir. 2005) …………………………34, 35, 53

*Buckley v. Valeo*, 424 U.S. 1 (1976) ……………………………………………………..19

*Calamia v. City of New York,* 879 F.2d 1025 (2d Cir.1989) ……………………………35, 51

*Carpenter v. City of New York*, 984 F. Supp. 2d 255 (S.D.N.Y. 2013)…36, 38, 39, 41, 54

*Citizens to End Animal Suffering and Exploitation, Inc. v.*
      *Faneuil Hall Marketplace, Inc.*, 745 F.Supp. 65 (D.Mass. 1990)…………..........27

*City of Chicago v. Morales,* 527 U.S. 41 (1999)… ……………………………………..29

*City of Los Angeles v. Preferred Communications, Inc.*, 476 U.S. 48  (1986)…………31

*Coggins v. Buonaro*, 776 F.3d 108 (2nd Cir. 2015) ………………………………24, 55

*Colon v. City of New York*, 2009 WL 4264462 (EDNY Nov. 25, 2009)……........………36

*Conario v. City of New York*, 2006 WL 2015651 (SDNY July 12, 2006) ……........………29

*Cook v. Sheldon*, 41 F.3d 73 (2nd Cir. 1994) …………………………………………..22

*Cornelius v. NAACP Legal Defense & Ed. Fund., Inc.*, 473 U.S. 788 (1985)…………..27

*Cox v. Louisiana,* 379 U.S. 536 (1965) …………………………………………….....29

*Cnty of Riverside v. McLaughlin*, 500 U.S. 44 (1991) ……….…….…….……..…..53

*Davis v. City of New York*, 2007 WL 755190 (EDNY Feb. 15, 2007) ……………......52

*Davis v. City of New York*, 373 F.Supp.2d 322 (SDNY 2005) ……….…….………….56

*Davis v. Rodriguez*, 364 F.3d 242 (2nd Cir. 2004) …………………………………….33

*Decker v. Campus*, 981 F.Supp. 851 (SDNY 1997) ……….…….…….……..….……49

*Deegan v. City of Ithaca*, 444 F.3d 135 (2nd Cir. 2006)… ……….…….………..26, 28, 31

*Dellums v. Powell,* 566 F.2d 167 (D.C.Cir.1977)…… ……….……….…….………29, 46

*Devenpeck v. Alford*, 543 U.S. 146 (2004) ……………………………………….35

*Dickerson v. Napolitano*, 604 F.3d 732 (2nd Cir. 2010) ………………………………34

*Dinler v. City of New York,* 2012 WL 4513352 (SDNY Sept. 30, 2012) …………34, 35

*Dorsett v. County of Nassau,* 732 F.3d at 157 (2nd Cir. 2013) ………………………24

*Dotson v. Farrugia,,* 2012 WL 996997 (SDNY Mar. 26, 2012) ………………………51

*Escalera v. Lunn*, 361 F.3d 737 (2nd Cir. 2004) …………………………………………55

*Fabrikant v. French*, 691 F.3d 193 (2nd Cir. 2012)… ……….…….……..……..…….20

*First Unitarian Church of Salt Lake City v. Salt Lake City Corp.*,
       308 F.3d 1114 (10th Cir. 2002)…… ……………………………….……………27

*Freeman v. Port Authority*, 243 A.D.2d 409 (1st Dept. 1997) ……………………..………52

*Frisby v. Schultz*, 487 U.S. 474 (1988)…. …………………………………………27, 31

*Garcia v. Does*, 779 F.3d 84 (2nd Cir. 2015) …………………………………………55

*Garnett v. City of New York,* 2014 WL 395094 (SDNY Aug. 13, 2014) ……....23, 24, 54

*Garnett v. Undercover Officer CO309,* 2015 WL 1539044 (SDNY April 6, 2015)........23

*Gianullo v. City of New York*, 322 F.3d 39 (2nd Cir. 2003)…………………………37

*Gomez v. City of New York*, 2007 WL 5210469 (SDNY May 28, 2007) ………………34

*Graham v. Connor*, 490 U.S. 386 (1989) ………………….…………………………49

*Grayned v. City of Rockford*, 408 U.S. 104 (1972)………………………………..19, 28, 31

*Griffin v. Crippen*, 193 F.3d 89 (2nd Cir. 1999) ……………………………………52

*Guntlow v. Barbera*, 907 NYS2d 86 (3rd Dept. 2010) ………………………………34

*H.E.R.E. v. City of New York*, 311 F.3d 534 (2nd Cir.  2002) ………………………26, 27

*Hague v. CIO*, 307 U.S. 496 (1939) ……………………………………………………26

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982) ……………………………………………55

*Harvey v. Brandt*, 254 A.D.2d 718 (4th Dept. 1998)……………………………………50

*Henry v. City of New York*, 2003 WL 22077469 (SDNY Sept. 8, 2003) ………………24

*Hershey v. Goldstein*, 938 F. Supp. 2d 491 (S.D.N.Y. 2013) …………...……………51

*Hervey v. Estes*, 65 F.3d 784 (9th Cir. 1995) …………………………………………56

*Hickey v. City of Seattle,* 2006 WL 3692658 (W.D. Wash. 2006)………………………35

*Higginbotham v. City of New York*, 2015 WL 2212242
    (SDNY May 12, 2015)… …………………………………....22, 25, 32, 49, 51, 55

*Hobbs v. County of Westchester*, 397 F.3d 133 (2nd Cir. 2005)…………………………28

*Holland v. City of Poughkeepsie,* 90 A.D.3d 841 (2nd Dept. 2011) ………………………50

*Jackson v. City of New York*, 939 F.Supp.2d 219 (EDNY 2013). ………………………54

*Jocks v. Tavernier,* 316 F.3d 128 (2d Cir.2003) ……………………………………23, 36

*Johnson v. Doherty*, 713 F. Supp. 69 (S.D.N.Y. 1989) …………………………………51

*Jones v. Parmley*, 465 F.3d 46 (2nd Cir. 2006) ……………………26, 28, 29, 42, 44, 46

*Kerman v. City of N.Y.,* 261 F.3d 229 (2d Cir.2001) ……………………………………51

*Knowles v. City of Waco, Texas*, 462. F.3d 430 (5th Cir. 2006)…………………………32

*Kolender v. Lawson*, 461 U.S. 352 (1982)……… ……………………………………19

*Landy v. Irizarry*, 884 F. Supp. 788 (S.D.N.Y. 1995) …………………………………51

*Lebowitz v. City of New York*, 2014 WL 772349
(SDNY Feb. 25, 2014) ……………………………………………………41

*Lebowitz v. City of New York*, 606 Fed.Appx. 17
(2nd Cir. June 2 2015) …………………………………………...………21, 27, 41, 53

*Lippay v. Christos*, 996 F.2d 1490 (3rd Cir. 1993) …………………………………56

*Lowth v. Town of Cheektowaga*, 82 F.3d 563 (2d Cir. 1996)……………………………36

*Mack v. Town of Wakill*, 253 F.Supp.2d 552 (SDNY 2003) ……… .........................… 54

*MacNamara, et al. v. City of New York, et al.,* 2007 WL 3196295
(S.D.N.Y. Oct. 30, 2007) ………..……………………………………………………18

*Make the Road By Walking, Inc. v. Turner*, 378 F.3d 133 (2nd Cir. 2004). …………….26

*Manganiello v. City of New York*, 612 F.3d 149 (2nd Cir. 2010) ………………………24

*Maryland v. Pringle*, 540 US 366 (2003) ……………………………………………35

*Meagher v. Safir*, 272 AD2d 114 (1st Dept. 2000) ……………………………………50

*Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, (1984)……… …..…31

*Mikulec v. Town of Cheektowaga*, 909 F.Supp.2d 214 (WDNY 2012)……………… 33

*Morse v. Fusto*, ___ F.3d ___, 2015 WL 5294862, (2nd Cir. Sept. 11, 2015) …23, 24, 55

*Mejia v. City of New York*, 119 F.Supp.2d 232 (EDNY 2000)…………………………35

*NAACP v. Claiborne Hardware,* 458 U.S. 886 (1982)… …………………………......29

*Olivieri v. Ward*, 801 F.2d 602 (2nd Cir. 1986)… …………………………………….31

*Ornelas v. United States*, 517 U.S. 690 (1996)……………………………,……………33

*Ostrowski v. Town of Southold*, 443 F.Supp.2d 325 (EDNY 2006) ………..…………52

*Paulsen v. County of Nassau*, 925 F.2d 65 (2nd Cir. 1991) ……………………………27

*People v. Arbeiter*, 169 Misc.2d 771 (N.Y.Sup.App.Term 1996)… ……………….…..47

*People v. Balmuth*, 178 Misc.2d 958 (Crim.Ct., N.Y. County 1994) …………………17

*People v. Baker*, 20 NY3d 354 (2013)…… ….……………………………………….…43

*People v. Barrett*, 13 Misc.3d 929 (N.Y. City Crim. Ct. 2006)… …….…….………45, 46

*People v. Basch*, 36 NY2d 154 (1975)…. …………………………………………..39

*People v. Benjamin*, 713 N.Y.S2d 247 (N.Y. Crim. Ct. 2000)… ….……….…….……45

*People v. Jennifer Bezjak,* 11 Misc.3d 424 (NYC Crim. Ct.,2006)……. …….………45

*People v. Blandford*, 37 A.D.2d 1003 (3rd Dep't 1971)….. ……………………………47

*People v Biltsed*, 574 N.Y.S.2d 272 (N.Y. Crim. Ct, 1991)…..……………..…………30

*People v. Bright*, 71 N.Y.2d 376 (1988) …………………………………………………19

*People v. Brown*, 25 NY2d 374 (1969)… …………………………………….……39, 50

*People v. Carcel*, 165 N.Y.S2d 113 (1957)… ………………………………………43

*People v. Case*, 42. N.Y.2d 98 (1977)… …………………………………….……49

*People v. Chesnick,* 302 N.Y. 58 (1950)… …………………………………………44

*People v. Collins*, 44 Misc.2d 430 (N.Y. Sup. 1964)… ……………….…….……45

*People v. Epton*, 19 N.Y.2d 496 (1967)…. …………………………………………30

*People v. Ferreira*, 10 Misc.3d 441 (Crim. Ct., N.Y. Co. 2005)…… …….…….……49

*People v. Fitzgerald*, 12 Misc.2d 1190(A) (N.Y.City Criminal Court, 2006)… ….…...46

*People v. Griswald*, 648 N.Y.S.2d 901 (N.Y. Co. Ct., 1996)…. …….………….……44

*People v. Jackson*, 831 NYS2d 596 (3rd Dept.,2007)……… …………….…………...39

*People v. Jones*, 9 NY3d 259 (2007)….. …………………………………….……42, 46

*People v. Joseph*, 156 Misc.2d 192 (Crim. Ct., Kings Co. 1992)….. …….………..…49

*People v. Leonard*, 62 NY2d 404 (1984) ……………………………………27, 38, 39

*People v. Losinger*, 313 N.Y.S2d 60 (Rochester City Crim. Ct. 1970….………………43

*People v. Maher*, 137 Misc.2d 162 (Crim. Ct., N.Y. County 1987)… …….……...44, 46

*People v. May*, 81 N.Y.2d 725 (1994)… …..……………………………………….…47

*People v. McDaniel*, 154 Misc.2d 89, 92 (Sup. Ct., App. Term,
9th and 10th Judicial Districts1, 1992)……………………… …..…………..…47

*People v. Millhollen*, 5 Misc.3d 810 (Ithaca City Ct. 2004). …………………..…17, 45

 *People ex rel. Maxian o/b/o Roundtree v. Brown*, 77 N.Y.2d 422 (1991) ………...……52

*People v. Mims*, 984 NYS2d 633 (NY City Criminal Court 2014)… …..……………45

*People v. Munafo*, 50 N.Y.2d 326 (1980)…… …..……………………………………45

*People v. Munroe*, 853 N.Y.S.2d 457 (1st Dept. 2007)…..  …..……………………….38

*People v. Murphy*, 177 Misc.2d 907 (Dist. Ct. Nassau Co. 1998)… …..……………...39

*People v. Nixon*, 248 N.Y.2d 182 (1928)…. …..……………………………………43

*People v. Nunez*, 36 Misc.3d 172 (NY Crim. Ct. 2012) ………..……..…15, 27, 40, 41

*People v. Offen*, 96 Misc.2d 147 (Crim. Ct., N.Y. Co. 1978).  …..……………………49

*People v. Parker*, 33 N.Y.2d 669 (1973)…..  …..……………………………………47

*People v. Peacock*, 68 N.Y.2d 675 (1986) …..……………………………………..…47

*People v. Powell*, 180 Misc.2d 627 (1999)… …..……………………………………39

*People v. Pritchard*, 27 N.Y.2d 246 (1970)… …..…………………………………43, 45

*People v. Reed*, 19 Misc.2d 217 (N.Y.City Crim. Ct., 2008)… …..…………………..44

*People v. Rewald*, 65 Misc.2d 453 (County Ct. Cayuga Co. 1971)… …..…….......…...39

*People v. Rodriguez,* 19 Misc.3d 302 (Crim.Ct. NY Co. 2008)… …..………………49

*People v. Simm*s, 36. A.D.2d 23 (4th Dep't 1971)…. …..……………………………47

*People v. Simon,* 145 Misc.2d 518 (Crim. Ct., N.Y. Co. 1989)… …..………………49

*People v. Stephen*, 153 Misc.2d 382 (N.Y. County, 1992)… …..…………………….47

*People v. Stuart*, 100 N.Y.2d 412 (2003) ……………….…..………………….……19

*People v. Szepansky*, 203 N.Y.S.2d 306 (N.Y. Co. Ct, 1960)…..  …..………………44

*People v. Taylor*, 114 Misc.2d 680 (Sup. Ct. Trial Term NY Co. 1982)… …….………..39

*People v. Tichenor*, 89 N.Y.2d 769 (1997) …….…….……………….……………….……45

*People v. Tillman*, 184 Misc.2d 20 (City Ct., City of Auburn 2000)… ….…….……...49

*People v. Turner*, 48 Misc.2d 611 (App. Term. 1st Dept., 1965)… ….……….…………44

*People v. Vargas*, 179 Misc.2d 236 (Crim. Ct., N.Y. Co. 1998)… ….…….………..49

*People v. Weaver*, 16 NY3d 123 (2011)….. ….…….………………………………….43

*People v. Wolf*, 63 Misc.2d 178 (Suffolk Co. Dist. Ct. 1970)… ….……….……………38

*Perry Ed. Assn. v. Perry Local Educators' Assn.*, 460 U.S. 37 (1983)……………….....27

*Phelps v. City of New York*, 2006 WL 1749528 (SDNY June 27, 2006) ……………..…22

*Pierre-Antoine v. City of New York*, 2006 WL 1292076 (SDNY May 9, 2006) ………52

*Pluma v. City of New York*, 2015 WL 1623828 (SDNY March 31, 2015) ………….24, 25

*Provost v. City of Newburgh*, 262 F.3d 146 (2nd Cir. 2001). ……………………………54

*Reed v. Town of Gilbert*, 135 S.Ct. 2218 (June 18, 2015) ………………..…..…………30

*Ricciuti v. NY City Transit Authority*, 124 F.3d 123 (2nd Cir. 1997) ……………...23, 56

*Roberts v. United States Jaycees*, 468 U.S. 609 (1984) ……………………………..…26

*Robison v. Via*, 821 F.2d 913 (2nd Cir. 1987) …………………………………………51

*Sash v. United States*, 674 F.Supp.2d 531 (SDNY 2009) …………………………..…52

*Schiller v. City of New York*,  2008 WL 200021 (SDNY, January 23, 2008)……18, 24, 42

*Schiller v. City of New York*, 2009 WL 497580 (SDNY, Feb. 27, 2009)………………42

*Sforza v. City of New York,* 2009 WL 857496  (SDNY March 31, 2009)….…….22, 50, 52

*Shamir v. City of New York*, Docket No. 14-3606,
         2015 WL 6214708 (2nd Cir. Oct. 22, 2015)… ……………………….............35

*Singer v. Fulton Cnty*, 63 F.3d 110 (2nd Cir. 1995)…… ………………………..........41

*Smith v. California*, 361 U.S. 147 (1959) ……………………………...........………..19

*Smith v. Goguen*, 415 U.S. 566, (1974) …………………………….............………..19

*Soares v. Connecticut*, 8 F.3d 917 (2nd Cir. 1993) ………………………………….51

*Spence v. Washington*, 418 U.S. 405 (1974) …………………………………………27

*Sullivan v. City of N.Y.,* 2011 WL 3806006 (S.D.N.Y. Aug. 29, 2011) ………...……51

*Texas v. Johnson*, 491 U.S. 397 (1989) ……………………………………….....…..27

*Thimmesch v. NYC*, 2013 U.S. Dist. LEXIS 53587 (SDNY April 9, 2012) …….……40

*Thomason v. Jernigan*, 880 F.Supp. 1195 (ED Mich. 1991)……………………………27

*Tomaino v. State of New York*, 22 Misc.3d 1013 (NY Ct. Claims 2008) ……………….52

*Trueman v. New York State Canal Corp.*, 451 Fed. Appx. 27 (2nd Cir. 2011)…......…….34

*United States v. Chavez*, 534 F.3d 1338, 1345 (10th Cir. 2008)…. …………………….36

*United States v. Colon*, 240 F.2d 130 (2nd Cir. 2001) …..……………….…………….36

*United States v. Cruz*, 834 F.2d 47 (2nd Cir. 1987) ………………………...………….37

*United States v. Shareef*, 100 F.3d 1491 (10th Cir. 1996) ………………………….....37

*United States v. Williams,* 2004 WL 134898, (S.D.N.Y. 2004)……………………….44

*Vega v. Hempstead Union Free School Dist.*, 2015 WL 5127519
    (2nd Cir. September 2, 2015……………………......….……………………….2

*Venetian Casino Resort, LLc v. Local Joint Exec. Bd.*, 257 F.3d 937 (9th Cir. 2001)….27

*Waller v. City of New York*, 933 NYS2d 541 (Sup.Ct.NY Cty. Nov. 15, 2011)……....15, 27

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989) ………………………………30, 31

*Wu v. City of New York*, 934 F.Supp. 581 (SDNY 1996)………………..…………….34

*Ybarra v. Illinois*, 444 U.S. 85 (1979) ……………………………………………….35

*Zahrey v. Coffey*, 221 F.3d 342 (2nd Cir. 2000) ………………………………………23

*Zellner v. Summerlin*, 494 F.3d 344 (2nd Cir. 2007) …………………………...36, 37

## FEDERAL STATUTES

Fed.R.Civ.P. 26……………………….......................................................... 16

Fed.R.Civ.P. 56……………………….......................................................... 18

## STATE STATUTES

New York State Criminal Procedure Law §140.10(1)(a) ……………….....………33, 58

New York State Penal Law ("PL") § 10.00(1) …………..……………………....………33

PL § 10.00(3) …………………………………………………………………………33

PL § 15.00(1). …………………………………………………………………………47

PL § 15.00(2). …………………………………………………………………………47

PL § 15.00(5). …………………………………………………………………………47

PL § 240.15 ……………………………………………………………………………30

PL § 140.00(5) …………………………………….………………………………38

PL §240.20……………………………………………………………………42, 43, 44

PL § 240.20(6) ………………………………………………………………42, 44, 45

PL § 205.30……………………………………………………………….......……46, 47, 48

PL § 195.05……………………………………………………………………………48

## NEW YORK CITY LAWS

New York City Zoning Resolution ("ZR") § 37-752………...................................... 11

ZR § 37-747…………………………………………………………………………. 11

ZR § 37-721…………………………………………………………………………. 11

ZR § 37-723…………………………………………………………………………. 11

ZR § 37-726………………………………….................................................... 11

ZR § 37-727…………………………….......................................................... 11, 12

ZR § 37-625………………………….............................................................. 11

ZR § 37-62………………………….............................................................. 11

ZR § 74-91………………………….............................................................. 11

ZR § 37-78………………………….............................................................. 11

62 Rules of the City of New York ("RCNY") Section 1-01(a)…................................... 12

62 RCNY Section 1-01(m) ………………...…………….................................. 12

62 RCNY Section 1-01(n) …………………………….................................... 12

62 RCNY Section 2-03(d)(2) ……………………..………................................ 12

New York City Charter Section 206(c) …………………….................................. 12

Plaintiffs submit this Memorandum of Law dated October 29, 2015 in Opposition to Defendants' Motion for Summary Judgment (Dkts. Nos. 181-184).

## STATEMENT OF FACTS

For a full statement of the relevant facts, please see Plaintiffs' Response to Defendants' Local Rule 56.1 Statement dated October 27, 2015 ("Plaintffs' 56.1"), and the Declaration of Gideon Orion Oliver in Opposition to Defendants' Summary Judgment Motion dated October 27, 2015 (the "Oliver Dec.").

Defendants' motion relies almost solely on self-serving skews of plaintiffs' own testimony, provided in the years after the events in question, in an effort to shore up their lack of legal justification to arrest, detain, or prosecute any plaintiff on March 17, 2012 for any offense. Plaintiffs explicitly contest defendants' self-serving mischaracterizations of the facts developed during discovery as presented in their summary judgment motion papers, including their Memorandum of Law and their Rule 56.1 Statement. Because those mischaracterizations of the facts are so numerous, Plaintiffs cannot and do not always respond to each and every one. The Court should not take Plaintiffs' silence as to a particular mischaracterization as a concession that the mischaracterization is true. In every instance, where there is a discrepancy between Defendants' characterizations of the facts and Plaintiffs', Plaintiffs' 56.1 characterizes the facts in the manner Plaintiffs content a jury could ultimately construe them.

Notably, Defendants' motion does not rely at all on the testimony of the officers who were assigned to process plaintiffs' arrests and who filled out arrest processing paperwork falsely stating they had observed plaintiffs prior to their arrests. Yet, as discussed below, it is defendants' burden to establish probable cause and – in these cases

– personal observation of each Plaintiff having committed an offense or crime, and they cannot here. For that reason, among others, defendants cannot establish as a matter of law that any lawful justification existed to arrest, detain, and/or prosecute (or attempt to prosecute) any plaintiff, and the Court should reject Defendants' application for summary judgment.

To the extent that defendants rely on the testimony of Defendant Esposito, Defendant Winski, Defendant Viviano, or non-party Mike Larkin to establish that there was any justification to detain, arrest, or prosecute any plaintiff, viewed in the light most favorable to plaintiffs, that testimony does not establish such cause as a matter of law. Rather, a close reading of their testimony, along with Plaintiffs, establishes multiple facts and/or disputes as to material facts based on which a jury could determine that there was no probable cause to arrest, detain, and/or prosecute (or attempt to prosecute) any Plaintiff.

A jury could find based on the record that Brookfield Properties, Inc. ("Brookfield") established, changed, and enforced rules prohibiting conduct in Zuccotti Park between September of 2011 and the date of plaintiffs' arrests on March 17, 2012 in cooperation and consultation with the NYPD and the City, in direct – and non-content-neutral - response to Occupy Wall Street ("OWS") and the perceived conduct of participants in OWS and in violation  (or at the very least circumvention) of the letter of the requirements of the applicable provisions of the New York City Zoning Resolution (the "ZR") and other laws and regulations restricting private owners' abilities to regulate access to and conduct in Privately Owned Public Spaces ("POPS"). *See, e.g.,* Oliver Decl. Paragraphs 56-58.

The record also establishes facts based on which a jury could determine that, to the extent that purported violations of the Zuccotti Park rules were the purported predicate for Defendants Esposito's, Winski's, and/or Viviano's orders to take police action on March 17, 2012, those rules were routinely changed at the whim of, and/or were selectively and/or overbroadly enforced by, Brookfield and/or the NYPD, to target conduct perceived to be associated with OWS. A jury could therefore find that, in addition to violating protected rights to freely assemble, association, and otherwise engage in peaceful, protected expression, the Zuccotti Park rules were unconstitutionally vague and/or overbroad on their face and/or in their application, and/or that their enforcement against Plaintiffs was selective and unconstitutional.

Beyond that, the record also establishes facts based on which a jury could determine that there was no probable cause to arrest plaintiffs. For example, a jury could determine that there was no lawful basis to order plaintiffs to leave Zuccotti Park based on some parties' purported violations of Zuccotti Park rules.

In that connection, although defendants claim that Brookfield requested that the NYPD close Zuccotti Park on March 17, 2012, there is only testimony in the record from one person whom defendants might claim made such a request – Mike Larkin.

Mr. Larkin testified that he did not work for Brookfield Properties, but rather that he was Director of Business Operations with MSA Security, which was "part of the security detail that was responsible for the park." *See, e.g.,* Plaintiffs' 56.1 at 1285-1288. He was not the Property Director for Brookfield Properties on March 17, 2012, *see, e.g,.* Plaintiffs' 56.1 at Paragraph 1287, although numerous defendants included in their arrest processing paperwork that he was and that they had observed him personally

communicating orders to leave Zuccotti Park to Plaintiffs on March 17, 2012, *see, e.g.,* OLBS Reports.

Mr. Larkin testified repeatedly that the NYPD made the determination and decision to ask people to leave Zuccotti Park on March 17, 2012 and that he was "not sure who from the NYPD decided" and he "wouldn't be able to speak to" the reasons for the decision. *See, e.g.,* Plaintiffs' 56.1 at Paragraphs 1318-1323. Mr. Larkin testified unequivocally that MSA Security did not make a decision to ask people to leave, and that as far as he knew, neither did Brookfield. *Id.* Beyond that, Mr. Larkin testified that neither he nor anyone else at MSA had or was meant to have any involvement in the potential prosecutions of any March 17, 2012 arrestee, or any other person who was allegedly requested or ordered to leave Zuccotti Park for purportedly violating Zuccotti Park rules. *See, e.g.,* Plaintiffs' 56.1 at Paragraphs 1298-1301.

Aside from Mr. Larkin's testimony, there is only testimony from two other sources related to the circumstances leading up to the purported dispersal orders given on March 17, 2012: Defendants Esposito and Winski. None of the defendants who were asked about Mr. Larkin – including Defendants Esposito, Winski, and Viviano, as well as all of the assigned "arresting officer" defendants – knew who Mr. Larkin was. Nor did Mr. Larkin know who any of them were, with the exception of Defendant Esposito, whom he specifically remembered not interacting with on March 17, 2012.

Defendant Esposito testified in sum and substance that Defendant Winski had told him that some unidentified police were approached by Brookfield who had asked for their help in "clos[ing] the park for a few hours" to address "what they saw as damage being done to the park and rules being violated" so that Brookfield "could clean, repair,

4

and just get some order to the park," Defendant Esposito did not know who made the request that Defendant Winski allegedly told Defendant Esposito about, and Defendant Esposito did not recall any other interactions with specific NYPD officers that night, aside from Defendant Winski. *See, e.g.,* Plaintiffs' 56.1 at Paragraphs 1098, 1101 and 1110. Also according to Defendant Esposito's version of events, Defendant Esposito consulted with Defendant Winski who suggested that the NYPD "comply" with the alleged request from Brookfield in part to "enforce" what they understood were the "rules" of Zuccotti Park so that Brookfield could "take down the tents" and "remove all items that weren't supposed to be there" based on their understanding of the rules and to "prevent further damage." *See, e.g.,* Plaintiffs' 56.1 at Paragraphs 1109, 1111.  As a result of that conversation, Defendant Esposito agreed with Defendant Winski's suggestion and the two of them developed a plan including a mas s arrest plan, which he ultimately approved and they put into place. *See, e.g.,* Plaintiffs' 56.1 at Paragraphs 1109, 1112-1116.

According to Defendant Winski's version of events, nobody from Brookfield asked him or anyone else to close Zuccotti Park on March 17, 2012. *See, e.g.,* Plaintiffs' 56.1 at Paragraphs 1225-1226. Rather, he understood that Brookfield wanted NYPD's help to clear the park to clean and protect their property *as a result of* his discussion with Defendant Esposito, after which Defendant Esposito made the decision to clear the park. *See, e.g.,* Plaintiffs' 56.1 at Paragraphs 1224, 1227-1231, 1246-1248.

These versions of events conflict with each other. A jury would be entitled to believe any, some, or all aspects of one or another or both or neither version of Defendants Esposito's and Winski's version of events related to the decision to close

5

Zuccotti Park on March 17, 2012. The only other version of events related to the decision to close Zuccotti Park on March 17, 2012 is Mr. Larkin's, which conflicts with both of those police versions of events. A jury would be entitled to believe Mr. Larkin's account of events or any aspect(s) of it, or not.

According to plaintiffs' testimony and other evidence in the record, a jury could find that plaintiffs were each arrested in Zuccotti Park on the evening of March 17, 2012, without having first received lawful and constitutionally meaningful dispersal orders and meaningful opportunities to disperse. With respect to dispersal orders that were or were not given, the testimony of both Defendants and Plaintiffs is wildly conflicting, and any material disputes created by the conflicting testimony are for a jury to resolve. The same is true with respect to the parties' versions of the events related to the uses of force against Plaintiffs in conducting their arrests, in cuffing them, and otherwise throughout their custody.

Plaintiffs were each eventually loaded onto an MTA bus and transported to the NYPD's Midtown South Precinct.

A jury could find that those John Doe, or named defendants, who personally took plaintiffs into custody used force on plaintiffs in the course of detaining and transporting them, used force that was excessive under the circumstances.

According to the testimony of Defendants Galgano, Ahmed, Rodriguez, and Li, whom Defendant Viviano assigned to process plaintiffs' arrests and the arrests of around 20 total arrestees, they had never seen Plaintiffs nor any of the other people whose arrests they were assigned to process prior to seeing them on the MTA bus, either outside of Zuccotti Park or outside of the Midtown South Precinct some time on the early morning

of March 18, 2012. Each of those defendants admitted that, the first time they saw each

plaintiff, each plaintiff was already under arrest, in handcuffs, and in police custody, and

they neither had nor were supplied with information about the circumstances leading up

to each plaintiff's arrests before or after they were assigned to "process" them by taking

custody of Plaintiffs and creating arrest processing paperwork to justify Plaintiffs' arrests

and in preparation of prosecuting them.

A jury could credit Defendant Galgano's testimony that he and the other

Manhattan South Task Force officers he was with did not actually participate in any

arrests, but rather were each assigned five arrests because there had been a "mixup" as a

result of which Defendant Viviano knew that none of the officers to whom he assigned

five arrestees for large-scale arrest processing each had in fact seen the conduct leading

up to their arrests. *See, e.g.,* Plaintiffs' 56.1 at Paragraph 626. Under the circumstances

established in the record, it should have been immediately obvious to numerous

defendants, including Defendants Esposito, Winski, Viviano, Galgano, Ahmed,

Rodriguez, and Li, that plaintiffs' arrests were unlawful and that they should have been

released at the latest by the time the "mixup" was discovered.

Yet, in part due to Defendants' policies and practices related to OWS and large-

scale arrest processing related to OWS, including Plaintiffs' arrest processing pursuant to

a Mass Arrest Processing Plan ("MAPP") and Defendants' testimony about its

incorporation into arrest processing of a NYPD Legal Bureau supervisor, and the denial

of consideration for release with a summons to OWS-related arrestees pursuant to a No-

Summons Policy, it was not until around thirty hours after plaintiffs' false arrests that

they were released out the back door of the New York City Criminal Court building.

7

The arrest processing officer defendants more or less consistently testified that they each met with supervisors including a supervisor from the NYPD's Legal Bureau, after which they filled out arrest processing paperwork including OLBS Reports related to each Plaintiffs. *See, e.g.,* OLBS Reports. Based on the evidence in the record, including their testimony and as well as the testimony from Defendants Esposito, Winsko, and Viviano, and third-party witnesses Papamihael and Blanco, a jury could find that, as part of Defendants' mass arrest processing procedures, Defendants Galgano, Ahmed, Rodriguez, and Li met with a supervisor from the NYPD's Legal Bureau who determined or was instructed that Plaintiffs would not be released with summonses or Desk Appearance Tickets, consistent with the NYPD's MAPP and No-Summons Policy, and that those officers falsified police paperwork, including the OLBS Reports, as a result of that meeting.

By all rights, assuming the worst about Plaintiffs' conduct - which of course the Court may not do in the context this motion - Plaintiffs should have been released after an hour or two with summonses for a Trespass or Disorderly Conduct violation. If a police officer had observed them committing a violation-level Trespass or Disorderly Conduct violation outside of the Occupy Wall Street protest context, that is what would have happened. But for for Plaintiffs' unequal treatment at Defendants' hands – including by subjecting them to the No-Summons Policy and the MAPP with its involvement of NYPD Legal Bureau attorney who participated in the creation of the arrest processing paperwork - based on Defendants' perception that they were participating in an OWS-related event, that would have happened. Yet, predictably, in part because what happened

to Plaintiffs occurred as a result of acts and omissions at the policy level, Defendants caused Plaintiffs to be detained for almost 30 hours.

Based on the evidence in the record, a jury could determine that Plaintiffs spent spent the vast majority of that time in custody suffering from delay for delay's sake, as a result of ill will, malice, and/or as a result of Defendants' efforts to gather more evidence against them in efforts to supply *post hoc* justifications for their unlawful arrests, consistent with Defendants' MAPP and No-Summons Policy and with their policies and practices related to restricting and/or punishing conduct they perceived to be associated with OWS.

A jury could find that Plaintiffs were ultimately released after nearly 30 hours in custody for the reasons cited in the DP forms: Because Defendants could identify no officer who saw them do anything prior to their arrests. *See, e.g.,* DP Forms (and Defendants' testimony related to their interactions with representatives of the Office of the District Attorney of New York County); OLPA Reports (and Plaintiffs' testimony related to the lengths of their detentions).

Although the cases could never have been prosecuted because the assigned arresting officers had not seen Plaintiffs engage in any unlawful conduct alone, in this case, there is no admissible evidence that either Brookfield or any authorized agent rescinded the contractual, constitutional, and statutory licenses and authority Plaintiffs had to be in Zuccotti Park on March 17, 2012. Nor is there any evidence that Brookfield or a representative of Brookfield ever was or meant to be the complainant in a criminal case.

With respect to Zuccotti Park in particular, the Complaint and the FAC both challenge defendants' roles in enacting and enforcing unduly restrictive and unlawful rules with respect to access to and conduct in Zuccotti Park, including by arresting plaintiffs for purportedly having been involved in – or near – violations of those rules, on First Amendment, due process, and equal protection-based grounds.

Zuccotti Park is not private property. It is a Privately Owned Public Space ("POPS") currently owned by Brookfield Properties, Inc. ("Brookfield"), and as such it is subject to regulations including provisions of the New York City Zoning Resolution ("ZR"). *See, e.g.,* FAC Paragraphs 40-47; Oliver Decl. Paragraphs 51-59. As seen, it was principally as a result of the public benefit of a permanent open park in the heart of New York City's financial district that the City approved the special permit application and granted the private developers of the property on which Zuccotti Park was established zoning incentives in exchange for the creation of spaces that are legally required to be open to the public and subject to other legal constraints that preclude the property owner from treating the public space as if it were private property. *See, e.g.,* Oliver Decl. Paragraphs 51-52.

For example, in exchange for a waiver of existing height and setback requirements, US Steel applied to the New York City Planning Commission (the "CPC") for a special permit under which it would maintain the space later designated as Zuccotti Park as a "permanent open park" for the "public benefit."  *See, e.g.,* Oliver Decl. Paragraph 52. The public was a direct and intended beneficiary of this exchange and of this aspect of the exchange. As a result of these contractual obligations and that relationship, and for the other reasons discussed elsewhere herein, POPS owners may not

unilaterally manage POPS as if they were private property.In a subsequent written agreement between the City and the United States Steel Corporation, Inc. – Brookfield's predecessor in interest – US Steel promised for its self and its successors and assigns that it would always comply with the rules and laws of the City and that its obligation was a covenant that ran with the land. ." *See, e.g.,* Oliver Decl. Paragraph 53.

The New York City Council enacted a sweeping and comprehensive rezoning scheme governing POPS in 2007, which is codified in the ZR. The ZR places significant substantive and procedural constraints on private owners of POPs who wish to close POPS or establish prohibitions on anything other than unrestricted public access to POPS. For example, the ZR requires that owners may prohibit certain behaviors by posting a "maximum of one prohibition or 'Rule of Conduct' sign" which "shall not prohibit behaviors that are consistent with the normal use of a public plaza." ZR 37-752; *see also* ZR 37-747 ("Public Space Signage"); 37-751 ("Public space signage systems").

The ZR also mandates that public plazas conform to certain design criteria and hours of operation. For example, owners may not erect barriers when the public space is open and a certain percentage of the property's frontage must remain unobstructed at all times. *See, e.g.,* ZR 37-721 (sidewalk frontage rules); 37-723 (rules as to circulation paths); 37-726 (rules as to permitted obstructions). Additionally, "public plazas shall be accessible to the public at all times, except where the CPC has authorized a nighttime closing." ZR 37-727. The CPC is also precluded by statute from authorizing changes to a public plaza's physical design unless the changes will improve – not inhibit – compliance with the ZR's broad public accessibility standards. *See, e.g.,* ZR 37-625 (regulating design changes). Similarly, the ZR requires that any proposed modification to the design

of Zuccotti Park must first go through City approval processes. *See, e.g.,* ZR 37-62 ("Changes to Existing Publicly Accessible Open Areas"), *et seq.*; 37-78 ("Design Changes"); 74-91 ("Modification of Public Plazas").

The ZR vests the CPC with the sole authority to authorize restrictions to public access and requires that the CPC comply with certain procedural safeguards before authorizing any restrictions on POPS access. For example, before any restriction to the hours of public access may be approved, an owner must submit documentation of the alleged "significant operational or safety issues" underlying the request. *See* ZR 37-727. The ZR also precludes the CPC from authorizing any closure of a POPs unless the owner provides documented evidence of "significant" safety issues and the CPC determines based on that evidence that the closure is "necessary for public safety…as documented by the applicant." *See id.*

These procedural requirements are necessary to ensure that the beneficiaries and users of POPS – members of the public such as Plaintiffs – have notice and the ability to comment before a private owner takes actions to exclude them from a POPS, or to limit their conduct in a POPs. *See, e.g.,* NYC Rules Sections 1-01(a), (m), (n); 2-03(d)(2). The Borough President and Community Board affected by any proposed changes must also be given notice and opportunity to comment, *see* NYC Charter Section 206(c), further protecting members of public such as Plaintiffs from any unjustified closing or restrictions related to POPS access. The plain text of the relevant provisions of the ZR makes it clear that the administrative approval processes contemplated by the ZR are mandatory and not discretionary and that they are the only means by which the public's right to access a POPS may be limited. *See, e.g.,* ZR Section 37-727; *cf.* Comment to

N.Y. Stat. Law Section 213 "Exceptions" (McKinney) ("When one or more exceptions are expressly made in a statute, it is a fair inference that the Legislature intended that no other exceptions should be attached to the act by implication").

Based on the facts discussed herein and other facts on the record, and taking into account all of the reasonable inferences a jury could make from them, a jury could determine that there was no probable cause to arrest, detain, and/or attempt to prosecute Plaintiffs, and that Defendants therefore violated Plaintiffs' rights, precluding summary judgment for Defendants in this case. In light of the record, Plaintiffs respectfully submit that the Court cannot and should not dismiss any of Plaintiffs' claims.

## ARGUMENT

### APPLICABLE STANDARDS OF REVIEW UNDER FED.R.CiV.P. 56

In considering defendants' motion for summary judgment made pursuant to Fed.R.Civ.P. 56, this Court must draw all reasonable inferences and resolve all factual disputes in Plaintiffs' favor.

In this connection, in Plaintiffs' 56.1, Plaintiffs have variously objected to defendants' reliance, in their Local Rule 56.1 statement, on purported "facts" arising from non-evidentiary allegations and allegations made on the basis of citations to non-admissible, non-evidentiary materials. There are many, and the Court's acceptance of them as undisputed would severely prejudice Plaintiffs by removing disputed questions of fact from the jury's proper consideration of them.[1]

---

[1]     To the extent that there is any question about the evidentiary value of any of those materials relied on by Defendants and objected to by Plaintiffs, Plaintiffs respectfully request that the Court either disregard them, or grant Plaintiffs leave to seek additional discovery under Fed.R.Civ.P. 56(d), or in connection with the related litigation in *Yotam Marom, et al. v. City of New York, et al.* 15-cv-2017 (PKC) (SN).

For example, Defendants seek to rely on a UF-49 or "unusual incident" report authored by NYPD Captain Nicole Papamichael, *see, e.g.,* July 31, 2015 Declaration of Joy Anakhu ("Anakhu Decl."), Dkt. 182, at Paragraph 6, Exhibit E, to establish facts related to Plaintiffs' and others' arrests. However, there is no citation to any testimony that would render the document admissible for any purpose, let alone to establish the facts Defendants seek to use the document to establish.[2]

Similarly, Defendants seek to rely on what they characterize as an "arrest log documenting arrestees on March 17, 2012, redacted for privacy," to establish facts Defendants believe are damning for Plaintiffs. *See, e..g,* Anakhu Decl. at Paragraph 14, Exhibit M (claiming that the document "shows the plaintiffs' arrest time and location and matches it up with the arrest time and location of Deborah Thimmesch"). There is no evidence in the record related to the sources of information underlying this document. Plaintiffs made a motion to unseal and compel disclosure of the arrest reports and other data underlying the document and the Court denied those applications. The document does not accurately show Plaintiffs' arrest times and locations. Plaintiffs explicitly sought discovery of the underlying sealed police reports and other documents, which discovery Defendants resisted and the Court ultimately denied to Plaintiffs.

---

[2] In that respect, Captain Papamichael herself acknowledged that the information she included in that report came from second-hand or third-hand information communicated to her over the phone or in documents prepared by other officers, *see, e.g.,* Plaintiffs' 56.1 at Paragraph 1023, none of which were provided by Defendants in discovery. Plaintiffs have hotly contested the accuracy and relevance of the information contained in what Plaintiffs have elsewhere called the "Papamichael Report" and Plaintiffs explicitly sought discovery of the underlying sealed police reports and other documents, which discovery Defendants resisted and the Court ultimately denied to Plaintiffs.

Plaintiffs have also objected to facts predicted on citations to two affidavits, *see, e.g.,* Anakhu Decl. at Paragraphs 31-32 and Defendants' 56.1 at Paragraphs 1-7 and 9-11, unauthenticated correspondence, see, e.g., Anakhu Decl. Paragraphs 33-34, 37, and Exhibits FF, GG, and JJ thereto, as well as a document Defendants have unilaterally claimed contains the "Rules of Conduct for Zuccotti Park, promulgated by Brookfield Properties" as alleged (without any factual support) in Paragraph 35 of the Anakhu Decl., referring to Exhibit HH thereto. The correspondence and purported information related to Zuccotti Park rules relied on by Defendants from Brookfield to the NYPD and/or the City, all such correspondence and/or purported "rules" are unauthenticated and otherwise inadmissible.[3]

With respect to the Hsu-Chen Aff. and the Holloway Aff., each of the allegations contained in the affidavits that Defendants seek to rely on are non-evidentiary – in some cases they are mere assertions where the basis for information or belief is neither

---

3 In this connection, particularly as relates to Zuccotti Park, the rules of conduct in Zuccotti Park, and the NYPD's involvement in their establishment and/or enforcement, Defendants have flatly failed to comply with their obligations under Fed.R.Civ.P. 26, consistent with Plaintiffs' discovery demands in the case and their disputes raised about them *(see, e.g.,* Dkt. No. 66) seeking evidence related to the status of Zuccotti Park as a POPS, restrictions on access to or conduct in Zuccotti Park including rules within Zuccotti Park, and the consequences for exceeding any such restrictions, limited to the time period between September of 2011 and March 17, 2012, even after the Court ordered Defendants to produce documents relating to those topics over Defendants' objection on October 20, 2014. *See* Dkt. No. 72*,* Transcript of conference held on October 20, 2014 before Magistrate Judge Michael H. Dolinger, at pp. 23-26 and 57-62.

After that conference, Defendants disclosed only a small sub-category of documents within Defendants' care, custody, and control related to those topics, including only a small subset of the documents, in some cases highly redacted, submitted by or to Defendants in the context of the City's defense in *Waller v. City of New York*, 933 N.Y.S.2d 541 (N.Y. Sup. Ct. 2011) and/or its intervention as *amicus curiae* in the *People v. Nunez*, 36 Misc.3d 172 (NY Crim. Ct. 2012) criminal prosecution in 2011 and 2012.

articulated nor clear from the context, and in other cases they are legal conclusions - and at any rate the contents of the affidavits do not establish beyond dispute any material fact. Significantly, neither person is named as a witness in the context of Defendants' disclosures made consistent to Fed. R.Civ.P. 26, and Defendants provided either no document discovery, or obviously insufficient document discovery, related to the Hsu-Chen or the Holloway Aff. or the topics discussed therein, although the evidence submitted by Plaintiffs shows that Defendants City – including the CPC - and NYPD were in communication and cooperation with POPS owners related to restricting public access to and/or establishing or modifying rules prohibiting certain conduct in response to OWS as early as October of 2011. *See, e.g.,* Oliver Decl. at Paragraphs 56-58 (including email correspondence with CPC representatives); *see also* Plaintiffs' 56.1, 909-921 (testimony of Defendant Vivano); 986-1003, 1014-1020, 1028-1034 (testimony of Captain Nicole Papamichael); 1099-1100, 1104-1108, 1152-1162, 1172-1182 (testimony of Defendant Esposito); 1187, 1198-1219, and 1267-1283 (testimony of Defendant Winski); and 1289-1310 (testimony of Mike Larkin).

With respect to the several videos Defendants seek to rely on, *see, e.g.,* Anakhu Decl. at Paragraphs 27-30 and Exhibits Z-CC thereto and Defendants' 56.1 at Paragraphs 102-151, Plaintiffs object to the video evidence as unauthenticated and inadmissible. Defendants' characterizations of what the videos show are self-serving and go well beyond the extent to which portions of the video might be considered admissible based on citations to evidence the Court might consider to establish their admissibility. The videos are without exception unauthenticated. Beyond that, plaintiffs have not deposed any of the alleged videographers. Therefore, especially to the extent that the videos may

have been taken by non-NYPD videographers, the videos- or portions of them - will ultimately be inadmissible. At any rate, to the extent that defendants' motion papers, including their Local Rule 56.1 Statement, have not established sufficient connection of the videos to render them admissible in their entirety, the Court cannot and should not consider them. Additionally, viewing them in the light most favorable to plaintiffs,  the videos do not establish what the Defendants say they do.

At any rate, as mentioned, Defendants' 56.1 Statement does not tell the full story. To the extent there are material facts in dispute, the Court must resolve them in Plaintiffs' favor for the purposes of resolving this motion.

## POINT I

**THE COURT SHOULD DENY DEFENDANTS SUMMARY JUDGMENT AS TO PLAINTIFFS' FIRST AMENDMENT, FOURTH, AND FOURTEENTH AMENDMENT-BASED AND RELATED STATE CONSTITUTIONAL AND STATE LAW CLAIMS**

The core of the First Amendment to the United States Constitution protects political speech, assembly, and other expression, most heavily in traditional public fora, including group political speech and expression (such as expressive association), while generally prohibiting content-based and other unreasonable restrictions on protected speech and conduct.  The attendant provision of the New York State Constitution is even more protective of those rights. *See, e.g., People v. Balmuth*, 178 Misc.2d 958, 969 (Crim.Ct., N.Y. County 1994); *People v. Millhollen*, 5 Misc.3d 810 (Ithaca City Ct. 2004).

As seen below, all of the relevant caselaw interpreting these constitutional provisions holds that the mere observation, in the context of a First Amendment assembly

17

in a traditional public forum, that some perceived participants or perceived "group" may have become disorderly, or even engaged in some criminal conduct, does not permit the police to interfere with the assembly unless there is clear and present danger of serious public ramifications far beyond mere annoyance, inconvenience, or other, similar conditions. Absent such imminent or actual public ramifications, police cannot simply treat the perceived "group" as a unit and order to disperse, detain, or arrest all of the perceived participants. Even where the police have the authority temporarily to restrict the movement of a perceived "group" where there is the imminent threat of serious public ramifications far beyond mere annoyance or inconvenience, they do not have the authority to arrest perceived participants in the "group" without first giving clearly audible notice and a real opportunity to disperse.

Plaintiffs' detentions and arrests – and the restrictions on protected conduct leading up to them - occurred in the context of a First Amendment assembly. The First Amendment issues at play in this case have Fourth and Fourteenth Amendment liberty, due process, and equal protection implications. *See, e.g., Schiller, et al. v. City of New York, et al.*, 04 Civ. 7922, 2008 WL 200021 at *2-5 (January 23, 2008)  (SDNY) (RJS) (JCF); *MacNamara, et al. v. City of New York*, 04 Civ. 9216, 275 F.R.D. 125, 154 (May 19, 2011) (SDNY) (RJS) (JCF) (citing and discussing cases).

Also related to the Zuccotti Park rules, due process principles mandate that penal laws provide reasonable notice of prohibited conduct clearly and definitely enough that ordinary people can understand what they prohibit. Such laws must be clearly drawn to prevent arbitrary and discriminatory enforcement. Laws that do not are void for vagueness. They may also be attacked as overbroad if they cover a substantial amount of

18

First Amendment protected conduct.[4]  As applied to the facts as charged in this case, Brookfield's rules are void for vagueness and overbroad. They neither give people adequate notice of what conduct they proscribe nor adequate guidance to those charged with enforcing them.

The few things defendants do say about the First Amendment, *see* Defendants' MOL at pp. 10-11, are flatly wrong. First, defendants claim that plaintiffs were not engaging in protected conduct leading up to their arrests, arguing that plaintiffs must show that their "refusal to leave the park, the conduct that led to their arrest" was protected by the First Amendment. That theory assumes defendants' version of facts and

---

[4]      "It is axiomatic that a proscriptive law must provide people with reasonable notice of the conduct it prohibits." *See People v. Stuart*, 100 N.Y.2d 412, 418 (2003); *see also Grayned v. City of Rockford*, 408 U.S. 104, 108-109 (1972) ("It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined"). Thus, a prohibition on protected conduct is unconstitutionally void for vagueness if it fails to define the prohibited conduct "(1) with sufficient definiteness that ordinary people can understand what conduct is prohibited and (2) in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1982); *see also People v. Bright*, 71 N.Y.2d 376, 379 (1988) (same under Due Process Clause of the New York State Constitution). The Supreme Court has recognized the second prong discussed in *Kolender* as "the more important aspect" of the test, *Kolender*, 461 U.S. at 358, and has stated that to prevent arbitrary and discriminatory enforcement, the legislature must "set reasonably clear guidelines for law enforcement officials and triers of fact." *Smith v. Goguen*, 415 U.S. 566, 573 (1974); *see also People v. Stuart*, 100 N.Y.2d at 420. "Where the legislature fails to provide such minimal guidelines, a criminal statute may permit a standardless sweep that allows policemen, prosecutors, and juries to pursue their personal predilections." *Kolender*, 461 U.S. at 358.

"[S]tricter standards of permissible statutory vagueness may be applied to a statute having a potentially inhibiting effect on speech; a man [sic] may the less be required to act at his [sic] peril here, because the free dissemination of ideas may be the loser." *Smith v. California*, 361 U.S. 147, 151 (1959); *see also Buckley v. Valeo*, 424 U.S. 1, 76-82 (1976); *Broadrick v. Oklahoma*, 413 U.S. 601, 611-612 (1973). A constitutional challenge for overbreadth is appropriately raised where a statute covers a substantial amount of conduct protected by the First Amendment. *See People v. Stuart*, 100 N.Y.2d at 422, n.8; *Broadrick*, 413 U.S. at 612.

goes beyond the scope of undisputed facts with evidentiary support.  More importantly, it

ignores the record evidence, which a jury could credit, supporting plaintiffs' version of

events – that plaintiffs were engaging in protected conduct prior to their arrests and that

police misconduct, not plaintiffs' misconduct, led to plaintiffs' arrests, detentions, and

attempted prosecutions. Plaintiffs address these issues after addressing defendants'

second argument below.

In their second argument, defendants argue that probable cause existed for

plaintiffs' arrests and is a "complete defense to a claim of First Amendment retaliation,"

relying on *Fabrikant v. French*, 691 F.3d 193, 215-216 (2nd Cir. 2012). However, that

theory assumes defendants' version of facts and goes beyond the scope of facts with

evidentiary support. Additionally, *Fabrikant* says that if the Court finds that there is

probable cause to arrest, considering the required objective standard, without taking into

account the state of mind of the officers involved, the arrest is privileged, so a plaintiff

raising a 1983 claim may not simply argue that the arrest was intended to chill speech to

undermine the properly supported arrest's status as privileged by probable cause.

However, where, as here, the arrest is initiated, or prolonged, impermissibly,

including when those things happen as a result of a municipal policy, practice, or custom,

the acts and omissions that cause those prolonged detentions can give rise to First

Amenment-based claims, as well as Equal Protection- based claims. Thus, for example,

even if a person's arrest for a summons-eligible violation – that is to say, a non-criminal

offense - is privileged, if the person's detention is prolonged for impermissible purposes,

such as delays caused "by 'ill will,' 'delay for delay's sake,' [or] officers' attempts to

gather more evidence against [an arrestee…or] any other 'extraordinary circumstances,'"

*Lebowitz v. City of New York*, 606 Fed.Appx. 17, 18 (2nd Cir. June 2 2015) (Summary

Order) ("*Lebowitz II*") (internal citations omitted) (discussed below).

 In support of their arguments that plaintiffs' First Amendment-based claims

cannot survive summary judgment, defendants recite the elements of a First Amendment

retaliation claim, and rely on probable cause or qualified immunity arguments as their full

response to plaintiffs' claims.  In the first instance, plaintiffs' First Amendment-based

claims are not limited to a retaliation theory. Rather, Plaintiffs contend that Defendants'

restrictions on their protected conduct were not content-neutral and fail to survive strict

scrutiny; or, alternatively, lacked narrow tailoring and failed to provide ample

alternatives for expression; and/or were the result of defendants' insufficiently bridled

discretion to permit, deny, or limit protected conduct.

 Plaintiffs advance those arguments with respect to the enactment and enforcement

of the Zuccotti Park rules as well as to the restrictions on their conduct imposed by

defendants on plaintiffs in arresting and detaining them. In other words, plaintiffs

challenge the arrests and detentions themselves as retaliatory. Plaintiffs also challenge the

use of Zuccotti Park rules as a purported basis for restricting their protected conduct and

expression. Plaintiffs challenge the enactment and enforcement of those rules – including

as purported predicates for their arrests -  facially and as-applied.

 Plaintiffs also challenge defendants' policies of denying plaintiffs individual

consideration for release with summonses, subjecting arrests perceived to be associated

with OWS to unduly long arrest processing, for their failure to survive strict or

intermediate scrutiny, and on due process and equal-based grounds.

21

With respect to defendants' allegations about the retaliation prongs of plaintiffs' First Amendment-based claims, a jury could infer that defendants' actions were motivated or substantially caused by plaintiffs' exercise of protected rights from the lack of probable cause for their arrests, which "generally creates an inference of malice'." *Higginbotham v. City of New York*, 2015 WL 2212242, at *5 (SDNY May 12, 2015). (citing cases).[5]

Additionally, even if a jury found that Plaintiffs' arrests were justified in the first instance, a jury could infer malice based on defendants' post-arrest conduct, including their conduct in detaining plaintiffs for an excessive period of time even though they did not have any privilege to do so, for the purpose of retaliating against them for engaging in protected conduct perceived to be associated with OWS, all the while falsifying evidence against them. A jury could find that they were aware of the lack of privilege at least as soon as Defendant Viviano assigned Defendants Li, Rodriguez, Ahmed, and Galgano to process the arrests of twenty people whose conduct they had not observed, and that it was not reasonable to detain plaintiffs for the around 30 hours they were each detained while defendants were falsifying arrest processing paperwork to include false information, which they forwarded to prosecutors.

---

[5]     *See also*, e.g., *Sforza v. City of New York*, 2009 WL 857496, at *17 ("lack of probable cause gives rise to an inference of malice, supporting a finding of 'intent to harm'") (internal citations omitted); *Cook v. Sheldon*, 41 F.3d 73, 80 (2nd Cir. 1994) ("'collateral objective' includes retribution" for purposes of malicious abuse of process claim); *Phelps v. City of New York*, 2006 WL 1749528, at *5 (SDNY June 27, 2006) ("Officers who promote or facilitate an arrest and prosecution may be liable for abuse of process. ….Furthermore, the absence of probable cause is probative of the lack of justification for the officers' actions and the existence of a collateral objective") (internal citation omitted).

In this case, Plaintiffs' detentions were directly prolonged by Defendants'

falsifications of police reports and forwarding them to prosecutors. In this connection,

> [t]he Second Circuit Court of Appeals has clearly held that "[n]o arrest, no matter how lawful or objectively reasonable, gives an arresting officer or his fellow officers license to deliberately manufacture false evidence against an arrestee. To hold that police officers, having lawfully arrested a suspect, are then free to fabricate false confessions at will, would make a mockery of the notion that Americans enjoy the protection of due process of the law and fundamental justice." *Ricciuti v. NY City Transit Authority*, 124 F.3d 123, 130 (2nd Cir. 1997).

*Garnett v. Undercover Officer CO309,* 2015 WL 1539044 at *1 (SDNY April 6, 2015)

("*Garnett II*"). The Second Circuit recently reaffirmed that key holding of *Ricciuti*. *See,*

*e.g., Morse v. Fusto*, ___ F.3d ___, 2015 WL 5294862, at *7 (2nd Cir. Sept. 11, 2015)

("*Morse II*"). Relatedly, "[E]veryone possesses the . . . 'right not to be deprived of liberty

as a result of the fabrication of evidence by a government officer acting in an

investigating capacity.'" *Morse,* 2015 WL 5294862 at *6, *quoting Zahrey v. Coffey*, 221

F.3d 342, 349 (2nd Cir. 2000).

> A plaintiff establishes a denial of the right to fair trial claim by showing that the defendant fabricated evidence that was likely to influence a jury, forwarded that information to prosecutors, and that the plaintiff suffered a deprivation of liberty as a result. *Ricciuti,* 124 F.3d at 129-130. The existence of probable cause is not a defense**.** *Id*. at 130.

*Garnett v. City of New York,* 2014 WL 395094, *12 (SDNY Aug. 13, 2014) ("*Garnett*

*I*"); *see also Jocks v. Tavernier*, 316 F.3d 128, 138 (2nd Cir. 2003) (citing *Ricciuiti* for

proposition that "[w]hen a police officer creates false information likely to influence a

jury's decision and forwards that information to prosecutors, he violates the accused's

constitutional right....") (cited in *Garnett II* at *4, *8).

"The limiting factor appears to be not whether the plaintiff went to trial but

whether the falsification caused material harm." *Schiller, et al. v. City of New York, et al.*

2008 WL 200021 at *10 (January 23, 2008), *citing Henry v. City of New York*, 2003 WL

22077469, at *4 (SDNY Sept. 8, 2003) ("plaintiff entitled to damages … '[i]f [his]

deprivation of liberty' between arrest and release 'was caused by the fabrication of

evidence'"); *accord, Garnett II* at *4.

      Falsifying affidavits and fabricating evidence "such as a post-arrest affidavit that

contained allegedly false information, ... an allegedly false and misleading police report,

… and an allegedly false narrative of events preceding plaintiff's arrest provided to

another officer, who in turn forwarded the information to the prosecutor," all run afoul of

the constitution. *Garnett I* at *12 (internal citations omitted); *see also Coggins v.

Buonaro*, 776 F.3d 108, 113 (2nd Cir. 2015) (no qualified immunity where an allegedly

falsified police report "laid the groundwork" for the prosecution). Additionally,

"[i]nformation may be 'false' if material omissions render an otherwise true statement

false." *Morse v. Fusto*, ___ F.3d ___, 2015 WL 5294862, at 7-8 (2nd Cir. Sept. 11, 2015),

*citing and discussing Manganiello v. City of New York*, 612 F.3d 149 (2nd Cir. 2010).

      To the extent defendants argue that plaintiffs have not adequately alleged or

shown First Amendment injuries, "the Court of Appeals has recently clarified that

'[c]hilled speech is not the *sine qua non* of a First Amendment claim" - rather, a plaintiff

may show "*either* that his speech has been adversely affected by the government

retaliation or that he has suffered some other concrete harm.'" *Pluma v. City of New York*,

2015 WL 1623828, at *7 (SDNY March 31, 2015), *quoting Dorsett v. County of Nassau*,

732 F.3d at 157, 160 (2nd Cir. 2013) (emphasis in original); *see also Pluma, at *7* ("Here,

although plaintiff pleads little by way of chilling, he clearly alleges a concrete injury

caused by the officers' pushing and deploying pepper spray, which satisfies the standard

recently articulated by the Court of Appeals.") Put simply, in this connection, "[b]eing subjected to criminal charges is a cognizable concrete harm." *Higginbotham* at *11 (citing cases) ("Higginbotham has satisfied the third element by pleading that the defendants arrested him and charged him with disorderly conduct"). So too must plaintiffs' detentions in this case, prolonged as they were while various defendants falsified evidence against plaintiffs, which they forwarded to prosecutors.

Based on the foregoing, as well as on other facts established in Plaintiffs' 56.1, and contrary to defendants' arguments, there is ample evidence in the record to support a finding for Plaintiffs on their First Amendment-based retaliation claims. For example, a jury could find that plaintiffs' arrests and the other constitutional harms described in the record were retaliatory based on the lack of probable cause, coupled with the facts in the record related to defendants' policies and practices related to OWS in general and related to OWS in Zuccotti Park and the establishment and enforcement of prohibited rules of conduct in Zuccotti Park in particular, as well as the reasonable inferences to be drawn therefrom.

By way of response to defendants' first contention – that Plaintiffs were not engaged in sufficiently expressive conduct, recognizable as such - the record amply demonstrates that plaintiffs were engaged in activities with obvious and protected expressive characteristics – the classically protected assembly, speech, association, and related conduct involved in their gathering and associating together in Zuccotti Park participating in a First Amendment assembly on the six-month anniversary of OWS. *c.f., Pluma*, at *7 (implying that allegations that arrestee had been engaging in protest activity or assembling as an OWS member would be sufficient).

25

In this connection, the "right to associate for the purpose of engaging in those activities protected by the First Amendment-speech, assembly, petition for the redress of grievances, and the exercise of religion" is constitutionally guaranteed "as an indispensable means of preserving other individual liberties." *Roberts v. United States Jaycees*, 468 U.S. 609, 609 (1984). "'The right of peaceable assembly is a right cognate to . . . free speech and . . . is equally fundamental.'" *Jones v. Parmley*, 465 F.3d 46, 56 (2nd Cir. 2006) (internal citation omitted). "The Supreme Court has declared that the First Amendment protects political demonstrations and protests-activities at the heart of what the Bill of Rights was designed to safeguard. *See Boos v. Barry,* 485 U.S. 312, 318, … (1988) (calling organized political protest 'classically political speech' which 'operates at the core of the First Amendment).'" *Id*. Therefore, there is no question that a jury could find that plaintiffs were engaging in protected conduct prior to their arrests.

Beyond that, as is relevant to the First Amendment analyses, plaintiffs were arrested in a traditional public forum. Parks such as Zuccotti Park are traditional public fora that have achieved a special status in the law.[6]

---

[6]   Areas traditionally available for public expression and the free exchange of ideas are public fora. *Deegan v. City of Ithaca*, 444 F.3d 135, 141 (2nd Cir. 2006), *citing H.E.R.E. v. v. City of New York*, 311 F.3d 534, 544 (2nd Cir. 2002); *see also id*. at 547 (noting that the primary factor in determining whether property is a public forum is its use). "'Speech finds its greatest protection in traditional public fora.'" *Deegan*, 444 F.3d at 142, *citing Make the Road By Walking, Inc. v. Turner*, 378 F.3d 133, 142 (2nd Cir. 2004).

   "[S]treets and parks" are examples of traditional public fora which "have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Hague v. CIO*, 307 U.S. 496, 515-516 (1939) ("Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.  Such use of the streets and public places has, from ancient times, been a part of the privileges,

Based on the evidence in the record, including the evidence related to the close and conspiratorial relationship between the NYPD and Brookfield with respect to OWS and imposing restrictions in OWS in Zuccotti Park, coupled with other facts about the nature of the forum such as the Special Permit, the applicable provisions of New York City's Zoning Resolution requiring that Zuccotti Park be open and accessible to the

---

immunities, rights, and liberties of citizens"); *see also Frisby v. Schultz*, 487 U.S. 474, 480-481 (1988); *Cornelius v. NAACP Legal Defense & Ed. Fund., Inc.*, 473 U.S. 788, 815 (1985); *Perry Ed. Assn. v. Perry Local Educators' Assn.*, 460 U.S. 37, 45 (1983); *H.E.R.E.,* 311 F.3d at 548 ("Streets, parks and sidewalks are the paradigms of a public forum…." (internal quotation omitted)); *see also, e.g., Paulsen v. County of Nassau*, 925 F.2d 65, 70 (2nd Cir.,1991) (considering  "the nature of the property and its compatibility with expressive activity," the Court ruled that the Nassau Coliseum was a traditional public forum).

In keeping with these precedents, numerous courts have held that when privately owned land is explicitly dedicated to public use, the space is a traditional public forum, regardless of who holds title to the property. *See, e.g., Venetian Casino Resort, LLc v. Local Joint Exec. Bd.*, 257 F.3d 937, 94 5(9th Cir. 2001) (where private properrty owner agreed to construct sidewalk "dedicated to public use" in exchange for ability to widen road to construct new casino, the privately owned section of the sidewalk constituted a traditional public forum); *Thomason v. Jernigan*, 880 F.Supp. 1195, 1197 (ED Mich. 1991) (privately-owned driveway with easement for public access was a traditional public forum); *Citizens to End Animal Suffering and Exploitation, Inc. v. Faneuil Hall Marketplace, Inc.*, 745 F.Supp. 65 (D.Mass. 1990) (pedestrian lanes inside a City marketplaed but leased to a private company for 99 years constituted public forum because, *inter alia*, the City had an easement protecting "the public's access and passage"); *First Unitarian Church of Salt Lake City v. Salt Lake City Corp.*, 308 F.3d 1114, 1123 (10th Cir. 2002) ("Because such traditional public fora are often easements, it is evident the property here is not exempt from the First Amendment merely because it is an easement rather than land to which the government holds fee title") (citation omitted) (although privately owned, a street that contained a public easement was "infused with public purposes" and was thus a traditional public forum); *Waller v. City of New York*, 933 N.Y.S.2d 541, 544 (N.Y. Sup. Ct. 2011) (assuming *arguendo* that First Amendment protections apply to Zuccotti Park); *Nunez,* 36 Misc.3d at 179 ("the park is considered 'public space' for purposes of zoning law"); *People v. Leonard*, 62 NY2d 404, 410 (1984) ("[w]hen the public enjoys broad license to utilize certain property, State trespass laws may not be enforced solely to exclude persons from exercising First Amendment or other protected conduct in a manner consistent with the use of the property"); *Lebowitz II* at *17 (agreeing that plaintiffs' act of lying down in Zuccotti Park was expressive enough to warrant First Amendment protection) (quoting *Texas v. Johnson*, 491 U.S. 397, 404 (1989) (quoting *Spence v. Washington*, 418 U.S. 405, 410-11 (1974)).

public on a 24-hour basis, and that its owners seek approval before modifying prohibition

rules and publicly post prohibition rules, the historic uses of Zuccotti Park, including as a

location compatible with and used for protest activity, and other proof, coupled with

reasonable inferences to be drawn therefore, a jury could determine that at all times

relevant herein Zuccotti Park was a traditional public forum for First Amendment

purposes, and that the Zuccotti Park rules were enacted and/or articulated against

Plaintiffs to target speech and conduct perceived to be associated with OWS.

In this respect, "'[t]he government's authority to regulate speech or expressive

conduct on property that has traditionally been open to the public for such activity, such

as public streets and parks, is sharply circumscribed.'"  *Deegan*, 444 F.3d at 141, *quoting*

*Hobbs v. County of Westchester*, 397 F.3d 133, 148 (2nd Cir. 2005) (citations omitted).

"The crucial question (in determining whether [particular] expressive conduct may be

prohibited) is whether the manner of expression is basically incompatible with the normal

activity of a particular place at a particular time."  *Grayned*, 408 U.S. at 116-117.  As the

Second Circuit has put it,

> [t]he Supreme Court has declared that the First Amendment protects
> political demonstrations and protests-activities at the heart of what the Bill
> of Rights was designed to safeguard. *See Boos v. Barry,* 485 U.S. 312,
> 318, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988) (calling organized political
> protest "classically political speech" which "operates at the core of the
> First Amendment").

*Jones v. Parmley,* 465 F.3d at 56. Thus, "the Court has repeatedly held that police may

not interfere with orderly, nonviolent protests merely because they disagree with the

content of the speech or because they simply fear possible disorder" and "the Supreme

Court has long applied the 'clear and present danger' test to protest cases to determine

when police interference is constitutional." *Id*. at 56, 57; *see also Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969).[7]

Even where police interference is authorized because there is actually significant disorder creating or threatening significant public ramifications a clear and present danger of significant disorder creating or threatening significant public ramifications, police must provide fair warning and meaningful opportunity to disperse.[8]

---

[7]    Making it clear that the observation of some disorderly members at a First Amendment assembly does not permit the arrest of perceived members or associates of the perceived "group" without first providing fair notice and an opportunity to disperse or otherwise conform their conduct in *Jones v. Parmley*, the Second Circuit held that the plaintiffs

> had an undeniable right to continue their peaceable protest activities, even when some in the demonstration might have transgressed the law. *NAACP v. Claiborne Hardware,* 458 U.S. 886, 908, 102 S.Ct. 3409 (1982). Plaintiffs still enjoyed First Amendment protection, and absent imminent harm, the troopers could not simply disperse them without giving fair warning. *City of Chicago v. Morales,* 527 U.S. 41, 58, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999) ("[T]he purpose of the fair notice requirement [in disorderly conduct statutes] is to enable the ordinary citizen to conform his or her conduct to the law."); ... *accord Dellums v. Powell,* 566 F.2d 167, 181 n. 31 (D.C.Cir.1977) (Where "[t]he record ⋯ indicates that not all of the arrestees were violent or obstructive or noisy ⋯ [and] only a small minority of the demonstrators were involved in any mischief," notice and time to comply with a dispersal order is required.). To the extent there was no imminent harm, plaintiffs' version of facts does not give rise to circumstances that would have suggested police need not have given a dispersal order as a matter of law.

*Id.*, 465 F.3d at 60-61. *Jones v. Parmley* also reiterates that "[n]either energetic, even raucous, protesters who annoy or anger audiences, nor demonstrations that slow traffic or inconvenience pedestrians, justify police stopping or interrupting a public protest. *Cox v. Louisiana,* 379 U.S. 536, 546-47, 549 n. 12, 85 S.Ct. 453 (1965) (group of protesters who provoked a visceral, angered response and slowed traffic did not jeopardize their speech rights); ... ("clear and present danger" means more than annoyance, inviting dispute or slowing traffic)." *Id,* 465 F.3d at 57-58 (internal citations omitted).

[8]    The unlawful assembly-type offenses against public order described in PL Article 240 criminalizing group conduct such Unlawful Assembly and Riot, can be enforced only

Against that backdrop, the record describes what a jury could determine are content-based governmental restrictions in the form of repressive police actions depriving plaintiffs of their rights to engage in protected speech and conduct that cannot survive strict scrutiny. A jury could further find that those restrictions were imposed based on plaintiffs' viewpoint and/or the police perception that the content of the their speech/expressive conduct was associated with OWS.

In this connection, plaintiffs need not prove that the Zuccotti Park rules themselves are facially content-discriminatory. Rather, they can show that rules in Zuccotti Park and the NYPD's policies and practices related to enforcing them "were adopted by the government 'because of disagreement with the message [the speech] conveys,'" *Reed v. Town of Gilbert*, 135 S.Ct. 2218, 2227 (June 18, 2015), quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). Plaintiffs have developed adequate evidence, including circumstantial evidence and party admissions, based on which a jury could infer that the Zuccotti Park rules were promulgated, modified, and/or enforced against Plaintiffs by Defendants because of disagreement with OWS's message. Therefore, strict scrutiny should apply to the analysis of the restrictions placed on Plaintiffs' First Amendment-protected conduct.

Even assuming, *arguendo*, that strict scrutiny should not apply, a jury could find that plaintiffs' arrests were not valid, content-neutral time, place, and/or manner

---

to prevent the kind of "imminent lawless action" described in *Brandenburg* or the enforcement action violates the First Amendment. "[T]he problems with New York's unlawful assembly statute and its attendant potential to chill First Amendment activity can only be cured by superimposing the requirements of *Brandenburg* upon its provision." *People v Biltsed*, 574 N.Y.S.2d 272, 277 (N.Y. Crim. Ct, 1991); *see also People v. Epton*, 19 N.Y.2d 496 (1967) (requiring "clear and present danger" to be read into Conspiracy to Riot and § 240.15, Criminal Anarchy).

restrictions, and/or that Defendants enjoyed unbridled discretion in establishing and/or enforcing the Zuccotti Park rules against Plaintiffs, and/or in otherwise violating Plaintiffs' rights to expression, assembly, and association.

In this respect, any and all content-neutral time, place and/or manner restrictions placed on the exercise of First Amendment rights must be narrowly tailored to serve a significant governmental interest and permit ample alternative channels for expression, *Deegan*, 444 F.3d at 142, *citing Ward*, 491 U.S. at 791.[9] "As to alternative avenues of communication, '[w]hile the First Amendment does not guarantee the right to employ

---

[9]    "The 'narrowly tailored' standard does not tolerate a time, place, or manner regulation that may burden substantially more speech than necessary to achieve its goal, nor does it require that the least restrictive alternative available be used." *Deegan*, 444 F.3d at 144, *citing Ward,* 491 U.S. at 788-789.

The Supreme Court has held that a regulation is narrowly tailored "if it targets and eliminates no more than the exact source of the 'evil' it seeks to remedy." *Frisby v. Schultz*, 487 U.S. 474, 485 (1988).   Put another way, "the 'essence of narrow tailoring' is that the regulation must 'focus[] on the source of the evils the [government] seeks to eliminate . . . and eliminate[] them without at the same time banning or significantly restricting a substantial quantity of speech that does not create the same evils." *Ward*, 491 U.S. at 791.

The prosecution "'bears the burden of showing that its restriction of speech is justified under the traditional 'narrowly tailored' test,'" *Deegan*, 444 F.3d at 142 (internal citation omitted), and determining whether a particular regulation accords with the Constitution "involves a fact specific and situation specific inquiry" in which "'[t]he nature of a place, 'the pattern of its normal activities, dictate the kinds of regulations of time, place, and manner that are reasonable.'' *Id., quoting Grayned*, 408 U.S. at 116-117.

"Because the excuses offered for refusing to permit the fullest scope of free speech are often disguised [Courts] must independently determine the rationality of the government's interest implicated and whether the restrictions are narrowly drawn *to further that interest.*"  *Olivieri v. Ward*, 801 F.2d 602, 606 (2nd Cir. 1986) (internal quotations omitted) (emphasis added).  A court "may not simply assume that [a decision by local officials] will always advance the asserted state interests sufficiently to justify its abridgement of expressive activity." *City of Los Angeles v. Preferred Communications, Inc.*, 476 U.S. 488, 496 (1986) (*citing and quoting Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 803 n. 22 (1984)).

every conceivable method of communication at all times and in all places, a restriction on expressive activity may be invalid if the remaining modes of communication are inadequate.'"   *Knowles v. City of Waco, Texas*, 462. F.3d 430, 434 (5th Cir. 2006).

Whether applying strict or intermediate scrutiny, a jury could determine based on the record in this case that the restrictions Defendants imposed on Plaintiffs' protected conduct lacked narrow tailoring and/or failed to provide ample alternatives for expression.

Based on the record in this case, a jury could find that Defendants violated Plaintiffs' First Amendment, due process, and/or equal protection rights.

Therefore, the Court should deny Defendants' motion for summary judgment as to those claims claims.

<div align="center">**POINT II**</div>

**THE COURT SHOULD DENY DEFENDANTS SUMMARY JUDGMENT ON PLAINTIFFS' FALSE ARREST AND RELATED CLAIMS**

This Court has recently set forth the relevant Fourth Amendment standards related to making out a false arrest claim, including that probable cause to arrest for any offense is an absolute defense to a false arrest claim. *See Higginbotham v. City of New York*, 2015 WL 2212242, at *2 (SDNY May 12, 2015). Plaintiffs here raised false arrest claims under the Fourth Amendment and the attendant provisions of the New York State Constitution, as well as New York State common law. As seen above, the Fourth Amendment issues at play in this case are not entirely separable from the First and Fourteenth Amendment issues at play in this case.

The Court should deny defendants' motion for summary judgment on plaintiffs' false arrest and related claims for several reasons.

For example, critically, none of the defendants, nor any other identifiable police officer, observed any plaintiff commit any violation of the law or crime or engage in any behavior whatsoever prior to their arrests by NYPD agents on March 17, 2012.

In this connection, probable cause is a "mixed question of law and fact," *Ornelas v. United States*, 517 U.S. 690, 696 (1996), and in determining whether probable cause existed courts "to the law of the state in which the arrest occurred." *Davis v. Rodriguez*, 364 F.3d 242, 433 (2nd Cir. 2004).

Based on defendants' versions of events and explanations as to their theories of probable cause, the predicate for plaintiffs' arrests were violation-level offenses, not crimes, under New York State law. A police officer may only arrest a person for a violation when "he or she has reasonable cause to believe that such person has committed such offense in his or her presence." New York Penal Law Sections 10.00(1) and (3); New York Criminal Procedure Law ("CPL") Section 140.10(1)(a), which require an officer's personal observations of facts supporting probable cause.[10]

---

[10]     In other cases, including the related *Marom* matter, Defendants have relied on *Atwater v. City of Lago Vista*, 532 U.S. 318, 324 (2004) and *Mikulec v. Town of Cheektowaga*, 909 F.Supp.2d 214, 225 (WDNY 2012), defendants argue that New York State law related to when there is and is not probable cause is "of no consequence, or, at best, not a clearly established pre-requisite to a finding of probable cause." However, as *Mikulec* itself points out, *Atwater* does not stand for the proposition that state law is of "no consequence" to Fourth Amendment analysis, but rather explicitly states that "an arrest might be considered unreasonable under the Fourth Amendment if the officer was not present when an alleged minor offense occurred." *Mikulec*, 909 F.Supp. at 225 (*citing Atwater*, 532 U.S. at 340, n. 11) (noting that the *Atwater* majority opinion "scrupulously and consistently reminded its readers that the criminal offense at issue was committed in the officer's presence" and that "[t]he word 'presence' … appears 22 times").

Based on the record in this case, including the admissions made by Defendants Li, Ahmed, Rodriguez, and Galgano that they had no involvement in plaintiffs' arrests and never saw them in Zuccotti Park or until they were already under arrest and handcuffed on a police-controlled bus, a jury could find that plaintiffs were not arrested in the "presence" of any NYPD officer for purposes of establishing that some police officer had probable cause to arrest any plaintiff on March 17, 2012 in the first instance.

Additionally, as it is undisputed that plaintiffs' arrests were made without a judicial warrant, so the defendants bear "the burden of proving probable cause as an affirmative defense." *Dickerson v. Napolitano*, 604 F.3d 732, 751 (2nd Cir. 2010) (citing *Broughton v. State*, 37 N.Y.2d 451, 458 (1975)), *cited in Dinler v. City of New York,* 2012 WL 4513352, at *3 (SDNY Sept. 30, 2012); *see also Trueman v. New York State Canal Corp.,* 451 Fed. Appx. 27, 29 (2nd Cir. 2011) (Unreported Opinion) (citing cases); *Gomez v. City of New York*, 2007 WL 5210469, at *15 (SDNY May 28, 2007) (same) (citing *Wu v. City of New York*, 934 F.Supp. 581, 586 (SDNY 1996).

Under New York law, as well as federal precedent interpreting the Fourth Amendment, an arrest that is made without a judicial warrant is "presumptively unlawful." *Trueman v. New York State Canal Corp.,* 451 Fed. Appx. 27, 29 (2nd Cir. 2011) (Unreported Opinion) (citing *Guntlow v. Barbera*, 907 N.Y.S.2d 86, 90 (3rd Dept. 2010)). *See also Broughton*, 37 N.Y.2d at 458.

There is no such thing as "group" probable cause, even (and perhaps especially) in the protest context. *See, e.g, Dinler,* 2012 WL 4513352 at *3-6. "Importantly, probable cause must be particular to the individual being arrested," and the requirement that there be individualized, articulable probable cause to arrest a person "cannot be

undercut or avoided by simply pointing to the fact that coincidentally there exists probable cause to search or seize another." *Dinler*, 2012 WL 4513352 at *3 (citing *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979)); *see also Barham v. Ramsey*, 434 F.3d 565, 573 (D.C. Cir. 2006) (same).[11]

Because "[w]hether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer *at the time of the arrest*." *Devenpck v. Alford*, 543 U.S. 146, 152 (2004) (emphasis added)," it is "axiomatic that subsequently discovered evidence cannot be used to cure an arrest that was made without probable cause." *Mejia v. City of New York*, 119 F.Supp.2d 232, 253 (EDNY 2000). For that reason, "the Second Circuit has stated that, '[a] court 'must consider [only] those facts available to the officer at the time of the arrest and immediately before it,'' when considering whether an officer has probable cause to arrest. … Thus, in the context of false arrest and malicious prosecution, courts have rejected evidence that arose *subsequent* to an arrest or the initiation of a prosecution as probative of probable cause." *Adams v. City of New York*, 993 F.Sup.2d 306, 328 (EDNY 2014) (internal citations omitted) (citing cases). The Second Circuit has recently reaffirmed those principles. *See, Shamir v. City of New York*, Docket No. 14-3606, 2015 WL

---

[11]     The Supreme Court has made clear that the "'substance of all the definitions of probable cause is a reasonable ground for belief of guilt, and that belief of guilt must be particularized with respect to the person searched or seized.'" *Dinler*, 2012 WL 4513352 at *3 (quoting *Maryland v. Pringle*, 540 US 366, 370-71 (2003) (internal quotations and citations omitted). Thus, at the time of the arrest, the police must have "knowledge or trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed *by the person to be arrested*." *Calamia v. City of New York*, 879 F.2d 1025, 1032 (2d Cir.1989) (emphasis added). To conclude otherwise "would erode the Fourth Amendment's fundamental requirement that searches and seizures be based on individual suspicion of wrongdoing." *Hickey*, 2006 WL 3692658 at *10.

6214708, at *4 (2nd Cir. Oct. 22, 2015) ("What Shamir admitted several months after his arrest cannot be used to show what the officers knew at the time of the arrest").

Additionally,

[u]nder New York law, "even when probable cause is present at the time of arrest, evidence could later surface which would eliminate that probable cause." ... In order for probable cause to dissipate, the groundless nature of the charges must be made apparent by the discovery of some intervening fact. ... The New York Court of Appeals has noted that "the failure to make a further inquiry when a reasonable person would have done so may be evidence of lack of probable cause." ...

*Lowth v. Town of Cheektowaga*, 82 F.3d 563, 571 (2d Cir. 1996), *amended* (May 21, 1996) (internal citations omitted); see also *Carpenter v. City of New York*, 984 F. Supp. 2d 255, 265 (S.D.N.Y. 2013), *certificate of appealability denied* (Feb. 13, 2014) (an "officer may not "deliberately disregard facts known to him which establish" an exculpatory defense. *Jocks v. Tavernier,* 316 F.3d 128, 136 (2d Cir.2003). Indeed, an officer's awareness of the facts supporting an exculpatory defense may eliminate probable cause. *Id.* at 135.")

The Court should reject Defendants' attempts to rely on the collective or imputed knowledge doctrine, also known as the fellow officer rule, to establish probable cause for Plaintiffs' arrests, detentions, or prosecutions. As the Second Circuit has recently stated,

under the "collective or imputed knowledge doctrine," *Zellner v. Summerlin*, 494 F.3d 344, 369 (2nd Cir. 2007), "'an arrest ... is permissible where the actual arresting . . . officer lacks the specific information to form the basis for probable cause … but sufficient information to justify the arrest … was known by other law enforcement officials initiating … the investigation.'" *Id.* (quoting *United States v. Colon*, 240 F.2d 130, 135 (2nd Cir. 2001)), and other officers "have communicated the information they possess individually, thereby pooling their collective knowledge to meet the probable cause threshold." *United States v. Chavez*, 534 F.3d 1338, 1345 (10th Cir. 2008).

*Brown v. City of New York*, ___ F.3d _____ , at *4 (2nd Cir. Aug. 19, 2015).

However, where, as here, other officers have not communicated information to the arresting or arrest processing officer sufficient to establish probable cause to arrest or prosecute a person, the collective knowledge doctrine cannot create a *post hoc* shield for an arrest that was otherwise unlawful because no officer observed the arrestee commit a violation.[12] In other words, at the bottom of the chain of information imputed to an arresting officer by the fellow officer rule, there must be some nugget of information that establishes probable cause that defendants can point to in order to establish that there was probable cause at the time of each plaintiff's arrests. In these cases, such information would need to be based on some identifiable officer's observations of plaintiffs engaging in unlawful conduct. Because there is no such information in the record, the collective knowledge doctrine cannot help Defendants establish that probable cause existed to arrest, detain, or prosecute Plaintiffs on March 17, 2012. Where, as here, there are disputed facts about whether there was probable cause to arrest, they are ultimately for a jury to decide. *See, e.g., Zellner*, 494 F.3d at 368 (citing cases).

Based on the record in this case, a jury could conclude that there was no probable cause to arrest any Plaintiff for any of the reasons offered by the Defendants to justify plaintiffs' arrests or for any other reason.

---

[12]     *See, e.g, Zellner*, 494 F.3d at 375 (where police officer had neither given lawful dispersal order to arrestee, that the arrestee disregarded, at the time of arrest, observations made after the time of arrest could not create probable cause); s*ee also United States v. Cruz*, 834 F.2d 47, 51 (2d Cir. 1987) (collective knowledge doctrine applied only to officers who were in communication with each other); *Gianullo v. City of New York*, 322 F.3d 139, 142-143 (2d Cir. 2003) (reversing grant of summary judgment, holding collective knowledge doctrine inapplicable without evidence the arresting officer(s) had received a communication from another officer); *United States v. Shareef*, 100 F.3d 1491, 1504 & n. 5 (10th Cir. 1996) (declining to extend collective knowledge doctrine where evidence showed officers had not communicated with each other; "'[i]nformation scattered among various officers in a police department cannot substitute for possession of the necessary facts by a single officer related to the arrest.'")

A.        A JURY COULD DETERMINE THERE WAS NO
          JUSTIFICATION TO ARREST ANY PLAINTIFF FOR
          TRESPASS

Based on the record, a jury could determine that there was no cause to arrest,

detain, or prosecute each plaintiff for trespassing in violation of PL § 140.00(5).

PL § 140.00(5) states that

[a] person who, regardless of his intent, enters or remains in or upon
premises which are at the time open to the public does so with license and
privilege unless he defies a lawful order not to enter or remain, personally
communicated to him by the owner of such premises or other authorized
person.

*See* PL § 140.00(5). A PL § 140.00(5) offense is a violation and not a crime.

"Generally, a person will be deemed to '[e]nter or remain unlawfully' on property

when he or she does so without license or privilege."  *People v. Leonard*, 62 NY2d 404,

408 (1984). There is no question in this case whether plaintiffs *entered* Zuccotti Park

with license or privilege.

"Where, as here, the alleged trespass occurred on premises generally open to the

public, the State has the burden of proving three elements to support a prima facie case of

criminal trespass: (1) that a lawful order excluding the defendant from the premises was

issued (2) that the order was communicated to the defendant by a person with authority to

make the order, and (3) that the defendant defied that order." *Carpenter v. City of New

York*, 984 F.Supp.2d 255 (SDNY 2013), *citing People v. Munroe*, 853 N.Y.S.2d 457, 458

(1st Dept. 2007); *see also People v. Wolf*, 63 Misc.2d 178, 180 (Suffolk Co. Dist. Ct.

1970) ("The public has a perfect right to enter a public building as long as they do not

create a disturbance or remain unlawfully in that building after a lawful order to leave");

*People v. Rewald*, 65 Misc.2d 453 (County Ct. Cayuga Co. 1971) (private property can be "open to public" within the meaning of the statute); *People v. Taylor*, 114 Misc.2d 680, 682 (Sup. Ct. Trial Term NY Co. 1982) (compiling "open to the public" cases).In this connection, "the People have the burden of proving that a lawful order excluding the defendant from the premises issued, that the order was communicated to the defendant by a person with authority to make the order, and that the defendant defied that order." *People v. Leonard*, 62 NY2d at 408 (emphasis added), *citing People v. Brown*, 25 NY2d 374, 377 (1969) (same).  Moreover, "the People must demonstrate that the particular order of exclusion had a legitimate basis and that, considering the nature and use of the subject property, its enforcement did not unlawfully inhibit or circumscribe the defendant from engaging in constitutionally or statutorily protected conduct." *People v. Leonard*, 62 NY2d at 411.

A person who enters on premises with an honest belief that they are licensed or privileged to enter is not guilty of trespass, *see, e.g., People v. Basch*, 36 NY2d 154, 159 (1975), even if that belief was mistaken, *see People v. Powell*, 180 Misc.2d 627 (1999); *see also People v. Murphy*, 177 Misc.2d 907, 910-911 (Dist. Ct. Nassau Co. 1998) (a person who "remains" on public premises may do so lawfully even "after being requested to leave . . . provided that the individual does not interfere with the particular purpose of the property"). "It is generally left to a jury to assess the credibility of this defense." *Carpenter*, 984 F.Supp.2d at 265, citing *People v. Jackson*, 831 NYS2d 596, 598 (3rd Dept.,2007).

Defendants argue that the license or privileged was revoked because Brookfield allegedly rescinded permission for plaintiffs to remain in Zuccotti Park after observing violations of Brookfield's rules.

However, as seen above, there is no admissible evidence in the record that happened. Specifically, there is no evidence of any request or communication from Brookfield to Defendants related to excluding people from or clearing Zuccotti Park at all, let alone for purported violations of Brookfield's rules.

Beyond that, a jury could believe or reject any or all of the various and conflicting stories about the events leading up to Plaintiffs' arrests, on credibility grounds or in light of other evidence in the record. For example, a jury could also determine that there were no lawfully imposed or enacted "rules" in place that Plaintiffs or others violated such that Brookfield had authority to exclude Plaintiffs, even if there were evidence in the record that Brookfield made such a request – which there is not.

A jury could also believe that the reasons Defendants offered for Defendant Esposito's offered reasons for ordering the clearing of Zuccutti Park on March 17, 2012 were pretextual and/or *post-hoc* justifications.[13]

---

[13]      In this connection, defendants' reliance on *People v. Nunez*, 36 Misc.3d 172 (NY Crim. Ct. 2012) and *Thimmesch v. City of New York*, 2013 U.S. Dist. LEXIS 53587 (SDNY April 9, 2012) to establish probable cause to arrest the plaintiffs in this case for trespass is misplaced. Plaintiffs hotly contest the factual allegations underlying the Court's determination in *Thimmesch*, as well as the Court's legal conclusions. Plaintiffs explicitly reject Defendants' contentions that Plaintiffs were arrested as as a result of their roles in engaging in the same "group" conduct that the *Thimmesch* Defendant allegedly engaged in. *Nunez* -a case arising from a criminal prosecution arising from the NYPD's November 15, 2011 late-night raid on Zuccotti Park to evict OWS -  considered the facial sufficiency of a first-party complaint alleging that the deponent NYPD officer had observed the defendant commit the violation-level trespass and other violations and crimes, including Resisting Arrest and OGA. With respect to the trespass charges related to the eviction, accepting the factual allegations in the accusatory

A jury could also determine that Plaintiffs were not given clearly communicated orders to quit by Brookfield's authorized representative, or meaningful opportunities to disperse.

Where, as is the case here, circumstances give doubt as a complainant's veracity, or where there may be "a material dispute of fact regarding the officers' knowledge of conduct supporting the elements of the crime of trespass," *see, e.g., Carpenter*, 984 F.Supp.2d at 265, reliance on defendants' version of the facts – and therefore summary judgment – would be inappropriate.

---

instrument it was considering as true – including allegations that there were dispersal orders being given over loudspeakers and bullhorns as well as circulated on paper to occupants of Zuccotti Park for several hours, which the *Nunez* plaintiff was allegedly observed defying by the alleged arresting officer – and construing those allegations in light of the applicable facial sufficiency principles, the *Nunez* Court allowed the trespass charge to proceed, noting "that the prosecution [would] have a difficult case to prove an actual intent to trespass … due to the many complexities of the eviction." *Nunez* at *183. With those same reservations, the Court also relied on the deponent officer's allegations that he observed the defendant "locking arms with others" and "tighten[ing] his arms to prevent the NYPD from removing himself and other persons" in sustaining both the Disorderly Conduct and OGA charges. *Id.* at 184-185. As seen above, no such observations undergird Plaintiffs' arrests or detentions or Defendants' attempts to prosecute them.

Defendants' reliance on *Lebowitz v. City of New York*, 2014 U.S. Dist. LEXIS 25515, *9 (SDNY 2014) is also misplaced. The plaintiffs in that case were arrested after allegedly violating purportedly clearly posted park rules prohibiting lying down, by lying down, and on the complaint of a security guard whose authority to exclude them for violating the rule was established through discovery, such that the Court's opinion was based on "undisputed evidence." *See, e.g., Lebowitz v. City of New York*, 2014 WL 772349, at *1 (SDNY Feb. 25, 2014) *(Lebowitz I*"). Under those circumstances, the District Court found that, where the police were entitled to rely on the complaint of a security guard whom they recognized and knew had authority to exclude the plaintiffs that he had withdrawn their permission to be in the park and that he had personally given plaintiffs an order to depart, "absent circumstances that give doubt as to the [security guard's] veracity." *Lebowitz I* at *3-4, *quoting Singer v. Fulton Cnty*, 63 F.3d 110, 118 (2nd Cir. 1995); *see also Lebowitz v. City of New York*, 606 Fed.Appx. 17, 18 (2nd Cir. June 2 2015) (Summary Order) ("*Lebowitz II*") (same).

41

**B.**        **A JURY COULD DETERMINE THERE WAS NO JUSTIFICATION TO ARREST ANY PLAINTIFF FOR DISORDERLY CONDUCT**

PL § 240.20(6) states that "[a] person is guilty of disorderly conduct when, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof. . . He [sic] congregates with other persons in a public place and refuses to comply with a lawful order of the police to disperse." Probable cause to arrest a person for a PL § 240.20(6) violation exists only where the police give a lawful order to disperse and a meaningful opportunity to comply with it and the person lawfully ordered to disperse refuses to do so. Disorderly Conduct is a violation-level, non-criminal offense.

As seen above, a jury could find that any orders based on which defendants claim they had probable cause to arrest, detain, or prosecute any plaintiff, including police instructions to disperse, that were given on March 17, 2012, were not lawful. Moreover, a jury could find that any orders that were lawful were not clearly communicated to Plaintiffs, or that Plaintiffs did not have a meaningful opportunity to comply with them.

In this connection, as the Second Circuit has held, "New York courts have interpreted [PL § 240.20] to permit punishment only where the conduct at issue does more than merely inconvenience" members of the public. *Jones v. Parmley*, 465 F.3d at 59. These limiting constructions have constitutional foundations and implications – and they are based on New York State Court of Appeals and other precedent authoritatively construing the PL § 240.20 statute to ensure its applications are constitutional.[14]  Thus,

---

[14]     *See, e.g., Schiller v. City of New York*, 2008 WL 200021, *7 (SDNY, January 23, 2008), *reconsideration den'd, Abdell v. City of New York*, 2008 WL 2540813, *1 (SDNY June 25, 2008); *aff'd, Schiller v. City of New York*, 2009 WL 497580, *4 (SDNY, Feb. 27, 2009). For example, in *People v. Jones*, 9 NY3d 259 (2007), the Court of Appeals specifically reaffirmed a key holding of its seminal Disorderly Conduct decisions in

first and primary test in considering whether particular conduct is criminally disorderly is

whether or not there is evidence of violence or a threat of violence or criminally

tumultuous conduct – that is, a real breach of the peace. *See, e.g., People v. Losinger*, 313

N.Y.S2d 60, 62 (Rochester City Crim. Ct. 1970) ("the offensive conduct must be public

in nature and must cause inconvenience, annoyance or alarm to a substantial segment of

the public, or be of such nature and character that it would appear beyond a reasonable

doubt that the conduct created a risk that a breach of the peace was imminent") (citing

cases).[15]

---

*People v. Nixon*, 248 N.Y.2d 182, 187-188 (1928) and *People v. Carcel*, 165 N.Y.S2d
113, 116 (1957) that "[s]omething more than a mere inconvenience" is required to
support a PL §240.20 charge or conviction. *See also, e.g., People v. Weaver*, 16 NY3d
123 (2011); *People v. Baker*, 20 NY3d 354 (2013).

[15]     In this connection, *Nixon* and *Carcel* both considered violations of the former
Penal Law, which explicitly criminalized the commission acts tending toward a "breach
of the peace." According to the Court of Appeals, "[t]he proscription" of PL § 240.20,

> 'unlike the former statute (§ 722), is limited to that type of conduct which
> involves a genuine intent or tendency to provoke a 'breach of the peace'
> or, to use the revision's more modern phraseology, 'to cause public
> inconvenience, annoyance or alarm' (c.f. A.L.I. Penal Code § 250.2).'
> (Practice Commentary by Richard G. Dezner and Peter McQuillan,
> McKinney's Cons. Laws of N.Y., Book 39, Penal Law, § 240.20, p. 128.)

*People v. Pritchard*, 27 N.Y.2d 246, 248-249 (1970). The Court of Appeals has
determined that in order for a charge of Disorderly Conduct to be sustained, the
prosecution must establish, beyond a reasonable doubt, that the defendant possessed a
"conscious disruptive intent" and that the defendant's conduct caused "disturbance or
disorder among others present." *Id*. Some pedestrians had to step into the street to avoid
the crowds assembled to watch anti-war skits the *Losinger* defendants had staged in
downtown Rochester, New York on Christmas Eve. The *Losinger* Court held that

> where there was no violence or threat of violence on the part of the
> defendants or on the part of any member of the crowd watching them and
> there were no threatening remarks, hostile gestures or offensive language
> on the part of any member of the crowd, a conviction for breach of the
> peace could not stand constitutional attack.

As seen above, while conduct short of a real breach of the peace may also be punished, where serious public disorder is created or imminently threatened, the sort of disruption intentionally or recklessly created or risked punishable by PL § 240.20 must be real and physical obstruction of an enduring, rather than temporary, nature. The conduct must create or imminently threaten serious public ramifications beyond inconvenience or annoyance.

In this connection, to hold a defendant liable under PL § 240.20(6) the person must have been given not only a *lawful* order by police to disperse, but also a *meaningful* opportunity to do so. *See, e.g., People v. Rothenberg*, 15 N.Y.S2d 447, 449 (N.Y. Magistrate Ct. 1939).

---

313 Misc. 2d at 62; s*ee also*, *United States v. Williams,* 2004 WL 134898, *1 (S.D.N.Y. 2004) (PL § 240.20 "'designed to proscribe only that type of conduct which has a real tendency to provoke public disorder.'" (*citing People v. Maher*, 137 Misc.2d 162, 168 (Crim. Ct., N.Y. County 1987), *aff'd*, 142 Misc.2d 977 (App. Term. 1st Dept., 1989), *app.den'd*, 74 N.Y.2d 794 (1989) ("merely congregating in a group, causing some inconvenience to others, is not enough to establish guilt" of disorderly conduct).

The necessary element of "tumultuous and violent conduct" requires "more than mere loud noise or ordinary disturbance." William C. Donnino, Practice Commentary to § 240.50(5), McKinney's Penal Law (1999). Instead, "[i]t is designed to connote frightening mob behavior involving ominous threats of injury, stone throwing or other such terrorizing acts." *Id. See also, People v. Reed*, 19 Misc.2d 217 (N.Y.City Crim. Ct., 2008) (citing Staff Notes of the Commission Revision of the Penal Law McKinneys Spec. Pamph. (1964), p. 366 ("the Disorderly Conduct statute is 'designed to proscribe only that type of conduct which has a real tendency to provoke public disorder'")).

Under the caselaw, only a person's conduct that has either already "cause[d] inconvenience, annoyance or alarm to a substantial segment of the public or [is] of such nature and character that it would appear beyond a reasonable doubt that the conduct created a risk that a breach of the peace was *imminent*" violates PL § 240.20. *See, e.g., People v. Griswald*, 648 N.Y.S.2d 901, 903 (N.Y. Co. Ct., 1996) (emphasis added), *citing People v. Chesnick*, 302 N.Y. 58 (1950); *People v. Szepansky*, 203 N.Y.S.2d 306 (N.Y. Co. Ct, 1960); *see also Jones*, 465 F.3d 46; *People v. Turner*, 48 Misc.2d 611, 620 (App. Term. 1st Dept., 1965) (citing cases), *aff'd*, 17 N.Y.2d 829 (1966), *amended* 18 N.Y.2d 683 (1966), *cert. granted*, 87 S.Ct. 227 (1966), *cert. dismissed*, 87 S.Ct. 1417 (1966).

"Not every police instruction constitutes a 'lawful' order to leave, and the circumstances surrounding such an order must be examined." *People v. Benjamin*, 713 N.Y.S2d 247 (N.Y. Crim. Ct. 2000); *see also People v. Millhollen*, 713 NS2d 703, 707 (City Ct. 2004) (noting that it is "the People's burden to allege evidentiary facts that the police issued a lawful order to disperse.").[16]

Additionally, the conduct of refusing to comply with a lawful and clearly communicated dispersal order "must be 'reinforced by a culpable mental state to create a public disturbance.'" *People v. Barrett*, 13 Misc.3d 929, 944 (N.Y. City Crim. Ct. 2006), *quoting Tichenor*, 89 N.Y.2d at 775 (1997) and *citing People v. Munafo*, 50 N.Y.2d at 331; *People v. Pritchard*, 27 N.Y.2d at 248; *see generally, Barrett*, 13 Misc. 3d at 944-46. A prosecution or conviction must therefore be based on credible and particularized "facts, either about the defendant's conduct or about the surrounding circumstances, to support an inference that defendant possessed the requisite intent or recklessness." *Barrett*, 13 Misc.3d at 944.[17]

---

[16]    "Cases discussing a 'lawful order' under PL 240.20(6) have held that, where the accusatory instrument fails to allege the basis for the order, it is facially insufficient." *Id*. By its clear terms, this provision of the Penal Law applies only to circumstances where the police have given an order *to disperse* – other directions, such as orders to "move on" or warnings – do not count. *See, e.g.*, *People v. Jennifer Bezjak*, 11 Misc.3d 424, 436-437 (NYC Crim. Ct.,2006), *aff'd*, 26 Misc.3d 130(A) (App. Term,1st Dept.,2010), *cert. den'd*, 15 N.Y.3d 747-750, 752 (2010) (warnings on flyers and loudspeakers did not constitute "dispersal order"); *People v. Mims*, 984 NYS2d 633, at *3 (NY City Criminal Court 2014) (police directions were not dispersal order within the meaning of PL 240.20(6)); *People v. Collins*, 44 Misc.2d 430, 431 (N.Y. Sup. 1964) (police orders did not constitute orders to disperse). On balance, courts have found that "...if the police officer's direction to move was arbitrary and unreasonable under the circumstances, the conviction will not stand." *People v. Benjamin*, 185 Misc.2d 466, 468 (N.Y. City Crim. Ct.,2000) (internal citations omitted).

[17]    In *People v. Munafo*, 50 N.Y.2d 326 (1980), the Court of Appeals instructed the courts "to assess the nature and number of those attracted, taking into account the

These New York precedents have the same Due Process, First Amendment, and Equal Protection roots as the most relevant federal cases discussed elsewhere herein. *See, e.g.*, *Jones v. Parmley*, 465 F.3d at 61 n 6; *Dellums*, 566 F.2d at 181, n.31 (D.C. Cir. 1977) ("notice and an opportunity to disperse [required] before arrests of the crowd 'as a unit' would be constitutionally permissible. Moreover, the 'fair notice' required . . . is notice reasonably likely to have reached all of the crowd despite any noise the demonstrators may have been making") (cited favorably in *Jones v. Parmley*, 465 F.3d at 60-61); *Barham*, 434 F.3d  at 576 ("[Commanding officer] could not 'deal with the crowd as a unit' unless he first issued an order to disperse and then provided a reasonable period of time to comply with that order.")

Based on the forgoing, in consideration of the record in this case, a jury could find that Defendants lacked probable cause to arrest Plaintiffs for Disorderly Conduct.

### C.   A JURY COULD DETERMINE THERE WAS NO JUSTIFICATION TO ARREST ANY PLAINTIFF FOR RESISTING ARREST

A person is guilty of Resisting Arrest when s/he intentionally prevents or attempts to prevent a police officer from effecting an authorized arrest of himself or another person.  *See* PL § 205.30. Resisting Arrest is a Class A misdemeanor.

---

surrounding circumstances, including of course, the time and place of the episode under scrutiny" in considering the actual or potential public ramifications of allegedly Disorderly Conduct.  50 N.Y.2d at 331 (internal citations omitted). Other factors that the courts have been instructed to consider are "the extent to which the defendant's conduct annoyed others, whether defendant persisted in the conduct after warnings by others or the police, whether defendant's conduct created at least the risk that disorder might result; and whether defendant's conduct occurred in a public place." *Barrett*, 13 Misc.3d at 944-945, *quoting People v. Maher*, 137 Misc.2d 162, 168 (Crim. Ct., N.Y. County 1987), *aff'd*, 142 Misc.2d 977 (App. Term. 1st Dept., 1989), *app. den'd*. 74 N.Y.2d 794 (1989); *accord, People v. Fitzgerald*, 12 Misc.2d 1190(A) at *1 (N.Y.City Criminal Court, 2006).

A key element of resisting arrest is the requirement that there be an "authorized" arrest – that is, the arrest in issue must have been made in accordance with law and premised on probable cause.  If the arrest was not authorized, even a defendant who intentionally prevented or attempted to prevent it is not guilty of resisting arrest.[18] The facts in this case fails to establish that the arrest was authorized.

Second, a person must actually engage in affirmative resistance with intent to prevent an officer from effectuating an authorized arrest.  *People v. Simm*s, 36. A.D.2d 23, 24 (4th Dep't 1971); *People v. Blandford*, 37 A.D.2d 1003 (3rd Dep't 1971).  Absent a person's "affirmatively act[ing] to resist the arrest," a charge under PL § 205.30 cannot stand.  *People v. McDaniel*, 154 Misc.2d 89, 92 (Sup. Ct., App. Term, 9th and 10th Judicial Districts, 1992).[19]

---

[18]     *See, e.g., People v. Parker*, 33 N.Y.2d 669 (1973); *People v. Peacock*, 68 N.Y.2d 675, 677 (1986) (where trial court dismissed the underlying offense of harassment, appellate court held that the resisting arrest must also be dismissed); *People v. May*, 81 N.Y.2d 725 (1994) (where court held that the police had no right to approach defendant and that subsequent detention was unlawful);  *People v. Stephen*, 153 Misc.2d 382, 390 (N.Y. County, 1992) (where after court dismissed disorderly conduct charge, resisting arrest was dismissed for facial insufficiency).

[19]     An "act" is defined as a "bodily movement." PL § 15.00(1).  "Conduct "means an act or omission and its accompanying mental state.  PL § 15.00(2).  "To act" means either to perform an act or to omit to perform an act.  PL § 15.00(5).  *See, e.g., People v. Arbeiter*, 169 Misc.2d 771 (N.Y.Sup.App.Term 1996), *app. den.* 89 NY2d 918 (1996) and *cert den*., 520 US 1213 (1997); *People v. McDaniel*, 154 Misc.2d 89 (N.Y.Sup.App.Term 1992), *app den* 81 NY2d 889 (1993) and *app den* 81 NY2d 892 (1993) and app den 81 NY2d 894 (1993). In *Arbeiter*, the Court held:

> In merely delaying the inevitable by allegedly remaining seated during the arrest process, defendants did not "attempt[ ] to prevent" their arrest within the meaning of the resisting arrest statute as presently constituted *(see, People v McDaniel,* 154 Misc 2d 89, *lv denied* 81 NY2d 889). Read in accordance with the "ordinary and accepted meaning" (McKinney's Cons Laws of NY, Book 1, Statutes § 94) of the featured word "prevent" ("to

Based on the foregoing, and the record in this case, a jury could determine that

Defendants lacked probable cause to arrest any Plaintiff for Resisting Arrest.

> **D.      A JURY COULD DETERMINE THERE WAS NO JUSTIFICATION TO ARREST ANY PLAINTIFF FOR OBSTRUCTION OF GOVERNMENTAL ADMINISTRATION IN THE SECOND DEGREE**

A person is guilty of violating PL § 195.05 and committing Obstruction of

Governmental Administration in the Second Degree ("OGA"), a class A misdemeanor,

when the person

> intentionally obstructs, impairs or perverts the administration of law or other governmental function or prevents or attempts to prevent a public servant from performing an official function, by means of intimidation, physical force or interference, or by means of any independently unlawful act…

*See* PL § 195.05.

No Plaintiff was observed by any police officer acting by means of

physical interference to impede any specific, authorized governmental function

with criminal intent.[20]

---

> deprive of power or hope of acting, operating or succeeding in a purpose"; implying "an insurmountable obstacle or impediment" [Webster's Third New International Dictionary 1798 (1981)]), the provisions of Penal Law § 205.30 simply do not cover the type of inaction attributed to these defendants. As the Appellate Term, Second Department stated in parallel circumstances, "there has been no citation to this court of any statute, rule or ordinance that requires a defendant to cooperate once that defendant is arrested and so long as the defendant does not affirmatively act to resist the arrest *(People v Stevenson,* 31 NY2d 108, 112 [backing up]) then there is no independently unlawful act that the defendant is committing." *(People v McDaniel, supra,* 154 Misc 2d, at 92.)

773-774.

[20]     "Although criminal responsibility may attach to minimal interference set in motion to frustrate police activity, it does so only where a person intentionally impedes or

A jury could reasonably find based on the record that defendants lacked probable cause to arrest any plaintiff.

<u>POINT III</u>

**THE COURT SHOULD DENY DEFENDANTS SUMMARY JUDGMENT AS TO PLAINTIFFS' EXCESSIVE FORCE CLAIMS**

This Court recently analyzed an excessive force claim based on force used during an arrest in a protest context and related tight cuffing claims in *Higginbotham*. "A section 1983 false arrest claim arising in the context of an arrest is analyzed under Fourth Amendment principles." *Higginbotham* at *5, *citing Graham v. Connor*, 490 U.S. 386, 394 (1989); *see also Brown* at *5 (reversing grant of summary judgment on excessive force claim), *quoting Graham*, 490 U.S. at 396 (the Court must consider (1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of officers or others, and (3) whether the suspect was actively resisting or attempting to evade arrest or flight).

---

defeats a governmental function. . . ." *People v. Ferreira*, 10 Misc.3d 441, 442 (Crim. Ct., N.Y. Co. 2005). "[A]n essential element of the crime of obstructing governmental administration, to be charged in an information, must be an act of either (1) intimidation or (2) physical force or interference or (3) an independently unlawful act." *People v. Offen*, 96 Misc.2d 147, 150 (Crim. Ct., N.Y. Co. 1978). "The Court of Appeals [has] clarified that where the 'operative obstruction' is accomplished by interference, the alleged interference alleged must be physical interference, as 'physical' modifies 'interference' in the statute." *See, e.g., People v. Vargas*, 179 Misc.2d 236, 237-38 (Crim. Ct., N.Y. Co. 1998) (citing *People v. Case*, 42. N.Y.2d 98, 101 (1977)). Another "essential element" of the crime "is that the alleged conduct of the defendant prevented a public servant from performing an 'official function.'" *People v. Simon,* 145 Misc.2d 518, 521 (Crim. Ct., N.Y. Co. 1989). Failure to establish "a specific police function" compels dismissal. *People v. Tillman*, 184 Misc.2d 20, 21 (City Ct., City of Auburn 2000). The prosecution must establish that the specific police function was authorized or lawful under the circumstances. *People v. Joseph*, 156 Misc.2d 192, 194-197 (Crim. Ct., Kings Co. 1992) (Garnett, J.); *see also, e.g., People v. Rodriguez,* 19 Misc.3d 302, 305 (Crim.Ct. NY Co. 2008) (citing cases). Moreover, "[i]ntent is a necessary element of this crime." *Decker v. Campus*, 981 F.Supp. 851, 858 n.3 (SDNY 1997) (citing cases).

Preliminarily, when a police officer is not authorized to make an arrest, the officer is not authorized to use *any* force on a person. Under New York law, when the encounter "culminated in the unlawful arrest…any force used was excessive." *Meagher v. Safir*, 272 AD2d 114, 115 (1st Dept. 2000), *modified on other grounds*, 96 N.Y.2d 32, 40 (2001). Therefore, if a jury finds that probable cause was lacking to arrest, then any force used in connection with the arrest was not authorized.

Beyond that, even assuming, *arguendo*, that there was probable cause for each plaintiff's arrest, and that some uses of force against plaintiffs ere therefore authorized, the existence of probable cause to make an arrest does not justify a use of force that is excessive under the circumstances.

As the Second Circuit's recent decision in *Brown*, at *7 reemphasized, particularly where, as here, "the severity of the [alleged] crime is unquestionably slight," the plaintiffs "posed no threat whatsoever to the safety of the officers or others," and were "not fleeing, …nor physically attacking an offer, … nor even making a move than an officer could reasonably interpret as threatening an attack," it is appropriate to "leave[] the factual determination of excessiveness to a jury, whose collective common sense, informed by their life experiences, may well exceed that of all members of [the] panel." *Brown*, at *7.[21]

---

[21]    *See also, e.g., Sforza v. City of New York,* 2009 WL 857496, at *15 (SDNY March 31, 2009) ("A plaintiff need not demonstrate serious injury to prevail in an excessive force claim; bruising and other nonpermanent injuries are sufficient" (citing cases)); *Holland v. City of Poughkeepsie,* 90 A.D.3d 841, 844, (2nd Dept. 2011) ("Because of its intensely factual nature, the question of whether the use of force was reasonable under the circumstances is generally best left for a jury to decide") (declining to dismiss excessive for claims predicated on use of TASER to restrain plaintiff); *Harvey v. Brandt*, 254 A.D.2d 718, 718 (4th Dept. 1998) ("In this case, as in excessive force cases generally, 'the fact intensive inquiry of whether a particular use of force was reasonable

Moreover, although the Second Circuit has held that handcuffing is reasonable in almost all arrest situations, the Court has rejected "the principle that handcuffing is *per se* reasonable…. In determining whether the force used to effect a particular seizure is reasonable, a court must evaluate the particular circumstances of each case." *Soares v. Connecticut*, 8 F.3d 917, 921 (2nd Cir. 1993).

> Although "a line of cases have held that minor injuries that result from tight handcuffs, such as temporary swelling, inflammation or soreness of an arrestee's wrists, are insufficient on their own to sustain a Fourth Amendment excessive force claim," *Sullivan v. City of N.Y.,* No. 10 Civ. 0038 (NRB), 2011 WL 3806006, at *4 (S.D.N.Y. Aug. 29, 2011), the case law also reflects that excessive handcuffing "may constitute use of excessive force," *Dotson [v. Farrugia],* 2012 WL 996997, at *5 [SDNY Mar. 26, 2012)] (citing *Kerman v. City of N.Y.,* 261 F.3d 229, 239–40 (2d Cir.2001)); *see also Robison,* 821 F.2d at 924 (noting that a plaintiff can recover for damages for excessive handcuffing even if the injuries are not severe). Ultimately, "[l]ike all excessive force claims, the pivotal question is whether the officer[s'] behavior was objectively unreasonable in light of the circumstances." *Dotson,* 2012 WL 996997, at *5.

*Hershey v. Goldstein*, 938 F. Supp. 2d 491, 519 (S.D.N.Y. 2013).

*Higginbotham* and the cases cited therein notwithstanding, "the fact that an injury is neither permanent nor severe or that the victim required no medical treatment is not fatal to a § 1983 claim. *See id.* Rather, when faced with an incident involving a minor injury, a court should assess whether the force used was unreasonable and excessive." *Johnson v. Doherty*, 713 F. Supp. 69, 71 (S.D.N.Y. 1989), citing *Robison v. Via*, 821 F.2d 913, 924 (2nd Cir. 1987) (allegations of pushes, shoves, and arm-twisting causing bruising); *see also Bellows v. Dainack*, 555 F.2d 1105, 1106 and FN1 (2nd Cir. 1997) (trial involving excessive force claim predicated on arm-twisting and punching coupled with a detention that lasted only minutes); *Calamia v. City of New York*, 879 F.2d 1025,

---

is best left for a jury to decide") (citing *Landy v. Irizarry*, 884 F. Supp. 788, 797 (S.D.N.Y. 1995) (same) (citing cases).

1035 (2nd Cir. 1989) (denying directed verdict for defendants on excessive force claim where plaintiff was rear-cuffed for around five hours).

The extent of the injury is relevant as to damages, but not the legal viability of the claim in the first instance for pleading purposes. *Pierre-Antoine v. City of New York*, 2006 WL 1292076, at *5 (SDNY May 9, 2006) (rejecting defendants' "contention that the absence of medical evidence necessarily dooms an excessive force claim" in a case where an already-subdued person was repeatedly hit); *accord*, *Sforza*, at *15. Against that backdrop, even relatively minor injuries supported only by a plaintiff's testimony and not accompanied by medical proof of injuries can give rise to viable excessive force claims.[22]

## POINT IV

## THE COURT SHOULD DENY DEFENDANTS SUMMARY JUDGMENT ON PLAINTIFFS' EXCESSIVE DETENTION-BASED CLAIMS

---

[22]    *See, e.g., Griffin v. Crippen*, 193 F.3d 89, 91-92 (2nd Cir. 1999) (reversing dismissal where "[a]ppellant informed the court that the only evidence he intended to offer in support of his claims was his own testimony and that the only injuries he suffered were a bruised shin and swelling over his left knew"); *Davis v. City of New York*, 2007 WL 755190, at *12 (EDNY Feb. 15, 2007) (denying summary judgment on excessive force claim where plaintiff was kicked in the shoulder while cuffed on the ground, although she "never sought medical treatment and testified that she was only red and sore for a couple of days") (citing cases holding that "the Court cannot hold that the alleged use of force by an officer can constitute an objectively reasonable use of force as a matter of law"); *Sash v. United States*, 674 F.Supp.2d 531, 539 (SDNY 2009) ("Just as reasonable force is not unconstitutional even if it causes a serious injury, neither does unreasonable force become immunized because it only causes minor injury") (collecting cases involving tackles and pushes); *Ostrowski v. Town of Southold*, 443 F.Supp.2d 325, 342-343 (EDNY 2006) (precluding summary judgment where police rear-cuffed and then struck plaintiff while she was subdued); *Tomaino v. State of New York*, 22 Misc.3d 1013, 1019 (NY Ct. Claims 2008) (grabbing elbow of person in courtroom forcefully, pushing, pulling, and jerking it backwards, constituted excessive force, as, where there was no real resistance, any force was excessive); *Freeman v. Port Authority*, 243 A.D.2d 409 (1st Dept. 1997) (being thrown to the ground, held down with a foot, kicked, and handcuffed for under an hour constituted excessive force warranting punitive damages).

"'[T]he Fourth Amendment provides the proper analytical framework' for claims related to police activities that allegedly 'prolonged [arrestees'] postarrest detention[s].'" *Lebowitz II*, 606 Fed.Appx. at 18, *quoting Bryant v. City of New York*, 404 F.3d 128, 138 (2ⁿᵈ Cir. 2005).

Detentions attendant to custodial arrests of up to 48 hours prior to initially appearing before a court to face charges are presumptively reasonable under the Fourth Amendment to the United States Constitution.

Under New York State law, including CPL §140.20(1), and the New York State constitution, as well as pursuant to the policies of defendant City, a delay in arraignment of anything over 24 hours is presumptively unreasonable. *See, e.g., People ex rel. Maxian o/b/o Roundtree v. Brown,* 77 N.Y.2d 422, 426 (1991).

Any presumptive reasonableness attaching to plaintiffs' detentions can be rebutted by showing that their releases from custody "were delayed by 'ill will,' 'delay for delay's sake,' [or] officers' attempts to gather more evidence against them, *Cnty of Riverside v. McLaughlin*, 500 U.S. 44, 56 (1991), or any other 'extraordinary circumstances,' *Bryant*, 404 F.3d at 138." *See Lebowitz II*, 606 Fed. Appx. at 18.

As seen above, in this case, Defendants falsely arrested Plaintiffs and detained them for almost 30 hours although Plaintiffs were eligible for release with summonses or Desk Appearance Tickets, processes that typically take a couple or a few hours.

A jury could determine that the detentions were caused by Defendants' ill will, delay for delay's sake, officers' attempts to gather evidence against Plaintiffs, or other extraordinary circumstances. Therefore, the Court should deny Defendants' summary judgment motion with respect to Plaintiffs' excessive detention-based claims, including

those claims arising pursuant to the New York State Constitution and New York State law.

## POINT V

### THE RECORD ADEQUATELY ESTABLISHES EACH DEFENDANT'S INVOLVEMENT IN INJURING PLAINTIFFS

"The Second Circuit has defined 'personal involvement' to mean direct participation, such as 'personal participation by one who has knowledge of the facts that rendered the conduct illegal,' or indirect participation, such as 'ordering or helping others to do the unlawful acts.'" *Garnett I* at *7, *quoting Provost v. City of Newburgh*, 262 F.3d 146, 155 (2nd Cir. 2001). Multiple officers can be held liable for a single false arrest, malicious prosecution, or other constitutional tort. *See, e.g., Jackson v. City of New York*, 939 F.Supp.2d 219 (EDNY 2013). A particular officer who was not the "arresting" officer may still face liability if the officer assisted in the arrest or arrest processing in some other fashion. *See, e.g., Mack v. Town of Wakill*, 253 F.Supp.2d 552, 558 (SDNY 2003); *see also, e.g., Carpenter*, 984 F.Supp.2d at 268-269. Additionally, where defendant officers who knew or should have known of constitutional violations, but failed to intervene, they may also be liable.

The record adequately establishes facts based on which a jury could find that each Defendant engaged in acts and omissions proximately injuring plaintiffs, either related to their arrests or detentions or both, or that they knew or should have known about fellow officers' acts and omissions proximately injuring plaintiffs, and failed to intervene to prevent them or to cure the harms.

## POINT VI

**THE COURT SHOULD DENY DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT ON QUALIFIED IMMUNITY GROUNDS
BECAUSE DEFENDANTS LACKED EVEN ARGUABLE
PROBABLE CAUSE AND TO THE EXTENT THAT THEY
CREATED FALSE EVIDENCE AND/OR OTHERWISE
MALICIOUSLY VIOLATING PLAINTIFFS' CLEARLY
ESTABLISHED RIGHTS**

The Court should deny defendants' motion for summary judgment on qualified immunity grounds because defendants lacked even arguable probable cause and to the extent that they were involved in creating false evidence and/or otherwise maliciously violating plaintiffs' rights.

The record does establish as a matter of law that defendants had arguable probable cause to arrest or otherwise injure any plaintiff.[23] A jury could find based on the record that there was no such cause.

Moreover, government officials who take official actions with malicious intent to cause deprivations of constitutional rights or injury, or who falsify evidence and engage in similar, related dishonest practices, cannot enjoy qualified immunity.[24]

---

[23] "'Arguable probable cause exists if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *Garcia v. Does*, 779 F.3d 84, 92 (2nd Cir. 2015) (*quoting Escalera v. Lunn*, 361 F.3d 737, 743 (2nd Cir. 2004)), *quoted in Higginbotham* at *4.

[24] *See, e.g., Harlow v. Fitzgerald*, 457 U.S. 800, 815 (1982) (qualify immunity inappropriate if defendant official "knew or reasonably should have known" his official actions "would violate the constitutional rights of the [plaintiff], or if he took the action with the malicious intention to cause a deprivation of constitutional rights or other injury"); *Morse II,* at *1 ("the knowing creation of false or misleading evidence by an officer acting in an investigative capacity . . . qualifies as an unconstitutional deprivation of the victims' rights…[that] was, moreover, clearly established at the time of the defendants' conduct. The defendants are therefore not entitled to qualified immunity") and at *7 and *10; *see also Coggins,* 776 F.3d at 114 ("As the District Court properly concluded, the alleged falsification of evidence and the related conspiracy, if true, constitute a violation of clearly established law, and no objectively reasonable public

A jury could also find that Defendants cannot enjoy qualified immunity in this case based on their malicious intent to injure and/or their other unlawful acts, including their fabrication of false evidence against plaintiffs. Therefore, the Court should deny Defendants' motion for summary judgment on qualified immunity grounds.

### POINT VII

### THE COURT SHOULD DENY DEFENDANTS SUMMARY JUDGMENT ON MONELL GROUNDS

The Court should deny Defendants summary judgment on Plaintiffs' *Monell* claim. The FAC adequately pleads that Defendants had a policy and practice of unreasonably restricting First Amendment activities perceived to be associated with OWS in Zuccotti Park, including by means of colluding with Brookfield related to the rules in Zuccotti Park, changes in those rules, and the enforcement of those rules. The record related to the claim is sufficiently developed that a jury could hold Defendant City liable on *Monell* grounds.

---

official could have thought otherwise"); *Riccuti,* 124 F.3d at 130 (2nd Cir. 1997) (no qualified immunity where plaintiffs alleged that defendants had intentionally fabricate evidence against them); *Lippay v. Christos*, 996 F.2d 1490, 1504 (3rd Cir. 1993) ("If a police officer submits an affidavit containing statements he knows to be false or would know are false if he had not recklessly disregarded the truth, the office obviously failed to observe a right that was clearly established. Thus, he is not entitled to qualified immunity") (internal citations omitted); *Hervey v. Estes*, 65 F.3d 784, 788 (9th Cir. 1995) ("In a civil rights case, if an officer submitted an affidavit that contained statements he knew to be false or would have known were false had he not recklessly disregarded the truth and no accurate information sufficient to constitute probable cause attended the false statements…he cannot said to have acted in an objectively reasonable manner, and the shield of qualified immunity is lost") (internal quotations and citations omitted); *Davis v. City of New York*, 373 F.Supp.2d 322, 338 (SDNY 2005) ("where, as here, there is a question of fact as to whether defendants acted with malice in initiating a prosecution against plaintiffs, summary judgment on qualified immunity is inappropriate").

Additionally, to the extent that Defendants Esposito and/or Winski were final policymakers with respect to the decisions to clear Zuccotti Park based on purported rules volations, the City faces liability based on their statuses as such.

Moreover, to the extent that a jury might find that a failure to train resulted in any Plaintiff's injuries, the City may be called to account for, and face liability, based on that failure to train.

Therefore, the Court should deny defendants summary judgment on Plaintiffs' *Monell* grounds.

<div align="center">

**POINT VIII**

</div>

**THE COURT SHOULD NOT DISMISS PLAINTIFFS' CLAIMS BASED ON THE NEW YORK STATE CONSTITUTION AND NEW YORK COMMON LAW**

To the extent they are not merely duplicative of Plaintiffs' United States Constitution-based 1983 claims, the Court should not dismiss Plaintiffs' claims based on the New York State Constitution and/or New York State common law.

In this connection, the New York State Constitution is more protective than the attendant provisions of the United States Constitution in certain important respects. For example, the New York State Constitution is more protective of First Amendment rights than the First Amendment is.

Similarly, whereas a 48-hour detention is presumptively reasonable under the United States Constitution, the New York State Constitution is more protective than the United States Constitution in this respect, such that any detention over 24 hours – including plaintiffs' detentions in this case – are presumptively unreasonable.

Additionally, if the Fourth Amendment cannot protect people from arrest and prosecution for violation-level, non-criminal offenses that are not committed in an officer's presence or observed by an officer, in violation of the CPL Section 140.10(1)(a), the New York State Constitution must not countenance such violations of New York State law.

Thererfore, to the extent they are not merely duplicative of Plaintiffs' United States Constitution-based 1983 claims, the Court should not dismiss Plaintiffs' claims based on the New York State Constitution and/or New York State common law.

## **CONCLUSION**

**WHEREFORE**, plaintiffs respectfully pray that the Court deny defendants' motion, or for such other and further relief as the Court may deem just and proper.

DATED:        Queens, New York
              October 29, 2015

                                   /S/
                                   _____
                                   Gideon Orion Oliver
                                   Attorney at Law
                                   Counsel for Plaintiffs
                                   277 Broadway, Suite 1501
                                   New York, NY  10007
                                   646-263-3495

cc:      All parties (by ECF)