UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
ALEXANDER CARAVALHO, et al.,

                   Plaintiffs,            13-cv-4174 (PKC)(MHD)

      -against-                      MEMORANDUM
                                         AND ORDER

THE CITY OF NEW YORK, et al.,

                  Defendants.
------------------------------------------------------------x
CASTEL, U.S.D.J.

          Nine individuals bring a variety of claims against officers and employees of the

New York City Police Department ("NYPD"), as well as the City of New York ("City"), arising

out of their participation in an Occupy Wall Street protest in Zuccotti Park (the "Park") on March

17, 2012.  Fact discovery in this action, ably managed by Magistrate Judge Michael H. Dolinger,

has concluded.  Defendants now move for summary judgment on all claims.

         Among the issues that arise on this motion is whether there was probable cause to

arrest the nine plaintiffs for disorderly conduct.  There is no serious dispute that the plaintiffs and

others were "congregating," that a dispersal order was given, even if not universally heard, and

that the plaintiffs willfully failed to comply.  But a fundamental question presented here is

whether the dispersal order was a "lawful" order.

         "[T]he right of the people peaceably to assemble, and to petition the government

for a redress of grievances" is expressly protected in the First Amendment.  It is, however,

subject to reasonable restrictions on time, place and manner.  Zuccotti Park is private property

that is open for certain public uses.  The Court assumes without deciding that the public,

including each of the nine plaintiffs, had the right to assemble and protest in Zuccotti Park.

Their presence was subject to reasonable restrictions on time, place and manner.  Among the content neutral rules in place in Zuccotti Park was a prohibition on tents and tarpaulins.  At a minimum, temporary structures for habitation, such as tents and tarpaulins, present sanitation issues and, because of the amount of space they occupy, their presence restricts the use of the Park by others.  The incontrovertible facts of record show that the police gave a dispersal order to all present in the Park so that it could be cleaned of debris, tents and tarpaulins.  Plaintiffs, as noted, did not comply and were arrested.  So far as this record shows, individuals were permitted to engage in protest activities in Zuccotti Park before and after the cleaning and clearing.  For this and other reasons, the Court concludes that the March 17, 2012 order to disperse from Zuccotti Park for a limited period of time was lawful.

As will be explained, defendants' motion for summary judgment is granted as to all federal claims, except plaintiff Austin Guest's excessive force claim against defendant Grantley Bovell.  The Court dismisses on the merits or declines to exercise supplemental jurisdiction over all remaining state law claims, except for Guest's state assault and battery claim against Bovell and the City.

BACKGROUND

The following facts are taken from materials submitted in connection with the present motion and are either undisputed or construed "in the light most favorable to the [plaintiffs]."  Costello v. City of Burlington, 632 F.3d 41, 45 (2d Cir. 2011).

Plaintiffs in this action are Alexander Caravalho, Eric Carter, Sergio Castillo, Daniel Greenspan, Austin Guest, Thomas Hintze, Joseph Sharkey, Easton Smith, and Jennifer Waller.  Defendants are Chief of Department Joseph Esposito, Captain Nichole Papamichael, Deputy Inspector Edward Winski, Lieutenant Frank Viviano, Officer Grantley Bovell, Officer

Jabded Ahmed, Officer Alexis Rodriguez, Officer Cheung Li, Officer Michael Galgano, and Officer Fnu Abdel-Rahim, who are all employed by the NYPD, and unidentified NYPD Officers John and Jane Doe #1-15, as well as the City of New York.  In the Declaration of Gideon Orion Oliver in Support of Plaintiffs' Opposition to Defendants' Motion for Summary Judgment ("Oliver Decl."), plaintiffs withdrew their claims against Captain Papamichael.

Plaintiffs assert federal claims under section 1983 for false arrest, excessive force, excessive detention, denial of a fair trial, denial of First Amendment protections, denial of the equal protection of the laws, and denial of due process of law.  42 U.S.C. § 1983.  Invoking the Court's supplemental jurisdiction, plaintiffs also assert state constitutional claims for false arrest, violations of due process, and violations of equal protection as well as state common law claims for false imprisonment, assault and battery, intentional and negligent infliction of emotional distress ("IIED" and "NIED"), and negligent hiring, screening, retention, supervision, and training against the City.

On March 17, 2012, all nine plaintiffs were present in Zuccotti Park in connection with an Occupy Wall Street ("OWS") protest celebrating the six month anniversary of the Occupy Wall Street movement.  (Plaintiffs' Rule 56.1 Statement ("P's 56.1") ¶¶ 152, 206, 261-68, 342, 391-95, 447, 487, 522-29, 560-61).[1]  There were hundreds of other OWS protestors congregating in and around the Park on that same day.  (P's 56.1 ¶¶ 37-38, 53, 206, 212, 263).  Members of the NYPD as well as members of MSA, a private security company hired by the owner of Zuccotti Park, were also present.  (P's 56.1 ¶¶ 36, 51).

---

[1] Where applicable, the Court's citations to Plaintiffs' Rule 56.1 Statement are citations to plaintiffs' "response." Citations to the summary judgment record in this Memorandum and Order are intended to be illustrative, but not exhaustive.

Zuccotti Park is a privately-owned public space (a "POPS") created through a special permit issued by the City in 1968.  (P's 56.1 ¶¶ 2-3; Declaration of Joy Anakhu ("Anakhu Decl.") Ex. DD, Affidavit of Edith Hsu-Chen, ¶ 5).  It encompasses about a block of open space between Broadway, Cedar Street, Church Street, and Liberty Street in lower Manhattan.  (Anakhu Decl. Ex. DD, ¶ 7).  It is owned and operated by Brookfield Office Properties ("Brookfield").  (P's 56.1 ¶ 1).  Under the terms of the special permit, the Park is available for public use every day of the year.  (P's 56.1 ¶ 6; Anakhu Decl. Ex. DD, ¶ 10).  Brookfield also promulgates and enforces its own rules of conduct regarding permissible behavior in the Park, which, according to the sworn affidavit of Edith Hsu-Chen, the Director of the Manhattan Office of the New York City Department of Planning, do not need City approval prior to promulgation.  (P's 56.1 ¶¶ 24, 27-29; Anakhu Decl. Ex. DD, ¶ 11-12).[2]

Defendants produced a document entitled the "Rules of Conduct for Zuccotti Park" (the "Park Rules"), which they assert were the rules governing behavior in Zuccotti Park at the time of the incident.  (Anakhu Decl. Ex. HH).  Those rules prohibit, among other things, erecting tents or other structures; lying down on the ground in ways that unreasonably interfere with the use of the Park; placing tarps or other coverings on the property; and, any other activity prohibited by law or statute.  (Anakhu Decl. Ex. HH).  Plaintiffs deny that there were rules against camping, erecting tents and other structures, laying down on the ground and laying down on benches, sitting areas, or walkways, but produce no evidence supporting their conclusory denial.  (P's 56.1 ¶ 23).  It is undisputed, however, that representatives of Brookfield, usually

---

[2] Defendants submitted Edith Hsu-Chen's sworn affidavit describing the status of Zuccotti, which Ms. Hsu-Chen swore was based on her personal knowledge, records maintained by the City, and conversations with employees, officers, and agents of the City.  (Anakhu Decl. Ex. DD, ¶ 1).  Plaintiffs object to Ms. Hsu-Chen's affidavit as "non-evidentiary opinion testimony."  (P's 56.1 ¶1).

private security personnel hired by Brookfield, enforced rules of conduct inside the Park.  (P's 56.1 ¶¶ 27-31).

On the day in question, two high ranking NYPD officials, Chief of Department Esposito and Deputy Inspector Winski, were present in the Park and observed protestors engaging in behavior that they believed to be in violation of the Park Rules.  (P's 56.1 ¶¶ 51-52; Anakhu Decl. Ex. U, 82; Ex. V, 54-55).  Specifically, they observed protestors setting up tents and tarps, laying down, climbing on fences, and climbing on shrubs and plants.  (P's 56.1 ¶¶ 51-52; Anakhu Decl. Ex. U, 82; Ex. V, 54-55).  Esposito did not recall the exact number of Park Rule violations he saw that day, but generally recalled there being a "half dozen or so" tarps and many fewer tents than tarps.  (Anakhu Decl. Ex. V, 54).  He also recalled observing that the recently repaired Park property, particularly the newly replaced shrubbery, was "being destroyed again."  (Anakhu Decl. Ex. V, 56).  Winski similarly recalled "banners being hung from [Park] trees," "tents being erected," and "[p]eople [] standing in the flower beds again."  (Anakhu Decl. Ex. U, 82).  In addition, both officers believed that Brookfield wanted police assistance in protecting the Park, although neither Winski nor Esposito could recall being approached directly by a representative of Brookfield.  (P's 56.1 ¶¶ 71-72; Anakhu Decl. Ex. U, 98-99; Ex. V, 55, 57-58).

After conferring with Winski, Esposito decided to temporarily clear the Park of people to allow Brookfield to remedy the ongoing violations and clean the Park.  (P's 56.1 ¶¶ 74-76; Anakhu Decl. Ex. U, 81-82).  Specifically, in recalling his discussion with Winski about the decision to clear people from the Park, Esposito said:

> "[t]he violations, the park rules, the rules of the park were definitely being violated and [Winski] felt that was the best course of action, to clear the park for a period of time so we could have Brookfield come in and clean it, take down the tents, move any of

- 5 -

> the debris.  There were a few rules now that had come in with
> regarding what you can and can't do in the Park.  We wanted to
> enforce those rules and I felt that was the proper course of action."

(Anakhu Decl. Ex. V, 57-58).

After Esposito made the decision to temporarily clear the Park of people, Winski and other police officers, including Lieutenant Frank Viviano, used bullhorns to give dispersal orders to the assembled crowd of protestors.  (P's 56.1 ¶¶ 85-88, 937-38).  Those orders informed protestors that they had to leave the Park because they were violating Zuccotti Park Rules.  (P's 56.1 ¶¶ 89, 938).  Certain plaintiffs deny hearing or understanding the dispersal orders, (P's 56.1 ¶¶ 230, 353, 406, 455), but Caravalho and Greenspan testified in their depositions that they both heard dispersal orders, (P's 56.1 ¶¶ 161, 490).  After giving several dispersal orders, the police gave protestors an opportunity to leave, (P's 56.1 ¶ 91), but each of the nine plaintiffs remained inside the Park, (P's 56.1 ¶¶ 169, 232-33, 284-88, 355-58, 421-23, 459-66, 492, 534-36, 563-65).  Each plaintiff, except Castillo, then locked arms with other protestors around them, (P's 56.1 ¶¶ 170, 233, 288, 358, 423, 466, 496, 536), forming human walls of between 140 to 340 total protestors, (P's 56.1 ¶¶ 172-74).

Police officers proceeded to arrest the locked-arm protestors, including plaintiffs, using varying degrees of force.  (P's 56.1 ¶¶ 185, 246, 291-92, 360-64, 428, 475-77, 504-06, 540-41, 564-66).  Officers took these arrestees to transport buses, drove them to police precincts, and eventually moved them to Central Booking where the officers filled out arrest processing paperwork.  (P's 56.1 ¶¶ 190-91, 250, 256-57, 321, 324, 331, 386-88, 442, 444, 479, 485, 513, 520, 546, 550).  Each of the nine plaintiffs was held in custody for between 24 and 30 hours before being released without charges.  (P's 56.1 ¶¶ 1498-99).  Plaintiffs' "Declination of Prosecution" forms explain that the district attorney decided not to file charges against each

plaintiff because each one's arresting officers were unable "to personally attest to" their criminal conduct. (P's 56.1 ¶ 1498; Oliver Decl. Ex. U).[3] According to Officer Galgano's deposition testimony, some arresting officers became separated from their arrestees while the arrestees were being moved into transport buses; as a result, other officers were designated as arresting officers and completed processing paperwork for their newly acquired arrestees on the basis of information provided to them by other officials. (P's 56.1 ¶¶ 626, 642-46).

Additional facts relevant to each specific claim will be addressed, as necessary, during the analysis of those claims.

DISCUSSION

I.      Legal Standard.

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a), Fed. R. Civ. P. A fact is material if it "might affect the outcome of the suit under the governing law . . . ." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). It is the initial burden of a movant on a summary judgment motion to come forward with evidence on each material element of his claim or defense, demonstrating that he is entitled to relief as a matter of law. Vt. Teddy Bear Co., Inc. v. 1–800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004).

When the moving party has met this initial burden and has asserted facts demonstrating that the non-moving party's claim cannot be sustained, the opposing party "must

---

[3] Defendant Galgano was listed as the arresting officer for plaintiff Sharkey. (Oliver Decl. Ex. P, 27). Defendant Rodriguez was listed as the arresting officer for plaintiffs Smith and Castillo. (Oliver Decl. Ex. P, 15, 31). Defendant Ahmed was listed as arresting officer for plaintiffs Caravalho, Carter, and Guest. (Oliver Decl. Ex. P, 3, 7, 19). And, defendant Li was listed as arresting officer for plaintiffs Greenspan, Hintze, and Waller. (Oliver Decl. Ex. P, 11, 23, 35).

set forth specific facts showing that there is a genuine issue for trial." <u>Anderson</u>, 477 U.S. at 250.

In raising a triable issue of fact, the non-movant carries only a "limited burden of production,"

but nevertheless "must demonstrate more than some metaphysical doubt as to the material facts,

and come forward with specific facts showing that there is a genuine issue for trial." <u>Powell v.</u>

<u>Nat'l Bd. of Med. Exam'rs</u>, 364 F.3d 79, 84 (2d Cir. 2004) (internal quotation marks omitted).

An issue of fact is genuine "if the evidence is such that a reasonable jury could

return a verdict for the nonmoving party." <u>Anderson</u>, 477 U.S. at 248.  The Court must "view

the evidence in the light most favorable to the non-moving party and draw all reasonable

inferences in its favor, and may grant summary judgment only when no reasonable trier of fact

could find in favor of the nonmoving party." <u>Allen v. Coughlin</u>, 64 F.3d 77, 79 (2d Cir. 1995)

(internal quotations and citations omitted).  In reviewing a motion for summary judgment, the

Court must scrutinize the record, and grant or deny summary judgment as the record warrants.

Rule 56(c).  In the absence of any disputed material fact, summary judgment is appropriate.

II.     Section 1983 Claims.

To establish a claim under section 1983, a plaintiff must prove that "(1) the

challenged conduct was attributable at least in part to a person who was acting under color of

state law and (2) the conduct deprived the plaintiff of a right guaranteed under the Constitution

of the United States." <u>Snider v. Dylag</u>, 188 F.3d 51, 53 (2d Cir. 1999).  In this case, plaintiffs'

claim they were deprived of rights protected by the First, Fourth, Sixth, and Fourteenth

Amendments to the Constitution.  Specifically, they claim that they were: (a) falsely arrested, (b)

subjected to excessive force, (c) subjected to excessive detention, (d) deprived of their rights to a

fair trial, (e) deprived of their rights under the First Amendment, (f) deprived of the equal

protection of the laws, and (g) deprived of due process of law.  Plaintiffs also claim that the City

is liable for the alleged constitutional violations they suffered.  See Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 696 (1978).  Each claim will be addressed separately.

    A.  False Arrest.

        Defendants move for summary judgment on plaintiffs' false arrest claims on the basis that there was probable cause to arrest each plaintiff.  Probable cause to arrest "is a complete defense to an action for false arrest."  Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996) (quoting Bernard v. United States, 25 F.3d 98, 102 (2d Cir. 1994) (internal quotation marks omitted).  "The question of whether or not probable cause existed may be determinable as a matter of law if there is no dispute as to the pertinent events and the knowledge of the officers." Id. at 852.  There is probable cause to arrest "when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime."  Id.  It is not necessary for probable cause to have existed "with respect to each individual charge" so long as "probable cause existed to arrest for any crime."  Marcavage v. City of New York, 689 F.3d 98, 109 (2d Cir. 2012).  A court "must examine the totality of the circumstances of a given arrest" and judge those circumstances "from the perspective of a reasonable police officer in light of his training and experience."  United States v. Delossantos, 536 F.3d 155, 159 (2d Cir. 2008).

        Defendants assert that the arresting officers had probable cause to believe that plaintiffs committed trespass in violation of N.Y. Penal Law section 140.05, disorderly conduct in violation of N.Y. Penal Law section 240.20(6), and obstruction of governmental administration in violation of N.Y. Penal Law section 195.05.[4]  Defendants bear the burden of

---

[4] New York classifies trespass and disorderly conduct as "violations," but not crimes.  N.Y. Penal Law §§ 140.05, 240.20.

establishing probable cause for an arrest as an affirmative defense.  As will be discussed,

evidence that has not been disputed by plaintiffs, including in some instances their own

admissions, establishes that those officers who physically arrested plaintiffs inside Zuccotti Park

had probable cause to believe that each plaintiff violated the statutory prohibition on disorderly

conduct.  It is not necessary for the Court to consider whether there was also probable cause to

arrest plaintiffs for trespass and obstruction of governmental administration.  See Marcavage,

689 F.3d at 109.

　　　　　To show that there was probable cause to arrest for disorderly conduct, four

elements must be established: "(1) defendant congregated with other persons in a public place;

(2) was given a lawful order of the police to disperse; (3) refused to comply with that order; and

(4) acted "with intent to cause public inconvenience, annoyance or alarm" or with recklessness to

the "risk thereof."  United States v. Nelson, 10 cr 414 (PKC), 2011 WL 1327332, at *3

(S.D.N.Y. Mar. 31, 2011) aff'd, 500 Fed. App'x 90 (2d Cir. 2012); cf. Provost v. City of

Newburgh, 262 F.3d 146, 157 (2d Cir. 2001).[5]  Defendants establish all four elements.

　　　　　The first element is satisfied because each plaintiff was present in the Park

immediately prior to his or her arrest together with at least three or more persons.  People v.

Carcel, 3 N.Y.2d 327, 333 (1957) (holding that "[t]he term 'congregates with others', as used in

the statute, requires at the very least three persons assembling at a given time and place.").  Each

plaintiff admits that he or she was voluntarily present in Zuccotti Park on March 17, 2012.  (P's

56.1 ¶¶ 152, 206, 261-68, 342, 391-95, 447, 487, 522-29, 560-61).  And, there is testimony from

plaintiffs, defendants, and non-party witnesses establishing that there was a large crowd of other

---

[5] Under N.Y. Penal Law section 240.20(6), "[a] person is guilty of disorderly conduct when, with intent to cause
public inconvenience, annoyance or alarm, or recklessly creating a risk thereof . . . [h]e congregates with other
persons in a public place and refuses to comply with a lawful order of the police to disperse."

people present in and around the Park, in physical proximity to plaintiffs.  (P's 56.1 ¶¶ 37-38, 53, 206, 212, 263).  For example, Deputy Inspector Winski testified that "maybe 500 to 1,000" people were present in the Park, (Anakhu Decl. Ex. U, 89), and Joseph Sharkey stated that there were "likely upwards of 1,000 people in the vicinity of Zuccotti Park," (Anakhu Decl. Ex. T, 51).  Plaintiffs have not come forward with evidence to raise a material dispute as to the first element.

Regarding the second element, defendants have come forward with evidence tending to establish that they gave dispersal orders to the protestors in the Park.  Winski and other police officers used bullhorns to give numerous dispersal orders to the crowd of protestors gathered in Zuccotti Park.  (P's 56.1 ¶¶ 85-88, 937-38).  Those orders informed protestors that they were required to leave because they were violating Zuccotti Park Rules.  (P's 56.1 ¶¶ 89, 938).  In response, plaintiffs present evidence that some plaintiffs did not hear or did not understand defendants' dispersal orders.  (P's 56.1 ¶¶ 230, 353, 406, 455).  For example, Easton Smith testified at his deposition that he "heard some announcement being made by the police officer and [was] not sure if it was an order per se."  (Anakhu Decl. Ex. N, 76).  That evidence, however, does not create a material dispute regarding whether defendants *gave* a dispersal order.

Because probable cause is analyzed "from the perspective of a reasonable police officer in light of his training and experience," <u>Delossantos</u>, 536 F.3d at 159, evidence showing that defendants gave dispersal orders in a manner calculated to be heard is sufficient to establish that an order was given, whether or not it was, in fact, heard or understood.  Here, defendants testified that they gave numerous dispersal orders with bullhorns that were at full volume.  (Anakhu Decl. Ex. U, 101; Ex. X, 150)  And, that they observed "the vast majority of people," "hundreds" of people, leaving the Park in response to their orders.  (Anakhu Decl. Ex. U, 102).  Moreover, two plaintiffs, Caravalho and Greenspan, specifically admitted to hearing the police

- 11 -

dispersal orders.  (P's 56.1 ¶¶ 161, 490).  That undisputed testimony is sufficient, for the purposes of determining probable cause, to establish the fact that defendants gave dispersal orders.

The record also establishes that defendants' dispersal orders were "lawful."  An order to disperse is lawful under section 240.20(6), "unless the order was 'purely arbitrary' and 'not calculated in any way to promote the public order.'"  Crenshaw v. City of Mount Vernon, 372 Fed. App'x 202, 206 (2d Cir. 2010) (quoting People v. Galpern, 259 N.Y. 279, 284-85 (1932)).  Defendants have come forward with evidence showing that defendants Esposito and Winski made the decision to temporarily clear the Park of people in order to enforce the Park Rules and allow Brookfield to clean the Park.  A dispersal order reasonably calculated to enforce lawful Park Rules is itself "lawful" within the meaning of section 240.20(6).

Prior to making the decision to temporarily clear the Park, Esposito and Winski personally observed protestors engaging in behavior they believed to be in violation of the Park Rules.  (P's 56.1 ¶¶ 51-52; Anakhu Decl. Ex. U, 82; Ex. V, 54-55, 57-58).  In particular, they observed protestors setting up tents and tarps, laying down, climbing on fences, and climbing on shrubs and plants.  (P's 56.1 ¶¶ 51-52; Anakhu Decl. Ex. U, 82; Ex. V, 54-55).  While Esposito and Winski did not recall the exact number of Park Rule violations they saw, Esposito recalled there being a "half dozen or so" tarps and many fewer tents than tarps, (Anakhu Decl. Ex. V, 54), and Winski recalled "banners being hung from [Park] trees," "tents being erected," and "[p]eople [] standing in the flower beds again," (Anakhu Decl. Ex. U, 82).  Esposito also recalled observing that protestors were destroying Park property, specifically shrubbery that Brookfield had recently replaced.  (Anakhu Decl. Ex. V, 56).

- 12 -

In the course of pretrial discovery, defendants produced a notice containing the Park Rules as promulgated by Brookfield at the time in question.  (Anakhu Decl. ¶ 35, Ex. HH). Those Rules expressly prohibited "camping and/or erecting tents or other structures," "lying down on the ground or on benches, sitting areas, or walkways in ways that unreasonably interfere with their use," "placing tarps . . . or other coverings on the property," and, "any other activity prohibited by law or statute."  (Anakhu Decl. Ex. HH).  While plaintiffs deny that the rules in effect at the time actually prohibited camping, erecting tents and other structures, and laying down on the ground, they present no evidence supporting their conclusory denial.  (P's 56.1 ¶ 23).  Nor do they present evidence challenging the veracity of defendants' account of the applicable Park Rules.  Simply denying that the Park Rules prohibited certain conduct does not create a genuine issue of material fact regarding the existence or content of those rules.

Plaintiffs have not produced evidence materially disputing the content of the Park Rules or Winski's and Esposito's testimony describing what they saw and why they gave dispersal orders.  Instead, plaintiffs challenge the lawfulness of defendant's dispersal order on First Amendment and Due Process grounds.  Specifically, they contend that the Park Rules were improper time, place, and manner restrictions, that the Park Rules did not provide adequate notice of the prohibited conduct, and that defendants' decision to clear the Park of people in order to enforce the Park Rules unlawfully restricted their speech.  Because defendants gave dispersal orders as a means of enforcing the Park Rules, plaintiffs could successfully challenge a finding of probable cause if the Park Rules, or defendants' act enforcing those Rules, violated another constitutional provision.

Nevertheless, plaintiffs have failed to establish any viable First Amendment or Due Process claim attacking the police dispersal orders.  In short, the Park Rules are

constitutional content neutral time, place and manner regulations; the Park Rules are clear on their face and they deprived no plaintiff of any liberty interest protected by the Due Process Clause; and, defendants' decision to enforce the Park Rules by clearing the Park of people was viewpoint neutral and did not overly burden plaintiffs' speech.  For those reasons, there is no colorable First Amendment or Due Process challenge to finding that defendants' gave "lawful" dispersal orders.

In sum, the undisputed facts are sufficient to warrant a reasonable belief that defendants gave a dispersal order to clear Zuccotti Park of people and that the order was "lawful."  See Marcavage, 689 F.3d at 104 (quoting Bery v. City of New York, 97 F.3d 689, 697 (2d Cir. 1996) ("Government 'certainly has a significant interest in keeping its public spaces safe and free of congestion.'"); see also Rivera v. City of New York, 40 A.D.3d 334, 338 (1st Dep't 2007) (finding that dispersal order given to individuals handing out fliers on crowded boardwalk was lawful).

The third element is satisfied because a reasonable officer would believe that plaintiffs failed to comply with defendants' lawful dispersal orders.  Defendants have presented evidence that, after Winski announced the dispersal orders, the police gave protestors an opportunity to leave the Park.  (P's 56.1 ¶ 91).  As a result, many protestors left the Park and were not arrested.  (P's 56.1 ¶¶ 93, 273, 370).  Each of the nine plaintiffs, however, by their own admission, remained inside the Park.  (P's 56.1 ¶¶ 169-71, 232-33, 284-88, 355-58, 421-23, 459-66, 492, 534-36, 563-65).  Plaintiffs present no evidence disputing the fact that defendants gave protestors an opportunity to leave the park in compliance with the dispersal order or that plaintiffs remained in the Park until they were arrested.

As to the fourth and final element, the undisputed facts support the conclusion that it was reasonable for the arresting officers to believe that each plaintiff acted recklessly in creating a risk of causing public inconvenience, annoyance, or alarm.  This element contains two requirements: a public conduct requirement and an intent requirement.  See Provost, 262 F.3d at 157-58.  Regarding the intent requirement, "the statute does not require proof of the accomplished fact of public inconvenience, annoyance or alarm; but proof only from which the [r]isk of it, recklessly created, might be inferred."  People v. Todaro, 26 N.Y.2d 325, 328 (1970) (internal quotation marks omitted).  And, "because the practical restraints on police in the field are greater with respect to ascertaining intent . . ., the latitude accorded to officers considering the probable cause issue in the context of mens rea crimes must be correspondingly great."  Zalaski v. City of Hartford, 723 F.3d 382, 393 (2d Cir. 2013) (quoting Cox v. Hainey, 391 F.3d 25, 34 (1st Cir. 2004) (internal quotations marks omitted).

Plaintiffs' admissions about their own behavior in Zuccotti Park demonstrate that a reasonable arresting officer could have inferred plaintiffs' reckless disregard for public order. For example, every plaintiff but Castillo admits that he or she locked arms with other protestors when the police entered the Park to effectuate the dispersal order.  (P's 56.1 ¶¶ 170, 233, 288, 358, 423, 466, 496, 536).  While Castillo did not testify that he locked arms, he stated that he was seated on his knees inside the Park just prior to being arrested.  (P's 56.1 ¶¶ 564-65). According to Caravalho's deposition testimony, there were between 140 and 340 locked-arm protestors in total.  (P's 56.1 ¶¶ 172-74).  And, according Hintze's and Waller's testimony, some of those protestors had been engaging in "Plus Brigades" prior to their arrests, which involved practice in "melting to the ground, making a wall, and locking arms."  (P's 56.1 ¶¶ 346-49, 460, 464).  Moreover, plaintiffs Guest, Hintze, Smith, and Carter admitted that they did not

voluntarily move their bodies when ordered to move by the police, which impeded the arresting officers' ability to carry out the dispersal orders.  (P's 56.1 ¶¶ 293, 297, 365, 367, 429, 434, 543, 545).  This undisputed testimony shows that each plaintiff remained in the Park after dispersal orders were given and participated in, or associated with others participating in, activities reasonably interpreted by an arresting officer as recklessly creating a public inconvenience and exhibiting a reckless disregard for public safety.  See People v. Nunez, 36 Misc.3d 172, 183-84 (N.Y. City Crim. Ct. 2012) ("[T]he intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof is evidenced by the alleged acts of locking arms with others and that the defendant tightened his arms to prevent the NYPD from himself and other persons thereby preventing the NYPD from enforcing it's order to disperse from the location.") (internal quotation marks omitted); see also Nelson, 2011 WL 1327332, at *4; Todaro, 26 N.Y.2d at 329.

Regarding the "public conduct" requirement, the Court must assess whether plaintiffs' actions carried "public ramifications."  People v. Munafo, 50 N.Y.2d 326, 331 (1980) (describing the aim of the disorderly conduct statute as being "situations that carr[y] beyond the concern of individual disputants to a point w[h]ere they had become a potential or immediate public problem").  In doing so, "courts are constrained to assess the nature and number of those attracted, taking into account the surrounding circumstances, including, of course, the time and the place of the episode [] under scrutiny."  Id.  Plaintiffs conduct in remaining in groups waiting to be arrested in the middle of Zuccotti Park after other Occupy Wall Street protestors had dispersed was conduct "beyond the concern of individual disputants."  Id.

Finally, while each plaintiff ultimately was released without charges, the district attorney's decision to forgo prosecution does not, in and of itself, undermine the arresting officers' conclusions that there was probable cause to arrest each of the plaintiffs.  The

appropriate inquiry in a probable cause analysis "is limited to whether the facts known by the arresting officer at the time of arrest objectively provided probable cause to arrest." Gonzalez v. City of Schenectady, 728 F.3d 149, 155 (2d Cir. 2013). There is evidence in the record establishing that, at some point in time between when certain protestors were arrested and when they were processed, some arresting officers were separated from their arrestees. (P's 56.1 ¶ 626). This led to other officers, such as defendant Michael Galgano, filling out arresting paperwork for protestors whom they did not physically arrest on the basis of information provided to them by other officials. (P's 56.1 ¶¶ 642-46). Based on the evidence produced here, it is reasonable to conclude that this "mix-up" affected each of the plaintiffs: the arresting officers listed on their paperwork were not actually the officers who physically arrested them in Zuccotti Park. (P's 56.1 ¶¶ 628, 708, 711, 773-75, 854). As a result, the district attorney declined to prosecute plaintiffs because their arresting officers were unable "to personally attest to" their criminal conduct. (P's 56.1 ¶ 1498; Oliver Decl. Ex. U). Nevertheless, because this error in arrest processing took place after plaintiffs were initially arrested, it does not create a material dispute of fact regarding the basis for probable cause to arrest. Moreover, the fact that a charging instrument is based entirely upon hearsay—second hand information—does not render it constitutionally deficient. See United States v. Costello, 221 F.2d 668, 679 (2d Cir. 1955) (Hand, J.) aff'd, 350 U.S. 359 (1956) (sustaining a grand jury indictment that was based only on hearsay evidence).

An alternative grounds for dismissing the false arrest claims is that, in response to defendants' motion, plaintiffs have come forward with no evidence of the named defendants' "personal involvement" in their arrests in Zuccotti Park, except arguably as to Esposito, Winski, and Viviano. See Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995). The record establishes

that none of the named defendants physically seized any of the plaintiffs.  (P's 56.1 ¶¶ 628, 708, 711, 773-75, 854).  Instead, plaintiffs claim that defendants John and Jane Does #1-15 made the initial arrests inside the Park.  After a full and fair opportunity to conduct discovery, plaintiffs have been unable to identify John and Jane Does #1-15.  For that reason, plaintiffs' false arrest claims against defendants Bovell, Ahmed, Rodriguez, Li, Galgano, and Abdel-Rahim are dismissed on this alternative ground.

Defendants' motion for summary judgment is granted as to plaintiffs' false arrest claims.

B.  Excessive Force.

Defendants move for summary judgment on plaintiffs' excessive force claims for several reasons including that the force used against plaintiffs was reasonable as a matter of law and that plaintiffs failed to establish the "personal involvement" of any named defendant.

A claim that excessive force was used during an arrest is analyzed under Fourth Amendment principles.  Graham v. Connor, 490 U.S. 386, 394 (1989).  To prevail, a plaintiff must show that a defendant's use of force was objectively unreasonable "in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."  Id. at 397.  "[T]he right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it," and "'[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,' [], violates the Fourth Amendment."  Id. (quoting Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973)) (internal citation omitted).  In evaluating whether the amount of force used against a plaintiff was reasonable, the Court should consider: "[i] the severity of the crime at issue, [ii] whether the suspect poses an immediate threat to the safety of the officers or others, and [iii] whether [the

suspect] is actively resisting arrest or attempting to evade arrest by flight."  Pelayo v. Port Auth., 893 F. Supp. 2d 632, 642 (S.D.N.Y. 2012) (quoting Graham, 490 U.S. at 386) (alterations in original).  While courts in this Circuit regularly hold that a plaintiff must have sustained some injury to maintain a claim of excessive force, see, e.g., Acosta v. City of New York, 11 cv 856 (KBF), 2012 WL 1506954, at *10 (S.D.N.Y. Apr. 26, 2012), that injury, need not be severe, see Robison v. Via, 821 F.2d 913, 924 (2d Cir. 1987) (denying summary dismissal of excessive force claim where plaintiff "testified that she suffered bruises lasting a 'couple weeks'").

Courts in this Circuit have separately addressed excessive force claims arising from an officer's use of handcuffs.  See, e.g., Usavage v. Port Auth. of New York & New Jersey, 932 F. Supp. 2d 575, 592 (S.D.N.Y. 2013); Pelayo, 893 F. Supp. 2d at 642.  "Although handcuffs must be reasonably tight to be effective, [], overly tight handcuffing can constitute excessive force."  Lynch ex rel. Lynch v. City of Mount Vernon, 567 F. Supp. 2d 459, 468 (S.D.N.Y. 2008) (internal citation omitted).  "[I]n evaluating the reasonableness of handcuffing, a Court is to consider evidence that: 1) the handcuffs were unreasonably tight; 2) the defendants ignored the [plaintiffs'] pleas that the handcuffs were too tight; and 3) the degree of *injury to the wrists*."  Id. (quoting Esmont v. City of New York, 371 F. Supp. 2d 202, 215 (E.D.N.Y. 2005)) (emphasis in original).  Generally, "handcuffing does not suffice for an excessive force claim unless it causes some injury beyond temporary discomfort or bruising."  Omor v. City of New York, 13 cv 2439 (RA), 2015 WL 857587, at *7 (S.D.N.Y. Feb. 27, 2015); see also Higginbotham v. City of New York, 105 F. Supp. 3d 369, 377 (S.D.N.Y. 2015) (collecting cases); Lynch, 567 F. Supp. at 468-69 (collecting cases).

"Given the fact-specific nature of the inquiry, granting summary judgment against a plaintiff on an excessive force claim is not appropriate unless no reasonable factfinder could

conclude that the officers' conduct was objectively unreasonable." Amnesty Am. v. Town of W. Hartford, 361 F.3d 113, 123 (2d Cir. 2004) (Sotomayor, J.). "The plaintiff's testimony about the injuries and subsequent treatment alone is sufficient to support an excessive force claim on a motion for summary judgment." Pelayo, 893 F. Supp. 2d at 642 (citing Mickle v. Morin, 297 F.3d 114, 121–22 (2d Cir. 2002)).

1. Carter, Castillo, Greenspan, Sharkey, Smith, and Waller.

Plaintiffs Carter, Castillo, Greenspan, Sharkey, Smith, and Waller testify that police officers used varying degrees of physical force against them during their arrests. The Court need not reach the question of whether each of those instances of force was reasonable because none of these plaintiffs have put forth evidence establishing the "personal involvement" of any named defendant. This shortcoming is fatal to their federal excessive force claims against the individual defendants.

"It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'" Colon, 58 F.3d at 873 (quoting Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994)). There are several ways to establish the "personal involvement" of a defendant. A plaintiff could show that a defendant directly participated in the infraction. Williams v. Smith, 781 F.2d 319, 323 (2d Cir. 1986). She could show that a defendant failed to intervene on her behalf where there was a realistic opportunity to prevent the harm from occurring. Anderson v. Branen, 17 F.3d 552, 557 (2d Cir. 1994). And, she could show that a supervisory defendant, through "his or her supervisory responsibilities," violated the terms of the constitutional provision at issue. Ashcroft v. Iqbal, 556 U.S. 662, 675-77 (2009); see also Colon 58 F.3d at 873 (describing the various ways a supervisor could be personally involved in a constitutional deprivation carried out by a

subordinate).[6]  None of these six plaintiffs present facts showing that any of the named

defendants directly participated in, or were in a position to effectively intercede in, the alleged

uses of force.  They also do not adduce evidence showing that the supervisory defendants,

Esposito, Winski, and Viviano, failed to properly supervise any subordinate officer responsible

for, or put in place or continued any policy leading to, the alleged uses of force.

   Unlike the plaintiffs in Shankle v. Andreone, 06 cv 487 (NG)(LB), 2009 WL

3111761, at *5 (E.D.N.Y. Sept. 25, 2009), or De Michele v. City of New York, 09 cv 9334

(PGG), 2012 WL 4354763, at *16-17 (S.D.N.Y. Sept. 24, 2012), these plaintiffs do not present

any evidence, circumstantial or otherwise, of any named defendants' "personal involvement" in

the uses of force, or even that any of the named defendants witnessed plaintiffs being arrested

inside the Park.  See Rasmussen v. City of New York, 766 F. Supp. 2d 399, 411-12 (E.D.N.Y.

2011) (holding that it was an "insurmountable problem" that plaintiff, despite discovery, failed to

identify most of the officers who allegedly violated her rights).  Rather, the evidence shows that

each of the named defendants only became aware of certain plaintiffs' existence after they were

arrested, which is after the force had been used.  Specifically, the undisputed record shows that

Officer Galgano did not encounter Sharkey until he was placed on one of the transport buses,

(P's 56.1 ¶ 628); that Officer Rodriguez did not encounter Smith or Castillo until they were at

the Midtown South Precinct, (P's 56.1 ¶¶ 708, 711); that Officer Ahmed did not encounter Carter

while he was in Zuccotti Park, (P's 56.1 ¶ 775); and, that Officer Li did not encounter Waller and

Greenspan until they were on a transport bus, (P's 56.1 ¶ 854).[7]  Nor have these plaintiffs come

---

[6] For the purposes of this motion, the Court need not weigh in on the extent to which the Colon factors survive Iqbal, 556 U.S. at 675-77.  See Marom v. City of New York, 15 cv 2017 (PKC), 2016 WL 916424, at *15 (S.D.N.Y. Mar. 7, 2016) (describing the impact of Iqbal on the "Colon test" for supervisory liability).

[7] Plaintiff Waller claims that defendant Sergeant Abdel-Rahim threatened to use a taser on her if she did not stop singing in her cell.  (P's 56.1 ¶ 1421).  There is no evidence that Abdel-Rahim ever used force or was present during any other police officers use of force against any plaintiff.

forward with evidence sufficient to raise a material dispute of fact as to the defendants "personal involvement" in the use of force associated with their handcuffing.

Plaintiffs allege that John and Jane Does #1-15 were "personally involved" in the uses of force against them. But, after a full and fair opportunity to conduct discovery, plaintiffs have been unable to identify John and Jane Does #1-15. Fact discovery began on December 17, 2013. (Dkt. 16). It was originally scheduled to end on June 17, 2014, (Dkt. 16), but was extended four times, (Dkt. 49, 70, 75, 140). Fact discovery ultimately ended a year and a half later on May 15, 2015. (Dkt. 140). Because these plaintiffs cannot identify any named defendant "personally involved" in their excessive force claims, their claims fail as a matter of law. Defendants' motion for summary judgment against Carter's, Castillo's, Greenspan's, Sharkey's, Smith's, and Waller's excessive force claims is granted.

2. Caravalho, Hintze, and Guest.

In contrast, plaintiffs Caravalho, Hintze, and Guest present evidence of the "personal involvement" of certain named defendants in their excessive force claims. The Court will address each of those plaintiffs' specific claims in turn.

According to Caravalho, he was kicked by an officer in the ribs during his arrest and his handcuffs were painful when they were put on and got tighter whenever he moved his hands. (P's 56.1 ¶¶ 180, 187, 189). Critically, Caravalho presents no evidence identifying any named defendant as being "personally involved" in the alleged kick. He does, however, identify one named defendant during his testimony regarding his tight handcuffs—Officer Li. Specifically, Caravalho testified that he complained to Li about his handcuffs being tight and that Li loosened them for him; he characterized Officer Li as "the kind one." (P's 56.1 ¶ 195; Anakhu Decl. Ex. S, 108). Caravalho does not claim that Officer Li was responsible for putting

handcuffs on him or that Officer Li failed to respond to any other complaint from him about his handcuffs.  On the basis of Caravalho's own testimony, Officer Li could not have been "personally involved" in any constitutional deprivation associated with excessive force or handcuffing.  Because there is no evidence in the record linking any other named defendant to Caravalho's excessive force claims, defendants' motion for summary judgment is granted as to Caravalho's excessive force claim.

Plaintiff Hintze testified that officers gave him "pressure point treatments" on his shoulders and neck—namely, "[t]hey jammed their fingers into [his] back and the area where [his] neck meets [his] shoulders"—to get him to release his locked arms.  (P's 56.1 ¶ 360; Anakhu Decl. Ex. J, 29).  Then, they flipped him over on to his chest, with "one of the officers [coming] down with his knee on [Hintze's] cheek," and handcuffed him.  (P's 56.1 ¶¶ 362, 364; Anakhu Decl. Ex. J, 28-29).  Finally, officers carried him out of the Park by his hands and legs, dropping him a few times while carrying him.  (P's 56.1 ¶¶ 367, 372).  Like the previously discussed seven plaintiffs, Hintze does not present evidence, direct or circumstantial, of any named defendants' "personal involvement" in those actions.  Therefore, he cannot sustain an excessive force claim based on those actions at this stage.

Hintze does, however, present evidence that, while waiting on a transport bus, he too asked Officer Li to remove his flex cuffs because they were too tight.  (P's 56.1 ¶ 378). Officer Li complied with this request and replaced Hintze's flex cuffs with metal handcuffs.  (P's 56.1 ¶ 379).  Although Hintze testified that his metal handcuffs were also too tight, there is no evidence that he asked Officer Li to loosen the replacement handcuffs.  (P's 56.1 ¶ 380).  Hintze also testified that his only injury from being handcuffed was some numbness for a period of "some weeks and maybe a couple of months."  (P's 56.1 ¶ 382).  Because Hintze fails to show

that Li "ignored [his] pleas that the handcuffs were too tight," Lynch, 567 F. Supp. 2d at 468, and that he suffered some injury "beyond temporary discomfort or bruising," Omor, 2015 WL 857587, at *7, no reasonable fact finder could conclude that the handcuffing with which Li may have been "personally involved" was unreasonable.  On the above basis, defendants' motion for summary judgment is granted on all of Hintze's excessive force claims.

According to plaintiff Guest, police officers threw him face down on the ground, handcuffed him, and carried him outside of Zuccotti Park.  (P's 56.1 ¶¶ 290-97).  Guest stated that he "let [his] body go limp."  (Anakhu Decl. Ex. K, 30).  About a half hour later, officers carried Guest again, this time on to a transport bus, because Guest continued to refuse to move his body.  (P's 56.1 ¶¶ 302-07; Anakhu Decl. Ex. K, 36).  During that second round of carrying, the officers allegedly dragged Guest up the bus stairs causing him to hit his shin and knee on the steps, threw him into the driver partition head first, and dragged him down the row of seats with his head banging on the seats.  (P's 56.1 ¶¶ 308-10; Anakhu Decl. Ex. K, 36-37).  Then, shortly after placing Guest in one seat, officers asked him to move to a different seat in the back of the bus.  (P's 56.1 ¶ 312).  For a third time Guest refused, saying "something to the effect of '[n]o, you just threw me here, I'm not going to get up and go somewhere else.'"  (P's 56.1 ¶¶ 312-314).  Two officers then picked him up and carried him up the stairs to the back of the bus causing his head to hit each stair.  (P's 56.1 ¶¶ 314-16).  Guest also testified that his flex cuffs were tight and that, at some point on the bus, he asked for everyone's flex cuffs to be loosened.  (P's 56.1 ¶¶ 319-20).

Guest suffered only *de minimis* injuries as a result of the force used.  With regard to his tight flex cuffs, Guest experienced numbness in his hands while the cuffs were on, tingling in his fingers for several hours after the cuffs were taken off, and less severe tingling in his hand

for about a month.  (P's 56.1 ¶¶ 319, 337-38).  Otherwise, Guest claims to have suffered only a "sore and [] bruised" shin.  (P's 56.1 ¶ 326; Anakhu Decl. Ex. R, 128).  He could not recall if his knee hurt as a result of the incident on the bus and stated his head felt "okay" when he was at the Midtown South Precinct.  (P's 56.1 ¶¶ 327, 325; Anakhu Decl. Ex. R, 128).  Guest did not ask for medical assistance while in custody, has not sought medical treatment for any injuries related to that incident thereafter, and has no limitation as a result of any physical injury suffered on March 17, 2012.  (P's 56.1 ¶¶ 330, 335-36, 339).

While Guest does not identify any of the named defendants as being responsible for those actions, Officer Grantley Bovell separately testified that he was involved in escorting Guest through the transport bus, although he denied using the force alleged.  (P's 56.1 ¶¶ 1331-33).  Because there is some evidence of Bovell's "personal involvement," the Court must proceed to deciding whether it can resolve Guest's excessive force claim on the record presented.

Given Guest's testimony that officers dragged him up the bus stairs, threw him into the driver partition head first, dragged him down the row of seats with his head banging on the seats, and dragged up him up another set of stairs causing his head to hit each stair, (P's 56.1 ¶¶ 308-10, 314-16; Anakhu Decl. Ex. K, 36-37), a reasonable juror could conclude that the force used was unreasonable even though Guest suffered minimal injuries and admitted to going "limp" when approached by the police, (Anakhu Decl. Ex. K, 30, 36-37).  Whether Officer Bovell is responsible for using unreasonable force against Austin Guest is a question for a jury to decide.

In sum, Caravalho's, Carter's, Castillo's, Greenspan's, Sharkey's, Smith's, Waller's, and the balance of Hintze's excessive force claims are dismissed because each plaintiff failed to establish the "personal involvement "of any named defendant.  Hintze's remaining

handcuff claim is also dismissed, but on grounds that the force used was reasonable as a matter of law.  Guest's excessive force claim against Officer Bovell, however, survives to trial.

C.  Excessive Detention.

Defendants move for summary judgment on plaintiffs' excessive detention claims on the basis that, under the facts presented, there was no constitutional deprivation as a matter of law.  The Fourth Amendment also "governs the procedures applied during some period following an arrest."  Bryant v. City of New York, 404 F.3d 128, 136 (2d Cir. 2005).  Its reasonableness test is, again, one of "objective reasonableness," meaning that the subjective motivations of individual officers have no bearing on whether a seizure was reasonable under the Fourth Amendment.  Id.  "In the context of pretrial detention, the Supreme Court has held that, when there has been a warrantless arrest, the Fourth Amendment requires a prompt judicial determination of probable cause as a prerequisite to an extended pretrial detention."  Id.; see Gerstein v. Pugh, 420 U.S. 103, 113-14 (1975).  The Supreme Court subsequently clarified what it meant by "prompt" judicial determination of probable cause and held that "a jurisdiction that provides judicial determinations of probable cause within 48 hours of arrest will, as a general matter, comply with the promptness requirement."  Cty. of Riverside v. McLaughlin, 500 U.S. 44, 56 (1991).  In sum, "[w]hat is constitutionally required is that, except in extraordinary circumstances, the arrestee be given a hearing into probable cause for the arrest within 48 hours."  Bryant, 404 F.3d at 138; see also McLaughlin, 500 U.S. at 56 ("Examples of unreasonable delay are delays for the purpose of gathering additional evidence to justify the arrest, a delay motivated by ill will against the arrested individual, or delay for delay's sake.").

It is undisputed that each plaintiff was held in police custody for between 24 and 30 hours before being released without an arraignment.  (P's 56.1 ¶¶ 1498-99).  This length of

detention is presumptively reasonable.  See Bryant, 404 F.3d at 138.  Although an arrestee can

rebut that presumption "if the arrested individual can prove that his or her probable cause

determination was delayed unreasonably," plaintiffs adduce no evidence supporting such a

contention.  McLaughlin, 500 U.S. at 56.

Instead, plaintiffs make two untenable arguments.  First, plaintiffs argue that a

reasonable jury could decide that their detentions were unlawful based on the fact that defendants

denied them release with a summons or a Desk Appearance Ticket ("DAT").  Even assuming

that plaintiffs were "eligible" for release on a summons or DAT, plaintiffs fail to produce

evidence showing that defendants' decision denying them release on a summons or DAT was

unreasonable—i.e. the result of ill will.  See McLaughlin, 500 U.S. at 56.  The fact that plaintiffs

were not given summonses does not, itself, create a genuine issue of material fact regarding the

reasonableness of plaintiffs' detention.  If plaintiffs could sustain their excessive detention

claims simply by showing that defendants could have, but did not, release them with a summons,

than every summons-eligible arrest for which a summons was not given would amount to an

unreasonable detention.  There is no law supporting that assertion.

Second, plaintiffs argue that their detentions were unreasonably prolonged by

defendants' acts of "falsifying" police reports.  This argument is based on evidence of an error

during arrest processing whereby certain defendants were assigned to be arresting officers on

arrests they did not personally make.  (P's 56.1 ¶ 626).  That "mix-up" produced arrest reports

based on hearsay, (P's 56.1 ¶¶ 642-46, 833-41, 856-62), but the district attorney expressly

refused to charge plaintiffs based on those reports because the arresting officers assigned to each

plaintiff could not personally attest to his or her criminal conduct, (P's 56.1 ¶ 1498; Oliver Decl.

Ex. U).  Plaintiffs insinuate that this evidence shows defendants had "ill will" toward them, but

they fail to present facts that create an inference that defendants purposefully "falsified" the reports or otherwise had any malice towards plaintiffs.  Moreover, plaintiffs fail to present any evidence establishing a causal connection between those arrest reports and the length of plaintiffs' detentions.  These arrest reports do not raise a genuine issue of material fact regarding the reasonableness of plaintiffs' detention.

Because plaintiffs were detained for less than 48 hours and because plaintiffs fail to set forth any evidence showing that their releases were unreasonably delayed, defendants' motion for summary judgment is granted and plaintiffs' excessive detention claims are dismissed.

D.  Right to a Fair Trial.

In their memorandum in opposition to the motion, plaintiffs employ language indicative of a fair trial claim.  (Plaintiffs' Memorandum of Law in Opposition, 23-24).  Specifically, they assert that defendants fabricated evidence against them causing them to suffer a deprivation of liberty.  This allegation is based on evidence that plaintiffs' arrest reports were created by officers who did not have personal knowledge of the circumstances of their arrests.  (Id.; P's 56.1 ¶¶ 626, 642-46, 833-41, 856-62).  While the Court strains to read the First Amended Complaint as including a fair trial claim, it will "oblige[]" plaintiffs and infer the existence of such a claim.  Shamir v. City of New York, 804 F.3d 553, 556 (2d Cir. 2015).  Moreover, because defendants address the possible existence of a fair trial claim in their reply memorandum of law and move for summary judgment on those claims on the basis that plaintiffs fail to establish the necessary elements, the Court finds it appropriate to adjudicate the arguably unpled claim.  (Defendants' Reply Memorandum of Law in Support, 17-18).

"When a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial." Ricciuti v. N.Y.C. Transit Auth., 124 F.3d 123, 130 (2d Cir. 1997); see also Morse v. Fusto, 804 F.3d 538, 548 (2d Cir. 2015). A plaintiff need not have proceeded to a full trial on the merits in order to have an actionable section 1983 claim based on the denial of a fair trial. See Ricciuti, 124 F.3d at 127 (criminal charges dismissed pre-trial); Canario v. City of New York, 05 cv 9343 (LBS), 2006 WL 2015651, at *1 (S.D.N.Y. July 12, 2006) (plaintiffs original criminal charges were dismissed pre-trial). However, the Court is aware of no legal precedent establishing the existence of a fair trial claim where a plaintiff has never been charged with a violation or crime. Considering the rationale for a fair trial cause of action is that "false evidence works an unacceptable corruption of the truth-seeking function of the trial process," Ricciuti, 124 F.3d at 130 (quoting United States v. Agurs, 427 U.S. 97, 104 (1976)) (internal quotation marks omitted), the imposition of some form of criminal charges would seem to be a prerequisite for a fair trial claim. See Blair v. City of New York, 03 cv 1485(SLT) (CLP), 2009 WL 959547, at *11 (E.D.N.Y. Mar. 31, 2009) ("Falsified or fabricated evidence alone does not amount to a constitutional violation, however. The constitutional violation occurs when such evidence is admitted at trial and impairs the truth-seeking function of the court proceedings.").

Plaintiffs rely on Henry v. City of New York to support the proposition that they suffered a violation of their rights to a fair trial even though they were never charged with any crime or violation. 02 cv 4824 (JSM), 2003 WL 22077469, at *4 (S.D.N.Y. Sept. 8, 2003). In Henry, a court in this district held that "while there is no constitutional right to be free from having evidence fabricated against an individual, the offense rises to a constitutional violation if one is deprived of his liberty because of the fabrication." Id. Critically, the plaintiff in Henry

was actually tried and acquitted and thus the "deprivation of liberty" he suffered was not so obviously captured by another constitutional tort, which plaintiffs' "deprivation" is here.  If and to the extent plaintiffs assert that their arrests were made without probable cause because the post-arrest paperwork was not completed by the actual arresting officer those claims are subsumed in their failed false arrest claim.  If they contend that the completion of post-arrest paperwork by a person other than the actual arresting officer led to an excessive detention, those claims are subsumed in their failed excessive detention claims.

Because no plaintiff has been charged with any violation or crime, (P's 56.1 ¶ 1498; Oliver Decl. Ex. U), and because any allegedly unconstitutional conduct at issue is already subsumed in plaintiffs' other section 1983 claims, the Court grants defendants' motion for summary judgment and dismisses plaintiffs' fair trial claims.

E.  First Amendment.

Plaintiffs claim they suffered multiple violations of their First Amendment rights. First, they assert that defendants unlawfully arrested them in retaliation for exercising their right to free speech.  Second, they assert that the process through which defendants promulgated and enforced the Park Rules violated their First Amendment rights.  Defendants move for summary judgment on both claims.

1.  Retaliation.

"To plead a First Amendment retaliation claim a plaintiff must show: (1) he has a right protected by the First Amendment; (2) the defendant's actions were motivated or substantially caused by his exercise of that right; and (3) the defendant's actions caused him some injury."  Dorsett v. Cty. of Nassau, 732 F.3d 157, 160 (2d Cir. 2013).  The existence of probable cause, however, will defeat a First Amendment claim "premised on the allegation that

defendants prosecuted a plaintiff out of a retaliatory motive." Fabrikant v. French, 691 F.3d 193, 215 (2d Cir. 2012); see also Mozzochi v. Borden, 959 F.2d 1174, 1180 (2d Cir. 1992) ("An individual does not have a right under the First Amendment to be free from a criminal prosecution supported by probable cause, [even if it is] in reality an unsuccessful attempt to deter or silence criticism of the government."). As already explained, the undisputed evidence in this case shows that there was probable cause to arrest each plaintiff for a disorderly conduct violation pursuant to N.Y. Penal Law section 240.20(6). As a result, defendants' motion for summary judgment on the basis of that affirmative defense is granted and plaintiffs' First Amendment retaliation claims are dismissed.

2. Promulgation and Enforcement of Zuccotti Park Rules.

In parsing plaintiffs' claims regarding how the promulgation and enforcement of the rules governing Zuccotti Park violated plaintiffs' First Amendment rights, the Court understands plaintiffs to be making three separate arguments. First, Brookfield promulgated the Park Rules in violation of applicable zoning regulations. Second, the Park Rules themselves are unconstitutional time, place, and manner restrictions and defendants violated plaintiffs' First Amendment rights by enforcing those rule. And, third, even if the Rules are lawful, defendants' method of enforcing the Rules was itself unconstitutional.

Only two of those arguments support a First Amendment claim. The first argument addresses an issue not suitable for adjudication in this matter. Brookfield is not a party to this case. Whether Brookfield violated the applicable zoning regulations when promulgating the Rules for Zuccotti Park has no bearing on whether defendants violated plaintiffs' rights under the Constitution. Plaintiffs offer no theory explaining, and cite no law supporting, such a proposition.

The second and third arguments do state possible First Amendment claims. Namely, that defendants' dispersal orders were premised on enforcing rules that unlawfully restricted plaintiffs' speech and that defendants' act of temporarily clearing the Park of people itself unlawfully restricted plaintiffs' speech. Defendants move for summary judgment on both claims, arguing that the undisputed evidence establishes that the Park Rules are lawful and that the defendants acted lawfully by clearing people from the Park. Assuming *arguendo* that the First Amendment applies, the Court concludes that neither the Rules defendants were enforcing nor defendants' enforcement action violated the First Amendment.

As an initial matter, whether the First Amendment applies in Zuccotti Park remains an open question. Other courts in this Circuit have assumed, but have not held, that it does apply. See Bogart v. City of New York, 13 cv 1017 (NRB), 2015 WL 5036963, at *9 n.8 (S.D.N.Y. Aug. 26, 2015). While this Court is inclined to conclude that First Amendment protections apply in Zuccotti Park because of the hybrid nature of the property, it is unnecessary to definitively decide the issue. Because the Park Rules are lawful even if the First Amendment applied at full strength, the Court need only assume that the full spectrum of First Amendment protections apply in order to resolve defendants' pending motion.

"[T]he government may regulate the time, place, and manner of the expressive activity, so long as such restrictions are content neutral, are narrowly tailored to serve a significant governmental interest, and leave open ample alternatives for communication." Paulsen v. Gotbaum, 982 F.2d 825, 828 (2d Cir. 1992) (quoting Burson v. Freeman, 504 U.S. 191, 197 (1992)). Any regulation of expressive activity "is content neutral when it is justified without reference to the content of the regulated speech." Marcavage, 689 F.3d at 104. A facially neutral regulation "does not become content based simply because it may

disproportionately affect speech on certain topics." McCullen v. Coakley, 134 S. Ct. 2518, 2531 (2014).  And, a time, place, and manner regulation is narrowly tailored if it does not "burden substantially more speech than is necessary to further the government's legitimate interests." McCullen, 134 S. Ct. at 2535 (quoting Ward v. Rock Against Racism, 491 U.S. 781, 799 (1989)).

The Park Rules prohibit camping and/or erecting tents or other structures; lying down on the ground or on benches, sitting areas, or walkways in ways that unreasonably interfere with their use; placing tarps, sleeping bags, or other coverings on the property; storing or placing personal property on the ground, benches, sitting areas, or walkways in ways that unreasonably interfere with their use; using bicycles, skateboards, or roller blades; removing objects from trash bins; and, any other activity prohibited by law or statute.  (Anakhu Decl. Ex. HH).

Plaintiffs deny that the rules for Zuccotti Park included the prohibition on camping, the erection of tents and other structures, laying down on the ground and laying down on benches, sitting areas or walkways.  (P's 56.1 ¶ 23).  They also adduced testimony showing that there may have been other Park Rules, i.e. rules against food trays or drumming, (P's 56.1 ¶¶ 1267-82, 1302-10), or that the rules may have changed over time, (P's 56.1 ¶ 1293).[8]  Plaintiffs' evidence, however, does not create a genuine issue of material fact regarding the constitutionality of the Park Rules.

First, plaintiffs make only a conclusory assertion that the Park Rules did not include the prohibition on tents, camping, etc.  (P's 56.1 ¶ 23).  They produce no evidence

---

[8] Plaintiffs denial that the Park Rules included prohibitions on tents, tarps, camping, and laying down is peculiar given that their basis for inferring that other rules did exist, i.e. the rules against drumming and food trays, was a "rules of engagement" document that affirmatively included a prohibition on tents, tarps, sleeping and laying down. (Oliver Decl. Ex. PP).

substantively challenging the existence or content of the Park Rules as presented by defendants. (Anakhu Decl. Ex. HH).  At the summary judgment stage, simply denying that the Park Rules prohibited certain conduct is not enough.  Second, there is no evidence that defendants' dispersal orders were issued in order to enforce any rules other than the Park Rules.  (Anakhu Decl. Ex. HH).  For example, Esposito and Winski specifically cited protestors putting up tents and tarps, climbing on fences, and destroying plants and shrubs as the rule violations that led to the dispersal order.  (P's 56.1 ¶¶ 51-52; Anakhu Decl. Ex. U, 82; Ex. V, 54-55).  Plaintiffs' assertion that there may have been other rules of conduct is of no moment because plaintiffs only have standing to challenge the constitutionality of regulations that motivated the dispersal orders.  See Sec'y of State of Md. v. Joseph H. Munson Co., 467 U.S. 947, 955 (1984) (recognizing that plaintiff challenging statute on First Amendment grounds must have suffered sufficient injury as a result of the statute).

The Park Rules that motivated defendants' March 17, 2012 dispersal orders are constitutional.  (P's 56.1 ¶¶ 51-52; Anakhu Decl. Ex. U, 82; Ex. V, 54-55).  First, they are self-evidently content neutral.  They in no way proscribe conduct on the basis of its intended message.  Second, they are narrowly tailored to serve a significant "government" interest.  Those rules work to "alleviat[e] congestion and improv[e] circulation, promot[e] the aesthetics of the park[], and ensur[e] that the park[] [is] available to the public for a wide range of activities," which are "indisputably significant" interests.  Lederman v. New York City Dep't of Parks & Recreation, 731 F.3d 199, 202 (2d Cir. 2013); see Clark v. Community for Creative Non-Violence, 468 U.S. 288, 297 (1984) (upholding a regulation banning camping in certain public parks on the basis that "the Government has a legitimate interest in ensuring that the National Parks are adequately protected").  And, they do not impose substantial burdens on speech.  The

only speech that is conceivably burdened is expressive conduct that takes the form of laying on the ground, pitching tents, and other not obviously expressive activities.  Third, the regulations leave open ample alternatives for expressive conduct within the Park.  For example, Park goers were free to give speeches, dance, hold signs, or pass out leaflets.  Because the regulations that motivated defendants' dispersal orders were lawful, plaintiffs' claim that defendants violated their First Amendment rights simply by relying on the Park Rules fails as a matter of law.

Plaintiffs' second claim—that defendants' decision to clear the Park was itself an unlawful restriction on speech—fails as well.  Within this claim, plaintiffs make three separate but related arguments.  First, plaintiffs assert that defendants gave the dispersal orders because defendants wanted to censor Occupy Wall Street's contrarian political message.  In other words, plaintiffs claim that defendants' dispersal order amounted to viewpoint discrimination.  See Amidon v. Student Ass'n of State Univ. of New York at Albany, 508 F.3d 94, 105-06 (2d Cir. 2007) (holding that a state university student association's use of advisory referenda amounted to viewpoint discrimination).  Plaintiffs fail to sustain a First Amendment claim for viewpoint discrimination because they produce no evidence that defendants' dispersal orders were based on any animus towards, or even consideration of, OWS's political message.  Instead, the record establishes that defendants acted with the intention of only temporarily closing the Park in order to stop protestors from violating Park Rules and to allow Brookfield to clean up the Park. (Anakhu Decl. Ex. U, 81-82).  Nothing about defendants' dispersal orders forbade plaintiffs and other Occupy Wall Street protestors from returning to Zuccotti Park on March 18, 2012 to resume their protest.

Second, plaintiffs argue that police are only permitted to interfere with a protest if confronted with imminent "clear and present danger."  See Brandenburg v. Ohio, 395 U.S. 444,

447 (1969).  On that basis, plaintiffs contend that defendants violated the First Amendment

because they interfered with the Occupy Wall Street protest only to enforce the Park Rules.

Plaintiffs rely on the Second Circuit's decision in Jones v. Parmley, 465 F.3d 46, 60 (2d Cir.

2006) (Sotomayor, J.), to support their claim.

        In Parmley, the defendants could not have had probable cause to believe that

certain of the arrestees had engaged in disorderly conduct because "an important predicate of

their defense" was lacking—"an order to disperse:"

> [W]hile defendants repeatedly invoke the need to disperse the
> crowd as their *coup de grâce*—even claiming that "dispersal [is]
> the essence of plaintiffs' First Amendment claims"—they
> completely ignore an important predicate of their defense: the
> order to disperse. Here, defendants concede that they issued no
> dispersal order and instead stood in a "skirmish line," waited
> thirty-five seconds, and then charged into the crowd, arresting
> protesters indiscriminately. They further concede that most
> demonstrators (including many, if not all, of the plaintiffs) had not
> ventured out onto the Interstate and that they could not identify any
> of the demonstrators who had. As we noted earlier, plaintiffs had
> an undeniable right to continue their peaceable protest activities,
> even when some in the demonstration might have transgressed the
> law. . . Plaintiffs still enjoyed First Amendment protection, and
> absent imminent harm, the troopers could not simply disperse them
> without giving fair warning.

Parmley, 465 F.3d at 60 (footnote and citation omitted).  Perhaps of equal importance is the fact

that there would not have been a lawful reason to issue a dispersal order under the facts of

Parmley.  Whereas here, the police, in fact, issued dispersal orders temporarily clearing

protestors from the Park in order to enforce constitutional time, place, and manner regulations—

the Park Rules—and to assist Brookfield in cleaning Zuccotti Park.  As a result, to the extent

defendants' dispersal orders required protestors who did not violate the Park Rules to discontinue

their speech, defendants' actions were lawful.  See Parmley, 465 F.3d at 60.

Plaintiffs' third argument is that clearing Zuccotti Park was not itself a "narrowly tailored" means of enforcing the Park Rules. In other words, the police burdened too much speech by forcing every protestor out of Zuccotti Park in order to remedy the rule violations taking place inside the Park. To the extent this is a distinct First Amendment claim, the law affords defendants some latitude in selecting the appropriate means of enforcing the content neutral Park Rules. Ward, 491 U.S. at 800 ("So long as the means chosen are not substantially broader than necessary to achieve the government's interest, [] the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative.").

Defendants present evidence that a number of Rule violations were going on in Zuccotti Park amidst a crowd of hundreds of protestors. (P's 56.1 ¶¶ 37-38, 51-53, 206, 212, 263; Anakhu Decl. Ex. U, 82; Ex. V, 54-55). Plaintiffs set forth no evidence materially disputing the size of the protest or the existence of several Rules violations. Giving a dispersal order only to the specific protestors who were responsible for violating the Park Rules while allowing the remaining crowds to occupy other parts of the Park would have required interviewing untold numbers of persons and, perhaps, conducting forensic examinations, for example, to determine the rightful owners of the offending tents and tarps. There is no evidence in this record that those who were dispersed from the Park could not have continued their political speech on March 17 in other nearby and convenient places, or returned to Zuccotti Park the next day. The Court concludes that defendants' decision to temporarily clear the Park was reasonable and not "substantially broader than necessary" to serve the interests of protecting the Park.

In sum, all plaintiffs' First Amendment claims fail as a matter of law and defendants' motion for summary judgment is granted.

F.   Equal Protection.

Plaintiffs make two cognizable Equal Protection claims.  First, defendants selectively enforced the Park Rules against plaintiffs because defendants disagreed with Occupy Wall Street's message.  And, second, defendants failed to release plaintiffs on a summons or DAT because of animus towards Occupy Wall Street.  Defendants move for summary judgment on both claims on the basis that, on the record presented, plaintiffs fail to establish that they were selectively treated.

"There are several ways for a plaintiff to plead intentional discrimination that violates the Equal Protection Clause."  Brown v. City of Oneonta, New York, 221 F.3d 329, 337 (2d Cir. 2000).  A plaintiff could: (1) "point to a law or policy that expressly classifies persons on [an improper basis];" (2) "identify a facially neutral law or policy that has been applied in an intentionally discriminatory manner;" or, (3) "allege that a facially neutral statute or policy has an adverse effect and that it was motivated by discriminatory animus."  Id.  It appears from plaintiffs' submissions that they are proceeding with an Equal Protection claim based on a selective enforcement theory.

> "[A] violation of equal protection for selective enforcement would arise if: (1) the person, compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person."

LaTrieste Rest. & Cabaret Inc. v. Vill. of Port Chester, 40 F.3d 587, 590 (2d Cir. 1994)(quoting LeClair v. Saunders, 627 F.2d 606, 609-10 (2d Cir. 1980)).  The Second Circuit has interpreted "similarly situated" to mean "a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases, rather than a showing that both cases are identical."  Graham v. Long Island R.R., 230 F.3d 34, 40 (2d Cir. 2000).

Defendants are entitled to summary judgment on both of plaintiffs' Equal Protection claims because there is no evidence in the record to support a conclusion that plaintiffs, "as compared with others similarly situated, [were] selectively treated." LaTrieste, 40 F.3d at 590. Regarding the selective enforcement of the Park Rules, plaintiffs present testimony that, on some occasions, Brookfield put up barricades around certain segments of the Park in order to perform maintenance without closing the whole Park. (P's 56.1 ¶¶ 1296-97). The fact that Brookfield may have segmented the Park for cleaning under normal conditions, without similarly large crowds, but that defendants cleared the Park on March 17, 2012, does not, without more, create a genuine dispute of material fact regarding whether plaintiffs were selectively treated. Plaintiffs fail to show that the police have acted differently towards similarly situated individuals.

Likewise, plaintiffs fail to produce any evidence showing that defendants' decision not to release plaintiffs with a summons or DAT was unlawful discrimination. Plaintiffs adduce testimony showing that different individuals have the discretion to choose to release arrestees with a summons or DAT depending on the circumstances. Specifically, that desk sergeants determine who will receive a summons or DAT in normal arrest situations, (P's 56.1 ¶ 1042), whereas police supervisors or representatives from the Legal Bureau make the same decision in large scale or "mass" arrest situations, (P's 56.1 ¶¶ 1008-09, 1169). And, they adduce evidence showing that the NYPD Commissioner may have "made policy decisions regarding whether summonses could be issued in connection with Occupy Wall Street arrests" and that there were written criteria regarding what qualifies a person for release with a summons or DAT. (P's 56.1 ¶¶ 1005-06, 1170).

The fact that defendants treated individuals arrested on his or her own differently than individuals arrested in large groups is not evidence of selective treatment because such individuals are not similarly situated.  See Graham v. Long Island R.R., 230 F.3d at 40.  And, the fact that defendants may have articulated specific orders regarding how to police the OWS protest is not evidence that the defendants policed other large events, whether concerts, sporting events, or other types of religious or political gatherings, differently on the basis of protected characteristics.  Critically, plaintiffs present no facts showing that the policy denying OWS arrestees release with summonses treated OWS protestors any differently than other individuals seized during arrests of a large number of people at a single time and place.

Because plaintiffs have failed to produce any fact showing that they were selectively treated, defendants' motion for summary judgment is granted.

G.  Due Process.

Plaintiffs also raise two claims they classify as due process violations.  First, they assert that the Park Rules did not provide adequate notice of the proscribed conduct.  And second, they argue that defendants' decision not to release them with a summons or DAT violated their right to due process of law.  Defendants move for summary judgment on both theories on the basis that each fails to state a cognizable due process violation.

"Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment."  Mathews v. Eldridge, 424 U.S. 319, 332 (1976).  Consequently, "[t]o award damages under 42 U.S.C. § 1983 for an alleged violation of procedural due process, a court must find that, as the result of conduct performed under color of

state law, the plaintiff was deprived of life, liberty, or property without due process of law."
Bedoya v. Coughlin, 91 F.3d 349, 351 (2d Cir. 1996).

Plaintiffs argue that the Park Rules did not provide adequate notice of the regulated conduct and that, as a result, defendants violated plaintiffs' due process rights by enforcing them through dispersal orders.  In doing so, plaintiffs rely on the Supreme Court's decision in Kolender v. Lawson, which held that "the void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement."  461 U.S. 352, 357 (1983).  That case is inapposite.  First, it is not clear that the Due Process clause is applicable here because the Park Rules were promulgated by Brookfield, a private entity, and they created no criminal liability and deprived no one of a protected property interest.  Second, even assuming that the Due Process clause applies, the Park Rules submitted by defendants are clear, direct, and easily understood.  (Anakhu Decl. Ex. HH).  No reasonable jury could conclude that the Park Rules were vague or otherwise confusing.  In addition, at least two defendants, Captain Papamichael and Esposito, recalled that certain rules of conduct were posted in Zuccotti Park, although neither defendant testified to the content of those posted rules.  (P's 56.1 ¶¶ 999, 1156).

Plaintiffs also have failed to establish that they were deprived of any liberty interest protected by the Due Process Clause of the Fourteenth Amendment as a consequence of the Park Rules.  The Park Rules were not enforced by any defendant against any plaintiff.  Nor was any plaintiff accused of owning or possessing a prohibited tent or tarp.  The violations of the Park Rules were the reason why certain defendants authorized the issuance of dispersal orders.  The reasons for plaintiffs' arrests were the failure to comply with lawful dispersal orders.

Moreover, to the extent plaintiffs claim that they were deprived of a liberty interest protected by the First Amendment, the Court has already held that the Park Rules were lawful time, place, and manner restrictions.

Plaintiffs' second theory, that defendants violated their due process rights when defendants did not release them immediately with a summons or DAT, also fails. Even assuming *arguendo* that plaintiffs' suffered a deprivation of liberty because of that decision, plaintiffs cite no rule of law holding that "due process of law" requires the police to release certain arrestees with a summons or DAT simply because they are "eligible." In addition, to the extent this claim is simply a reformulation of plaintiffs' excessive detention or false arrest claims, the Court has already held that plaintiffs failed to establish those constitutional deprivations as a matter of law.

In sum, plaintiffs' have failed to establish any cognizable due process claim and, accordingly, defendants' motion for summary judgment is granted.

H.  <u>Monell</u> Claims.

Finally, defendants move for summary judgment on plaintiffs' claim that the City of New York is liable for the deprivations of their constitutional rights. A municipality may not be held liable on section 1983 claims solely "by application of the doctrine of *respondeat superior*." <u>Pembaur v. City of Cincinnati</u>, 475 U.S. 469, 478 (1986). Instead, in order to establish municipal liability, a plaintiff must show that: (1) "a particular municipal action *itself* violates federal law, or directs an employee to do so," <u>Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown</u>, 520 U.S. 397, 404 (1997) (emphasis in original), (2) an "authorized decisionmaker has intentionally deprived a plaintiff of a federally protected right," <u>Id.</u> at 405, (3) unconstitutional "practices [are] so persistent and widespread as to practically have the force of law," <u>Connick v.</u>

Thompson, 563 U.S. 51, 61 (2011), or (4) a municipality's failure to train its employees about their legal duty to avoid violating a citizen's rights amounts to "deliberate indifference," id.  In any case, "a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights."  Bryan Cty., 520 U.S. at 404.

The Court has dismissed all plaintiffs' section 1983 claims except for Austin Guest's excessive force claim.  Because there can be no municipal liability where there are no underlying constitutional deprivations, City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986), that fact would normally be dispositive of every other plaintiffs' Monell claims, see, e.g., Cancel v. NYPD Commissioner Raymond Kelly, 13 cv 6007 (JMF), 2016 WL 590230, at *7 (S.D.N.Y Feb. 11, 2016) (dismissing Monell claims where no underlying constitutional violations existed).  However, the Court did not conclude that every plaintiff's excessive force claims failed to state a constitutional deprivation as a matter of law.  The Court instead held that many of those claims should be dismissed because plaintiffs' failed to establish the "personal involvement" of any named defendant.[9]  For that reason, any one of those plaintiffs could still have a viable Monell claim if he or she can show that a municipal action proximately caused an unreasonable use of force against him or her, regardless of whether a named defendant was "personally involved."  Nevertheless, the Court does not need to determine whether any of those plaintiffs actually suffered an unreasonable use of force because plaintiffs have failed to adduce evidence supporting any plausible theory of municipal liability.  Guest's Monell claim based on his surviving excessive force claim fails for the same reason.

---

[9] The Court did hold that part of Hintze's claims were not Fourth Amendment violations as a matter of law.

Plaintiffs identify three possible bases for municipal liability.  First, "[d]efendants had a policy and practice of unreasonably restricting First Amendment activities perceived to be associated with OWS in Zuccotti Park."  (Plaintiffs' Memorandum in Opposition, 56).  Second, "to the extent [d]efendants Esposito and/or Winski were final policymakers with respect to the decision to clear Zuccotti Park based on purported rules violations, the City faces liability based on their statuses as such."  (Id. at 57).  And, third, "to the extent that a jury might find that a failure to train resulted in any [p]laintiff's injuries, the City may be called to account for, and face liability, based on that failure to train."  (Id.)

Only plaintiffs' third theory could bear some causal link to an excessive force claim.  However, there is no support in the record for a "failure to train" <u>Monell</u> claim.  For example, there is no evidence of the City's deliberate indifference toward its officers' treatment of OWS protestors or of a pattern or practice of untrained officers using excessive force against them.  <u>See</u> <u>Cash v. Cty. of Erie</u>, 654 F.3d 324, 334 (2d Cir. 2011); <u>Walker v. City of New York</u>, 974 F.2d 293, 297-98 (2d Cir. 1992).  In fact, the only possibly relevant evidence plaintiffs do adduce are statements from Esposito that there have been "some issues from time to time" with the processing of large scale arrests and with "detaining of prisoners for extended periods of time." (P's 56.1 ¶¶ 1139, 1141; Oliver Decl. Ex. LL, 81-82).  Even still, plaintiffs fail to establish how any of those "issues" proximately caused any defendant's use of force against any plaintiff. Regarding Guest's claims specifically, there is no evidence establishing any causal relationship between a City policy or custom and the force allegedly used by Bovell against Guest and no evidence showing a pattern or practice of similar uses of force.

Consequently, each plaintiff's <u>Monell</u> claims, including Austin Guest's, fail as a matter of law. Defendants' motion for summary judgment is granted on each plaintiff's <u>Monell</u> claims.

III.     State Constitutional and Common Law Claims.

A district court's exercise of supplemental jurisdiction is governed by 28 U.S.C. section 1367(a), which provides in pertinent part, that "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." Subsection (c) provides that a district court "may" decline to exercise supplemental jurisdiction over a claim if the court has dismissed all claims over which it had original jurisdiction. 28 U.S.C. § 1367(c)(3).

The Second Circuit has held that:

> in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims.

<u>Valencia ex rel. Franco v. Lee</u>, 316 F.3d 299, 305 (2d Cir. 2003) (quoting <u>Carnegie–Mellon University v. Cohill</u>, 484 U.S. 343, 349-50 (1988)). Here, the Court has dismissed all federal claims except for Austin Guest's excessive force claim. Because each of the other eight plaintiffs, aside from Guest, have only New York State constitution and New York common law claims remaining, judicial economy, fairness, convenience and comity will be served best by declining to exercise supplemental jurisdiction over each of those plaintiffs' remaining state law claims and, accordingly, all those claims are dismissed.

- 45 -

A.  Austin Guest's Common Law and New York Constitutional Claims.

Regarding Guest's remaining claims, the Court will exercise supplemental jurisdiction over those claims that "form part of the same case or controversy" as his excessive force claim against Officer Bovell.  28 U.S.C. § 1367(a).  Claims form part of the same case or controversy when they "derive from a common nucleus of operative fact."  United Mine Workers v. Gibbs, 383 U.S. 715, 725 (1966).  "[I]n other words, they must be such that the plaintiff 'would ordinarily be expected to try them all in one judicial proceeding.'"  Montefiore Med. Ctr. v. Teamsters Local 272, 642 F.3d 321, 332 (2d Cir. 2011) (quoting Gibbs, 383 U.S. at 725).

1.  Assault and Battery.

The Court exercises supplemental jurisdiction over Guest's common law assault and battery claim against Officer Bovell because it arises from the same allegedly unreasonable use of force against Guest.  Because the essential elements of a section 1983 claim for excessive force and a claim for assault and battery under New York law are "substantially identical," Posr v. Doherty, 944 F.2d 91, 95 (2d Cir. 1991), the Court denies defendants' motion for summary judgment on Guest's common law assault and battery claim for the same reasons that the Court denied summary judgment on Guest's federal excessive force claim.  Id.  Both claims against Officer Bovell will proceed to trial.  In addition, the City will remain a defendant on Guest's surviving claim for assault and battery because, unlike under federal law, the City can be found liable on the doctrine of *respondeat superior* for the common law torts of its employees.  Jones v. State, 33 N.Y.2d 275, 280 (1973).

2.   Negligent Hiring, Screening, Retention, Supervision, and Training.

The Court also exercises supplemental jurisdiction over Guest's common law negligent hiring, screening, retention, supervision, and training claim against the City because liability on that claim could arise out of Officer Bovell's allegedly unreasonable use of force against Guest.  However, defendants are entitled to summary judgment dismissing this claim because it is duplicative of the City's pending *respondeat superior* liability on Bovell's common law assault and battery claim.

"[W]here an employee is acting within the scope of his or her employment, thereby rendering the employer liable for any damages caused by the employee's negligence under a theory of respondeat superior, no claim may proceed against the employer for negligent hiring or retention."  Karoon v. New York City Transit Auth., 241 A.D.2d 323, 324 (1st Dep't 1997).  "This is because if the employee was not negligent, there is no basis for imposing liability on the employer, and if the employee was negligent, the employer must pay the judgment regardless of the reasonableness of the hiring or retention or the adequacy of the training."  Id.  The evidence presented here shows that Officer Bovell was acting within the scope of his employment as a police officer when he used force against Guest.  If Bovell is liable for assault and battery than the City is automatically liable under *respondeat superior*.  Guest's negligent hiring, screening, retention, supervision, and training claim is therefore duplicative and is dismissed.

3.   IIED and NIED.

The Court exercises supplemental jurisdiction over Guest's intentional infliction of emotional distress and negligent infliction of emotional distress claims against Officer Bovell as they relate to his allegedly unreasonable use of force against Guest.  The elements of an IIED

claim under New York law are: "(1) extreme and outrageous conduct, (2) intent to cause severe emotional distress, (3) a causal connection between the conduct and the injury, and (4) severe emotional distress." Bender v. City of New York, 78 F.3d 787, 790 (2d Cir. 1996). A plaintiff may recover for the related tort of NIED under New York law in two different ways: "(1) the 'bystander' theory; or (2) the 'direct duty theory.'" Mortise v. United States, 102 F.3d 693, 696 (2d Cir. 1996). Only the "direct duty theory" is applicable to Guest. See Id. Under that theory, Guest "has a cause of action for negligent infliction of emotional distress if [he] suffer[ed] an emotional injury from [Bovell's] breach of a duty which unreasonably endangered [Guest's] own physical safety." Id.

Defendants move for summary judgment on these two claims on the basis that Bovell's conduct was not extreme or outrageous, that Guest has produced no medical evidence of severe emotional distress, and that Guest's claims are encompassed entirely within his state law claim for assault and battery. Defendants are entitled to summary judgment dismissing Guest's IIED and NIED claims against Bovell because they are duplicative of his assault and battery and excessive force claims.

The New York Court of Appeals stated in dictum in Fischer v. Maloney, 43 N.Y.2d 553, 557-58 (1978), that: "it may be questioned whether the doctrine of liability for intentional infliction of extreme emotional distress should be applicable where the conduct complained of falls well within the ambit of other traditional tort liability, [such as] malicious prosecution and abuse of process." The Second Circuit in Bender v. City of New York, 78 F.3d at 791, recognized, but did not definitively resolve the issue. It stated that it was "uncertain whether the state courts would entertain an emotional distress claim" where the elements substantially overlap with traditional torts already alleged in a case, such as battery and false

arrest.  Bender, 78 F.3d at 792.  Meanwhile, state courts and federal district courts in this Circuit

"have consistently held that the tort of intentional infliction of emotional distress may not be

used as a substitute for an available traditional tort theory."  Brewton v. City of New York, 550

F. Supp. 2d 355, 370 (E.D.N.Y. 2008); see e.g., Leonard v. Reinhardt, 20 A.D.3d 510, 510,

(2005); Bender, 78 F.3d at 791 (collecting New York state appellate court cases).  Courts in this

Circuit have held the same for claims of NIED.  See, e.g., Poulos v. City of New York, 14 cv

3023 (LTS) (HBP), 2015 WL 5707496, at *10 (S.D.N.Y. Sept. 29, 2015); Crews v. Cty. of

Nassau, 996 F. Supp. 2d 186, 214 (E.D.N.Y. 2014); Druschke v. Banana Republic, Inc., 359 F.

Supp. 2d 308, 315 (S.D.N.Y. 2005).

        Here, the Court only exercises supplemental jurisdiction over Guest's IIED and

NIED claims against Officer Bovell.  Thus, the only conduct at issue is Bovell's allegedly

unreasonable use of force.  There are no allegations that Bovell engaged in any other potentially

tortious conduct against Guest, for example verbal conduct, which is not subsumed by Guest's

assault and battery or excessive force claims.  The Court grants defendants' motion for summary

judgment on Guest's IIED and NIED claims against Bovell on the basis that the conduct at

issue—Bovell's allegedly unreasonable use of force—and any resulting emotional damage is

entirely subsumed by Guest's common law assault and battery claim and his federal excessive

force claim.  Guest's IIED and NIED claims against Bovell are dismissed as duplicative.

    4.   Common Law False Imprisonment and State Constitutional Claims.

        Guest also brings claims for common law false imprisonment and for false arrest,

due process violations, and equal protection violations under the New York Constitution.  Those

claims do not substantially overlap with Guest's surviving federal excessive force claim against

Officer Bovell.  As a result, judicial economy, fairness, convenience and comity will be served

best by declining to exercise supplemental jurisdiction over Guest's remaining state law claims and, accordingly, those four claims are dismissed.

CONCLUSION

> For the foregoing reasons, defendants' motion for summary judgment is GRANTED in part and DENIED in part.  All section 1983 claims against all defendants brought by Alexander Caravalho, Eric Carter, Sergio Castillo, Daniel Greenspan, Thomas Hintze, Joseph Sharkey, Easton Smith, and Jennifer Waller are dismissed with prejudice, and each of those eight plaintiffs' remaining state law claims are dismissed without prejudice.  All section 1983 claims against all defendants brought by Austin Guest are dismissed with prejudice, except for his excessive force claim against Officer Grantley Bovell.  Guest's common law intentional infliction of emotional distress and negligent infliction of emotional distress claims against Grantley Bovell are dismissed with prejudice, as is Guest's common law negligent, hiring, screening, retention, supervision, and training claim against the City of New York regarding employee Grantley Bovell.  Guest's common law assault and battery claim against Grantley Bovell, and the City of New York in *respondeat superior*, survives defendant's motion for summary judgment.  All Guest's other state law claims are dismissed without prejudice

> SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
       March 31, 2016